IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TAWANDA JONES, *et al.*
    *Plaintiffs,*

v.

                          Civil Action No. ELH-14-2627

NICHOLAS DAVID CHAPMAN, *et al.,*
    *Defendants.*

## MEMORANDUM OPINION

This case arises from allegations of police brutality in connection with the untimely death of Tyrone A. West, Sr. ("Mr. West" or the "Decedent") on July 18, 2013.[1] Tawanda Jones, as Personal Representative of the Estate of Tyrone A. West, Sr. ("West Estate"); Nashay West; Tyrone West, Jr.; and T.W., a minor child, by Mary Agers, as Guardian and next of friend of T.W., plaintiffs, filed suit against various Baltimore City law enforcement officers, alleging, *inter alia*, the use of excessive force against the Decedent following a traffic stop that was allegedly unlawful. *See* ECF 2 ("Complaint").

Tawanda Jones is the sister of the Decedent. ECF 2 ¶ 4, Complaint. Nashay West, Tyrone West, Jr., and T.W. are children of the Decedent. *Id.* ¶¶ 5-7. They sued Baltimore City

---

[1] The Decedent was 44 years old at the time of his death. Justin Fenton, "Tyrone West files show passenger's account of death in policy custody," THE BALTIMORE SUN (Jan. 23, 2014), http://articles.baltimoresun.com/2014-01-23/news/bs-md-ci-tyrone-west-witness-20140122_1_ tyrone-west-jorge-bernardez-ruiz-kitmore-road.

Police Officers Nicholas David Chapman; Jorge Omar Bernardez-Ruiz; Matthew Rea Cioffi;

Eric Maurice Hinton; Alex Ryan Hashagen; Danielle[2] Angela Lewis; Derrick Dewayne Beasley;

and Latreese Nicole Lee (collectively, "BPD Officer Defendants").[3]   In addition, plaintiffs sued

Anthony W. Batts, who was Commissioner of the BPD from September 2012 to July 2015.[4]

---

[2] The caption of the Complaint refers to Canielle Lewis.  ECF 2 at 2, Complaint.  I presume this spelling is a typographical error; elsewhere in the Complaint plaintiffs spell the first name as Danielle.

[3] Plaintiffs filed suit in the Circuit Court for Baltimore City on June 23, 2014.  ECF 2 at 1, Complaint.  Defendants Chapman, Bernardez-Ruiz, Cioffi, Hashagen, Hinton, Lewis, Beasley, and Lee removed the case to this Court on August 18, 2014, on the basis of federal question jurisdiction.  ECF 1 ¶ 4 ("Notice of Removal"); 28 U.S.C. § 1331.  They allege the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).  ECF 1 ¶ 5, Notice of Removal.

[4] Baltimore Mayor Stephanie Rawlings-Blake appointed Commissioner Batts, with the "advice and consent of the Baltimore City Council."  ECF 2 ¶ 10, Complaint.  Of relevance here, he was appointed in September 2012.  Justin Fenton, "Contract approved for new city Police Commissioner Batts," THE BALTIMORE SUN (Sept. 12, 2012), http://www.baltimoresun.com/news/maryland/crime/blog/bs-md-ci-batts-contract-approved-20120912-story.html.  But, he was not sworn into office until November 8, 2012.  Justin Fenton, "Batts formally sworn in as Baltimore police commissioner," THE BALTIMORE SUN (Nov. 8, 2012), http://articles.baltimoresun.com/2012-11-08/news/bs-md-ci-batts-sworn-in-20121108_1_anthony-w-batts-violent-crime-mayor-stephanie-rawlings-blake.

Mayor Rawlings-Blake fired Batts on July 8, 2015, in the aftermath of the riots that erupted in Baltimore following the death of Freddie Gray, and due to a wave of violence that has plagued the City.  *See* Associated Press, "Baltimore mayor fires police chief in wake of Gray case, spike in violence," WASH. POST (July 8, 2015), http://www.washingtonpost.com/local/baltimore-mayor-fires-police-commissioner-amid-spike-in-violence/2015/07/08/5a419cbc-25ae-11e5-b72c-2b7d516e1e0e_story.html; Yvonne Wenger, "Baltimore Mayor Rawlings-Blake fires Police Commissioner Anthony W. Batts," THE BALTIMORE SUN (Jul. 10, 2015), http://www.baltimoresun.com/news/maryland/baltimore-city/bs-md-ci-batts-fired-20150708-story.html#page=1.

Batts has been replaced by Interim Commissioner Kevin Davis. Notwithstanding Batts's recent termination, the action may proceed against Batts.  Fed. R. Civ. P. 25(d) states, in pertinent part: "An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party.  Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be

And, they have sued David Lewis, an officer with the Morgan State University ("MSU") Campus Police ("MSU Police"); and Lance Hatcher, Chief of the MSU Police.[5] Plaintiffs sued all defendants in their official and individual capacities, except for Chief Hatcher.  ECF 2 at 1-3, Complaint.[6]

Plaintiffs allege that at about 7:15 p.m. on July 18, 2013, the Decedent was "beaten to death" by eight BPD officers and one MSU Police officer "after immediately complying to a request . . . to pull over the vehicle . . . during an alleged traffic stop . . . ." ECF 2 ¶ 12, Complaint.   They also assert, *id.* ¶ 37: "As a result of the unconstitutional use of force by Defendants, Tyrone West received multiple severe injuries about his body, experienced severe pain and suffering, and mental anguish resulting in death."

According to plaintiffs, the traffic stop was illegal.  *Id.* ¶ 14.  They maintain that "the individual police officer defendants made an unreasonable seizure" of the Decedent, thereby violating his rights under the Fourth and Fourteenth Amendments to the United States Constitution, and "assaulted and battered [him], resulting in his death, and otherwise used excessive force and unwarranted force during the course of said seizure."   ECF 2 ¶ 3, Complaint.[7]

---

disregarded."

[5] There appears to be some discrepancy in the official name of the MSU police force.  In their Complaint, ECF 2, plaintiffs refer interchangeably to Morgan State University Campus Police, *id.* ¶ 9, and Morgan State University Police. *Id.* at 3-4.  In their Answer to the Complaint, defendants Hatcher and Lewis refer to "Morgan State University Campus Police."  ECF 23 ¶ 9.

[6] In the Complaint, plaintiffs omitted any reference to the capacity in which they have sued Chief Hatcher.  *See* ECF 2 at 3, Complaint.  Moreover, as to their many claims, plaintiffs do not make clear which claims are brought in an official capacity or in a personal capacity.

[7] As discussed, *infra*, the Medical Examiner concluded that Mr. West died because of a

Plaintiffs assert claims under 42 U.S.C. § 1983, for violations of the Fourth and Fourteenth Amendments to the federal Constitution and Articles 24 and 26 of the Maryland Declaration of Rights;[8] and tort claims under Maryland law.[9]   Specifically, the Complaint contains seven counts, with claims within claims:[10]  (1) a survival action by the West Estate for assault and battery against the BPD Officer Defendants and MSU Officer Lewis (Claim I -- Count I), *id.* at 14; (2) a survival action by the West Estate for false arrest against the BPD Officer Defendants and MSU Officer Lewis (Claim I -- Count II),  *id.* at 15; (3) a survival action by the West Estate for false imprisonment against BPD Officer Defendants and MSU Officer Lewis (Claim I -- Count III), *id.* at 16; (4) a survival action by the West Estate against the BPD Officer Defendants and MSU Officer Lewis for a violation of the Fourth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983 and Articles 26 and 24 of the Maryland Declaration of Rights (Claim I -- Count IV), *id.* at 17-18; (5) a survival action by the West Estate against Batts and Chief Hatcher, pursuant to 42 U.S.C. § 1983, captioned as one for negligent supervision, training, and retention; and, in the text, a § 1983 claim based on a custom or policy of deliberate indifference to the use of excessive force by the

---

heart condition, complicated by dehydration.

[8] In the Complaint, plaintiffs referred once to 42 U.S.C. § 1985.  ECF 2 ¶ 1, Complaint. In their opposition to Batts's motion to dismiss, plaintiffs clarified that they did not intend to lodge a claim under § 1985.  ECF 24-1 at 13.

[9] Plaintiffs claim that they have satisfied the notice provisions of the Maryland Tort Claims Act, Md. Code (2014 Repl. Vol.), § 12-106 of the State Government Article, as well as the Local Government Tort Claims Act, Md. Code (2014 Repl. Vol.), § 5-304 of the Courts and Judicial Proceedings Article ("C.J.").  ECF 2 ¶ 2, Complaint.

[10] The format of the Complaint is rather confusing.  Batts is named only in "Claim I – Count V," a "survival action for negligent supervision, training and retention"; "Claim I – Count VI," for funeral expenses; and "Claim II – Count I," for wrongful death.

BPD (Claim I -- Count V), *id.* at 19-20; (6) a claim by the West Estate against all defendants for funeral expenses (Claim I -- Count VI), *id.* at 21-22; and (7) a wrongful death claim under Maryland Code (2014 Repl. Vol.), § 3-904 of the Courts and Judicial Proceedings Article ("C.J."), by Nashay West, Tyrone West, Jr., and Mary Agers, as Guardian and next of friend of T.W., a minor, against BPD Officer Defendants; Batts; MSU Officer Lewis; and MSU Chief Hatcher (Claim II -- Count I). *Id.* at 22-23.[11] Collectively, plaintiffs seek a total of $45,000,000 in compensatory damages, $95,000,000 in punitive damages, and $10,000 in funeral expenses.

All of the BPD Officer Defendants have answered (ECF 21), as have MSU Officer Lewis and MSU Chief Hatcher.   ECF 23.   Batts has moved to dismiss (ECF 20), supported by a memorandum of law (ECF 20-1, "Batts Memo.") (collectively, "Motion to Dismiss" or "Motion").   Plaintiffs submitted an opposition (ECF 24), supported by a memorandum of law (ECF 24-1) (collectively, "Opposition"), to which Batts has replied (ECF 27, "Reply").   No hearing is necessary to resolve the Motion.   *See* Local Rule 105.6.   For the reasons that follow, I will grant Batts's Motion to Dismiss (ECF 20) in part and deny it in part, and I will grant plaintiffs leave to amend the Complaint.

## I.   Factual Background[12]

On July 18, 2013, in the 5200 block of Kelway Road in Baltimore City, Mr. West was driving a 1999 Mercedes Benz owned by Tawanda Jones.   ECF 2 ¶ 15, Complaint.   At about

---

[11] The children are the primary beneficiaries with respect to the wrongful death action. C.J. § 3-904(a)(1) states:   "[A]n action under this subtitle shall be for the benefit of the wife, husband, parent, and child of the deceased person."

[12] The Factual Background is drawn largely from the Complaint.   As discussed, *infra*, the Court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences in favor of the plaintiff.'"   *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).

7:15 p.m., an "unmarked BPD car, driven by [BPD Officers] Chapman and Bernandez-Ruiz . . . pulled behind West and activated emergency lights."[13]   *Id.*   Corinthia Servance, who is not a party to this case, was a passenger in the vehicle driven by Mr. West.   *Id.* ¶ 15.   According to plaintiffs, Mr. West "was driving in a prudent and safe manner, obeying all traffic laws, and had not broken any laws of the road when Defendants Bernardez-Ruiz and Chapman, without probable cause pulled [him] over."   *Id.* ¶ 16.   After Mr. West stopped the car, Chapman and Bernardez-Ruiz "exited their vehicle, aggressively approached Tyrone West's vehicle with Defendant Bernardez-Ruiz on the driver's side and Defendant Chapman on the passenger's side of the decedent's vehicle and shouted verbal abuses" to Mr. West. *Id.* ¶ 18.   They "commanded that both Tyrone West and his passenger exit the vehicle." *Id.* They also shouted "verbal abuses to Mr. West," such as "'fu**ing ni**er, get out of the fu**ing car!'"   *Id.*

Further, plaintiffs allege: "As Tyrone West began voluntarily exiting the vehicle, Defendant Bernardez-Ruiz forced Mr. West out of the vehicle and onto the ground by dragging Mr. West out of the vehicle by his hair before Mr. West had a chance to fully comply[ ]."   ECF 2 ¶ 19, Complaint.   Then, Chapman "ran to the driver's side of Mr. West's vehicle and struck Tyrone West with his department issued baton and sprayed Mr. West in the face with his department issued pepper spray/mace."[14]   *Id.*  ¶ 20.   Thereafter, "Chapman and Bernardez-Ruiz

---

[13] Plaintiffs state that the BPD car was "driven by Defendants Chapman and Bernardez-Ruiz . . . ."   ECF 2 ¶ 15, Complaint.   However, both officers could not have been driving.

[14] Pepper spray and mace are not the same. *See Mann v. Failey*, 578 F. App'x 267, 272 (4th Cir. 2014).   The active ingredient in pepper spray is oleoresin capsicum, an extract from pepper. *See* Donald L. Nevins, III, *Municipal Liability Under 42 U.S.C. § 1983 for Failing to Equip Police with Tasers*, 28 QUINNIPIAC L. REV. 225, 264 n.233 (2009).   Mace, on the other hand, is tear gas and contains 2-chlorobenzalmalononitrile.   *Id.*   It is not clear from the Complaint whether Mr. West was sprayed with mace or pepper spray; plaintiff appears to use the terms interchangeably.   At this juncture, the discrepancy is immaterial.

both tazed [sic] Tyrone West on his neck and on the side of his abdomen while continuing to spray Mr. West in his face with their department issued mace/pepper spray." *Id.* ¶ 21. According to plaintiffs, Officers Chapman and Bernardez-Ruiz "continued their assault against Tyrone West through beatings with their batons and fists and kicking administered to his body and head." *Id.* ¶ 22.   In response, "West succumbed to the show of illegal and excessive police force." *Id.* ¶ 24.   He "begged" Chapman and Bernardez-Ruiz "to stop the assault" and shouted "'help me, help me, somebody help me! Please stop beating me!'" *Id.* ¶ 23.   According to plaintiffs, Mr. West was "on the ground exclaiming, 'ahhh, you got me, stop beating me, why are you beating me, stop beating me? My face is burning!'" *Id.* ¶ 24.

After approximately fifteen minutes of this "unprovoked assault" on Mr. West, Officer Chapman "radioed a signal 13 (officer needs assistance)" because Chapman and Bernardez-Ruiz "had sprayed pepper spray so vigorously, and at a close range to Mr. West, that some had gotten on the said defendants." ECF 2 ¶ 25, Complaint.   In response, "multiple BPD squad cars arrived on the scene . . . ." *Id.* ¶ 26.   Plaintiffs claim the squad cars "carried the remaining Defendants." *Id.*[15]

An MSU Campus Police squad car arrived first, driven by MSU Officer David Lewis with BPD Officer Beasley as a passenger. *Id.* ¶ 27.[16]   The two officers "jumped" out of their automobile, and "immediately" started to "strik[e] West in the head with their batons." *Id.*

---

[15] Despite plaintiffs' assertion as to the appearance of "the remaining Defendants," Batts and Chief Hatcher apparently were not at the scene of the incident.  ECF 2 ¶ 26, Complaint.

[16] Batts notes that paragraphs 26 and 27 of the Complaint are inconsistent.  He explains: "Plaintiffs assert [in ECF 2 ¶ 26 that] BPD cars arrived carrying the remaining Defendants while [¶] 27 asserts at least two Defendants arrived in a Morgan State University police car." ECF 20-1 at 4 n.2, Batts Memo.  This discrepancy is not material here.

Then, BPD Officers Danielle Lewis, Lee, and Cioffi arrived in a BPD police car, with Lewis as the driver, Lee as the front seat passenger, and Cioffi as the rear seat passenger. *Id.* ¶ 28. As explained by plaintiffs, the officers "recklessly drove up to the scene, striking the MSU vehicle from behind[ ]." *Id.* According to plaintiffs, "Defendant Lews' [sic] recklessly crash[ed] into the rear of the Morgan State University Vehicle driven by Defendant MSU Officer Lewis." *Id.* at 11 n.2. BPD Officers Lewis, Lee, and Cioffi "exited their vehicle and ran to join the beating" of Mr. West. *Id.* ¶ 28. Subsequently, a "BPD marked patrol vehicle arrived" at the scene, transporting BPD Officers Hinton and Hashagen,[17] who "immediately jumped out of their vehicle and ran to join the beating of Tyrone West." *Id.* ¶ 29.

Plaintiffs claim that "[d]efendant officers used their batons to strike Mr. West with so much force to his head, torso, neck, back, arms, shoulders, thighs and legs so that both subcutaneous and intramuscular bruising were visible days after his death." *Id.* ¶ 30. Plaintiffs assert, *id.* ¶ 31:

> Ultimately, Tyrone West became unconscious from the beatings, and as his seemingly lifeless body lay on the ground, he was handcuffed behind his back, left on the concrete ground in a prone face-down position and after a few more kicks to his face while in this state, Defendant, MSU Officer Lewis sat on the back of Tyrone West intentionally restricting his breathing. Eventually West turned gray, stopped breathing and had no pulse.

According to plaintiffs, after the incident, "[a]ll Defendant Officers reported in their statements to [the] BPD homicide [unit] or the State's Attorney for Baltimore City" that they knew that Mr. West had been "sprayed with pepper spray." *Id.* ¶ 32. Plaintiffs also claim that "[f]ellow police officers washed the eyes" of Chapman and Bernardez-Ruiz with water to clear the pepper spray or mace. *Id.* ¶ 33. Yet, "no treatment was administered to West . . . ." *Id.*

---

[17] The Complaint does not identify the driver.

Indeed, plaintiffs allege that "no call was made for a paramedic prior to [Mr. West's] death."  *Id.*

Medic 13 arrived at the scene for "'an injured officer,'" *id.* ¶ 34, and Mr. West's "non-responsive body was taken from the scene" and transported to Good Samaritan Hospital.  *Id.*  At about 9:00 a.m. on July 19, 2013, thirteen hours after Mr. West was pronounced dead, his body was taken to the Office of the Chief Medical Examiner.  *Id.* ¶ 34.

On December 11, 2013, the Office of the Medical Examiner "concluded" that the manner of death "'could not be determined'" and that the cause of death was "'Cardiac Arrhythmia and Cardiac Conduction System Abnormality complicated by dehydration during police restraint.'"  *Id.* ¶ 35.  However, plaintiffs allege that, prior to the incident, Mr. West was "in good physical condition . . . ." *Id.* ¶ 36.  As noted, Mr. West was 44 years of age at the time of his death.  In particular, plaintiffs assert, *id.*:

> [West] had clear lungs, a normal heart size, normal sinus rhythm and no murmur, normal ECG, carotid and femoral pulses strong and symmetric, no effusions, no active boney disease, no acute disease, generally no distress, his nutrition was normal, he was not obese or malnourished; and, his hydration was normal.

Plaintiffs allege that Batts "exercise[d] final policy making authority for the BPD, [and] establishe[d] the duties, standards of conduct, and discipline of officers."  *Id.* ¶ 10.  According to plaintiffs, Batts also "establishe[d] policies regarding hiring, screening, training, monitoring, supervision and discipline of officers employed by the BPD."  *Id.*  Moreover, they aver that, at all relevant times, Batts acted under color of State law.  *Id.*

In general, plaintiffs allege that Batts "failed to properly train, supervise, fire, manage, and otherwise enforce policies regarding the use of force against unarmed non-custodial persons after pepper spray/mace had been deployed against said unarmed non-custodial persons."  ECF 2 ¶ 3, Complaint.  Further, plaintiffs aver that Batts "failed to train, supervise and discharge the

Defendant Police Officers for their roles in the well-publicized beatings and custody deaths at the hands of these and other police officers of the [BPD] . . . .” *Id.* ¶ 65.[18]  According to plaintiffs, “Commissioner Batts’ response to [the use of excessive force by the BPD] was so inadequate as to constitute deliberate indifference to or tacit authorization of the alleged offensive practices; and there is an affirmative causal link between Batts’ inaction and Tyrone West’s injuries and constitutional deprivations.” *Id.* ¶ 10.

According to plaintiffs, the BPD and the Commissioner “exert substantial control over the policies and practices that govern the actions of individual officers in the BPD, and their supervisors.” *Id.* ¶ 38.  In plaintiffs’ view, the BPD and Batts “have permitted police practices and customs within the BPD which have allowed some citizens to be subjected to police brutality and in some instances death.”  *Id.* ¶ 39.  Indeed, plaintiffs contend that “in recent years” there have been “numerous examples . . . of the BPD’s intimidating witnesses, use [of] excessive force, shooting and brutally beating citizens to near death or death . . . .” *Id.*  ¶ 40.

Plaintiffs add that the “police brutality” against citizens such as Mr. West was not an isolated incident. *Id.* ¶ 39.  They aver, *id.* ¶ 10:

> It has been widely reported in the community, by news media, about the activities and excessive force allegations against members of the BPD, including specific Defendant BPD Officers in this suit.  Some resulting in settlements and awards. The [C]ommissioner is either aware of or should have been aware of these matters, and therefore, has actual or constructive knowledge that some of his BPD officers were engaged in conduct posing a pervasive and unreasonable risk of actual harm and constitutional deprivation to citizens such as Tyrone West[.]

In support of these allegations, plaintiffs highlight three examples of alleged police brutality committed by BPD officers prior to the incident with Mr. West.

---

[18] Plaintiffs make the same or similar allegations as to MSU Chief Hatcher.  *See*, *e.g.*, ECF 2 ¶¶ 42, 65, Complaint.  However, I focus here on the allegations as to Batts.

First, plaintiffs refer to the "the brutal, video-taped and highly publicized beating of Mr. Abduljaami Salaam," which was allegedly perpetrated by defendants Chapman and Bernardez-Ruiz on July 1, 2013.   ECF 2 ¶ 40, Complaint.   Plaintiffs claim that although Mr. Salaam's beating was "reported to [BPD] internal affairs . . . no disciplinary actions were taken against Defendants Chapman and Bernardez-Ruiz." *Id.*; *see also id.* at 10 n.1.

Second, in a footnote in the Complaint, plaintiffs describe the "unprovoked" assault and battery of Markita Smith.   ECF 2 at 10 n.1, Complaint.   Plaintiffs do not provide information about when and where the events involving Ms. Smith occurred, but they seem to imply that it preceded the incident with Mr. West.   And, plaintiffs seem to suggest that the assault was perpetrated by defendants Chapman and Bernardez-Ruiz.   *Id.*   Plaintiffs contend that although Ms. Smith was "subjected . . . to constitutional depravations [sic]," neither officer was disciplined. *Id.*

Third, plaintiffs highlight the "killing of Anthony Anderson on September 21, 2012 by BPD Officers Michael J. Vodarick, Gregg B. Boyd and Todd A. Strohman . . . ." *Id.* ¶ 65. However, the Complaint does not state whether Officers Vodarick, Boyd, and Strohman were disciplined for their alleged involvement in the death of Mr. Anderson.   Nor are these officers involved in the events concerning Mr. West.[19]

Additional facts are included in the Discussion.

_____

[19] The death of Freddie Gray in April 2015, which occurred while Mr. Gray was in the custody of Baltimore City police, has been the subject of intense national media attention. Recently, a member of the Baltimore City Council asked the State's Attorney for Baltimore City to reopen investigations into three deaths that occurred in police custody, including those of Mr. West and Mr. Anderson.   Luke Broadwater, "Councilman asks Mosby to reopen investigations into three in-custody deaths," THE BALTIMORE SUN (July 21, 2015), http://www.baltimoresun.com/news/maryland/crime/blog/bs-md-ci-tyrone-west-20150721-story.html.

## II.    Standard of Review

Batts's Motion is predicated on Fed. R. Civ. P. 12(b)(6).  A defendant may test the legal

sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *McBurney v.*

*Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243

(4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the

facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon

which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading

requirements of Fed. R. Civ. P. 8(a)(2).  Rule 8(a)(2) provides that a complaint must contain a

"short and plain statement of the claim showing that the pleader is entitled to relief."  The

purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds"

for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56, 555 n.3 (2007).

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).

*Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a

complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v.*

*City of Shelby*, ⸻ U.S. ⸻, 135 S. Ct. 346, 346 (2014) (per curiam).  But, the rule demands

more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555; *see Painter's Mill*

*Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).

To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth

"enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the]

actual proof of those facts is improbable and . . . recovery is very remote and unlikely."

*Twombly*, 550 U.S. at 556 (internal quotations omitted).  In other words, the complaint must

- 12 -

contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009); *Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 320 (4th Cir. 2012); *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, —— U.S. ——, 132 S. Ct. 1960 (2012).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Houck v. Substitute Tr. Servs., Inc.*, No. 13-2326, 2015 WL 3973527, at *9 (4th Cir. July 1, 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, —— U.S. ——, 132 S. Ct. 402 (2011); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 559 U.S. 991 (2010). However, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Twombly*, 550 U.S. at 555. Moreover, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe*, 579 F.3d at 385-86.

A motion asserting failure to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards*, 178 F.3d at 243 (quotation marks omitted); *see Houck, supra*, 2015 WL 3973527, at *9; *Tobey v. James*,

706 F.3d 379, 387 (4th Cir. 2013). But, "if all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint,'" or in other material that is the proper subject of consideration under Rule 12(b)(6), such a defense can be resolved on the basis of the facts alleged in the complaint. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*); *see Houck*, 2015 WL 3973527, at *9.

Ordinarily, in resolving a motion under Rule 12(b)(6), a court "is not to consider matters outside the pleadings . . . ." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007); *see Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 557 (4th Cir. 2013). If a court considers material outside of the pleadings, "the motion must be treated as one for summary judgment under Rule 56," in which case "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Under certain limited exceptions, however, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, No. 14-1825, 2015 WL 3973598, at *6 (4th Cir. July 1, 2015).

For instance, without converting a motion under Rule 12(d), "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'"[20] *Id.*; *see* Fed. R. Evid. 201(b) (stating, that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be

---

[20] "Adjudicative facts are simply the facts of the particular case." Fed. R. Evid. 201 advisory comm. nn.

accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir.), *cert. denied,* —— U.S. ——, 132 S. Ct. 115 (2011); *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Accordingly, "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007); *cf. Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227 (4th Cir. 2013) (noting that the court may take judicial notice of information on a website, "so long as the web site's authenticity is not in dispute"). However, "these facts [must be] construed in the light most favorable" to the non-movant. *Clatterbuck*, 708 F.3d at 557.

In resolving the motion to dismiss, I have taken judicial notice of the fact that Batts was sworn into office on November 8, 2012. Justin Fenton, "Batts formally sworn in as Baltimore police commissioner," THE BALTIMORE SUN (Nov. 8, 2012), http://articles.baltimoresun.com/2012-11-08/news/bs-md-ci-batts-sworn-in-20121108_1_anthony-w-batts-violent-crime-mayor-stephanie-rawlings-blake.

### III.    Discussion[21]

As noted, the Complaint includes three counts against Batts. Claim I -- Count V is titled "Survival Action for Negligent Supervision, Training and Retention"; Claim I -- Count VI is titled "Funeral Expenses"; and Claim II -- Count I is titled "Wrongful Death." With respect to all three claims, it appears that Batts has been sued in his official and personal capacities. ECF 2 at 2, Complaint.

---

[21] In my analysis, I have not considered events involving the BPD that occurred after Mr. West's death, such as the death of Freddie Gray.

Batts advances two key arguments in support of his Motion to Dismiss. He contends that, under principles of sovereign immunity, plaintiffs' state law claims against Batts in his official capacity are subject to dismissal because the BPD is an arm of the State. ECF 20-1 at 9, Batts Memo. With respect to the federal constitutional claims, Batts argues that plaintiffs have failed to allege facts sufficient to establish supervisory liability, and have also failed to allege adequately that an unconstitutional policy caused a violation of the Decedent's rights under the Fourth and Fourteenth Amendments. *Id.* at 13-14.

### A. Plaintiffs' State Law Claims

Batts argues, *inter alia*, that in his official capacity he is entitled to common law or State sovereign immunity as to all State law claims. ECF 20-1 at 2, 9-10, Batts Memo. Plaintiffs do not refute that a claim against Batts in his official capacity is tantamount to a claim against the BPD itself. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). According to plaintiffs, however, the BPD is not an arm of the State of Maryland so as to warrant sovereign immunity. ECF 24-1 at 5, Opposition.

In *Graham*, 473 U.S. at 165, the Supreme Court said: "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law . . . ." In contrast, "[o]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id.* (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978)); *see also, e.g.*, *Huggins v. Prince George's Cnty.*, 683 F.3d 525, 532 (4th Cir. 2012) (treating a suit against individuals in their official capacities as a suit against the county). The *Graham* Court also said, 473 U.S. at 166: "As long as the government entity receives notice and an opportunity to respond, an official-

capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is *not* a suit against the official personally, for the real party in interest is the entity." (Emphasis in *Graham*). Accordingly, plaintiffs' suit against Batts in his official capacity is tantamount to an action against the BPD.  *See Graham*, 473 U.S. at 166; *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).

The BPD has long been considered an agency of the State of Maryland.  *See Mayor & City Council of Balt. v. Clark*, 404 Md. 13, 21, 944 A.2d 1122, 1128–30 (2008) (outlining the BPD's history as a State agency).   The Maryland Court of Appeals has stated: "[N]otwithstanding the Mayor's role in appointing and removing the City's Police Commissioner, the Baltimore City Police Department is a state agency."  *Id.* at 28, 944 A.2d at 1131; *see also* Public Local Laws of Maryland, Art. 4, § 16-2(2) (stating that "the Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland"); *Ashton v. Brown*, 339 Md. 70, 104 n.18, 660 A.2d 447, 464 n.18 (1995) (stating that "the Baltimore City Police Department, for purposes of Maryland law, is a state agency"); *Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 668, 541 A.2d 1303, 1306 (1988) ("Unlike other municipal or county police departments which are agencies of the municipality or county . . . the Baltimore City Police Department is a state agency.") (citations omitted).

Sovereign immunity is the common law doctrine that protects the State from suit without its consent. *Davis v. State*, 183 Md. 385, 393, 37 A.2d, 880, 885 (1944); *see also Katz v. Washington Suburban Sanitary Commission*, 284 Md. 503, 512-13, 397 A.2d 1027, 1032-33 (1979) (declining to abrogate sovereign immunity by judicial fiat); *Board of Howard Community*

*College v. Rugg*, 278 Md. 580, 584, 366 A.2d 360, 362-63 (1976) (same); *Jekofsky v. State Roads Commission*, 264 Md. 471, 474, 287 A.2d 40, 41-42 (1972) (same). Therefore, absent a legislative waiver of immunity, suit does not lie against the State or any of its agencies. *See Clea*, *supra*, 312 Md. at 670, 541 A.2d at 1307; *Dep't of Public Safety and Correctional Servs v. ARA Health Servs, Inc.*, 107 Md. App. 445, 456, 668 A.2d 960, 966 (1995), *aff'd*, 344 Md. 85, 685 A.2d 435 (1996).

State sovereign immunity bars an individual from maintaining a suit for money damages against the State of Maryland or one of its agencies, in the absence of an express legislative waiver of immunity. *State v. Sharefeldin*, 382 Md. 129, 140, 854 A.2d 1208, 1214 (2004); *Baltimore Police Dep't v. Cherkes*, 140 Md. App. 282, 306, 780 A.2d 410, 424 (2001) (citing *Catterton v. Coale*, 84 Md. App. 337, 345-46, 579 A.2d 781, 785 (1990)); *Ritchie v. Donnelly*, 324 Md. 344, 369 (1991); *see also Samuels v. Tschechtelin*, 135 Md. App. 483, 522, 763 A.2d 209, 230 (2000). In this regard, sovereign immunity shields the State and its agencies from actions seeking damages for State constitutional violations.

Although the BPD is a State agency, the Maryland General Assembly included the BPD as a local agency for the purpose of the Local Government Tort Claims Act ("LGTCA"), C.J. § 5-301 *et seq*. However, "by adding the [BPD] to the list of local governments in the [LGTCA] . . . the General Assembly waived [BPD's] common law State sovereign immunity *only* to the extent of the statutory duties to defend and indemnify. Otherwise, the [BPD's] State sovereign immunity remained intact." *Cherkes*, 140 Md. App. at 323, 780 A.2d at 434 (emphasis added).

Plaintiffs rely on *Chin v. City of Baltimore*, 241 F. Supp. 2d 546, 548 (D. Md. 2003), to support their position. ECF 24-1 at 5, Opposition. In reference to the BPD, *Chin* stated: "[T]he Police Department is too interconnected with the government of the City" to be considered a part of the State. *Chin*, 241 F. Supp. at 548. Plaintiffs also quote *Wilcher v. Curley*, 519 F. Supp. 1 (D. Md. 1980), for the proposition that the BPD Commissioner "'in his official capacity can be subjected to damage awards without offending the Eleventh Amendment.'" ECF 24-1 at 5, Opposition (quoting *Wilcher*, 519 F. Supp. 1 at 4). In my view, plaintiffs' reliance on *Chin* and *Wilcher* is misplaced.

The dispute in *Chin* arose from an encounter between plaintiff Michael Chin and BPD police officers. *Chin*, 241 F. Supp. 2d at 547. Several BPD police officers, led by Officer Wilhelm, entered a store owned by Chin, with their weapons drawn. *Id.* The officers searched the premises without a warrant and "displayed no indicia that they were affiliated with law enforcement." *Id.* They subsequently assaulted Chin and "then handcuffed him for an extended period of time." *Id.* The search did not produce any contraband and, as a result of the search, the store sustained significant property damage. *Id.* Thereafter, Chin filed suit against Officer Wilhelm, the BPD, and the City of Baltimore, pursuant to 42 U.S.C. § 1983, for federal civil rights violations and for State common law and constitutional torts. *Id.*

Judge Blake considered, *inter alia*, "whether the Baltimore Police Department is a state agency for Eleventh Amendment purposes" and therefore entitled to Eleventh Amendment immunity. *Id.* at 548. In connection with the plaintiffs' § 1983 claims, Judge Blake determined that the BPD is "too interconnected with the government of the City" so as to constitute a State agency. *Id.* Therefore, it is a "person" subject to suit under § 1983. *Id.*

In an attempt to draw a parallel between *Chin* and this case, plaintiffs take the holding in *Chin* out of context. The ruling in *Chin* that Eleventh Amendment immunity did not shield the BPD from § 1983 liability had no bearing on plaintiff's State law claims. Significantly, the *Chin* Court explained, *id.* at 548-49:

> However, with respect to the state law causes of action, the result is different. State sovereign immunity "protects the State not only from damage actions for ordinary torts but also from such actions for State constitutional torts." *Cherkes*, 780 A.2d at 424.[ ] The Baltimore Police Department enjoys sovereign immunity from actions for damages based on state common law torts or state constitutional torts. *See id.* at 422; 436.[ ] The claims against the Baltimore Police Department based on state law will, therefore, be dismissed on sovereign immunity grounds.

In sum, as to the claims under Maryland law, the *Chin* Court considered the BPD an arm of the State and, based on sovereign immunity, dismissed the State law claims against it. Contrary to plaintiffs' characterization of *Chin*, in actuality, the case supports Batts's position that, in the context of the State law claims, a suit against him in his official capacity is akin to suing the BPD and thus akin to suing the State. Such claims are barred by State sovereign immunity.

Similarly, plaintiffs take *Wilcher* out of context. The dispute in *Wilcher*, 519 F. Supp. 1, stemmed from alleged police brutality perpetrated by officers of the Baltimore City Police Department. *Id.* at 1. There, the "threshold question" in the context of plaintiff's § 1983 claims was whether the BPD was a State or Baltimore City agency for the purpose of Eleventh Amendment immunity. *Id.* at 3. The *Wilcher* Court concluded that the BPD was not a State agency because "the City exercises such substantial control over the day-to-day activities . . . ." *Id.* at 4. Nonetheless, the holding applied exclusively to the federal claims filed pursuant to § 1983. Significantly, the *Wilcher* Court did not address the issue of BPD immunity from State

law claims.  Therefore, plaintiffs' attempt to analogize the State law claims in the case *sub judice*

to the § 1983 claims in *Wilcher* and *Chin* is unavailing.

I conclude that a suit against Batts in his official capacity is, in effect, a suit against the

BPD, which is an agency of the State of Maryland.  Thus, in his official capacity, Batts enjoys

the same protection as the State.  It follows that the State law claims against Batts in his official

capacity (Claim I -- Count VI for funeral expenses and Claim II -- Count I for wrongful death)

shall be dismissed, with prejudice.  I turn now to plaintiff's federal claims against Batts.[22]

## B.  Plaintiffs' Federal Claims

In Claim I -- Count V, the West Estate, by Ms. Jones, has brought a survival action

against Batts, pursuant to 42 U.S.C. § 1983, alleging negligent supervision, training, and

retention by Batts.  Although not entirely clear from the Complaint, the allegations seem to

constitute a claim against Batts in his personal capacity for supervisory liability under § 1983.

ECF 2 ¶¶ 66-67, Complaint.  The West Estate also seems to allege claims against Batts in his

official capacity pertaining to a policy or custom of deliberate indifference to the use of

excessive force by the BPD, as well as a custom or policy of failure to train.  *Id.* ¶¶ 66-67, 70;[23]

*see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  According to the

West Estate, Batts has permitted "police practices and customs within the BPD which have

allowed some citizens to be subjected to police brutality and in some instances death."  ECF 2 ¶

---

[22] In the Motion to Dismiss, Batts contends that plaintiffs' State law claims sounding in tort are subject to dismissal on the basis of public official immunity.  ECF 20-1 at 12-13, Batts Memo. Because I dismiss all State law claims against Batts pursuant to State law immunity, I need not reach the issue of public official immunity.  In any event, it appears in the Commissioner's Reply that he has abandoned this argument. ECF 27.

[23] Batts has responded as if the West Estate lodged claims for a custom or policy of deliberate indifference and failure to train.  Batts does not dispute that under *Monell* a claim against him in his official capacity amounts to a claim against the municipality.

39, Complaint.

Batts has moved to dismiss these claims for failure to state the claims.  He contends that the Complaint "fails to allege sufficient facts to show that an unconstitutional [BPD] custom or policy was the moving force behind a violation of Mr. Rivera's [sic] Fourth Amendment rights." ECF 20-1 at 13, Batts Memo.  According to Batts, in the absence of a BPD policy or custom as the "moving force" behind the purported constitutional violations committed against Mr. West, *id.*, the Complaint fails to support a claim under *Monell*.  *Id.* at 14.  And, "for the same reasons," Batts asserts that the Complaint fails to state a claim against him for supervisory liability under § 1983.  *Id.* at 20.

Section 1983 provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983; *see, e.g.*, *Filarsky v. Delia*, ─── U.S. ────, 132 S. Ct. 1657 (2012).  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

To state a claim under § 1983, "a plaintiff must aver that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United States."  *Wahi v. Charleston Area Medical Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *see Filarsky*, 132 S. Ct. at 1661; *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).  The phrase "under color of state law" is an element that "is synonymous with the more familiar state-

action requirement—and the analysis for each is identical."  *Philips*, *supra*, 572 F.3d 176, 180 (4th Cir. 2009).

Under § 1983, the claims against Batts seem to be based on three theories of liability. One theory is that the BPD—through Batts in his official capacity as Commissioner—implemented a policy or custom of condonation or deliberate indifference to the use of excessive force by BPD officers.  ECF 2 ¶ 70, Complaint. The second theory is that the BPD—through Batts in his official capacity as Commissioner—had a custom or policy of failing to train its officers adequately.  *Id.*  And, the third theory is that Batts is liable in his personal capacity for failing adequately to supervise the BPD officers involved in the incident with Mr. West.  *Id.* ¶ 10.

## 1.   Policy or Custom of Deliberate Indifference to Excessive Force

A municipality is subject to suit under § 1983, *Monell*, 436 U.S. at 690.  But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original).  As Batts explains, "any viable § 1983 *Monell* claim has two elements:   (1) the municipality had an unconstitutional "policy or custom"; and (2) the unconstitutional "policy or custom" caused a violation of the plaintiff's constitutional rights.  ECF 20-1 at 14, Batts Memo; *see, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

In *Monell*, 436 U.S. 658, the Supreme Court determined that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only if those defendants were executing an official policy or custom of the local government that

resulted in a violation of the plaintiff's rights.  *Monell*, 436 U.S. at 690-91.  The Court said that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983."  *Id.* at 694; *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).

Therefore, "[s]ection 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).  However, a municipality cannot be held liable in a § 1983 action under a theory of *respondeat superior*.  *Monell*, 436 U.S. at 693-94.  Rather, "[l]iability arises only where the constitutionally offensive acts of city employees are taken in furtherance of some municipal 'policy or custom.'"  *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (citing *Monell*, 436 U.S. at 694).  In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation."  *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); *see Moore v. Howard County Police Dep't*, No. CCB-10-1430, 2010 WL 4722043 at *2 (D. Md. Nov. 15, 2010).  "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403-04.

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple* and citations omitted).  In addition, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

"Outside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003).  A custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, *supra*, 824 F.2d at 1387.  In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan*, *supra*, 743 F.2d at 229 (internal citations omitted).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal

employees." *Id.* at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, *supra*, 489 U.S. at 389).

In *Connick v. Thompson*, —— U.S. ——, 131 S. Ct. 1350 (2011), the Supreme Court explained, *id.* at 1359 (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692[ ] (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479[  ] (1986) (citing *Monell*, 436 U.S. at 665-683[ ]). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691 [ ]; *Canton*, 489 U.S. at 392 [ ]; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 [ ](1997) (collecting cases).

> Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. *Monell*, 436 U.S. at 691 [ ]; *see id.*, at 694 [ ]. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. *See ibid.*; *Pembaur*, *supra*, at 480-481 [ ]; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 [  ] (1970). These are "action[s] for which the municipality is actually responsible." *Pembaur*, *supra*, at 479-480 [ ].

In sum, a plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, *supra*, 164 F.3d at 218.

Here, the Complaint alleges the use of excessive force by the BPD on multiple occasions. Such claims are rooted in the Fourth Amendment, which guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

- 26 -

searches and seizures . . . ." U.S. Const. amend IV.   It is made applicable to the States through the Fourteenth Amendment.   *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).   Section 1983 provides a damages remedy for violations of the Fourth Amendment.   *See, e.g.*, *Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("§ 1983 allow[s] a plaintiff to seek money damages from government officials who have violated his Fourth Amendment rights.").[24]

The West Estate's theory of liability rests on the premise that Batts and the BPD were deliberately indifferent to the use of excessive force and failed "to put a stop to or correct a widespread pattern of unconstitutional conduct . . . ."   *Spell*, *supra*, 824 F.2d at 1389.   According to the Complaint, "in recent years" there have been "numerous examples . . . of the BPD's intimidating witnesses, use [of] excessive force, shooting and brutally beating citizens to near death or death . . . ."   ECF 2 ¶ 40, Complaint.

The West Estate also alleges that the BPD "fail[ed] . . . to supervise, and discharge and/or fail[ed] to implement policies prohibiting the Defendant Officers' open and notorious previous violations of Baltimore citizens' constitutional rights."   *Id.* ¶ 68.   In particular, according to the West Estate, Batts and the BPD "fail[ed] to . . . supervise, and/or discharge when necessary the

---

[24] *Graham v. Connor*, 490 U.S. 386 (1989), is the touchstone case with respect to excessive force claims under § 1983. There, the Supreme Court rejected the proposition "that all excessive force claims brought under § 1983 are governed by a single generic standard." *Graham*, 490 U.S. at 393. Excessive force claims during an arrest or other seizure are governed by the Fourth Amendment's prohibition against "unreasonable" seizures. *Id.* at 394. Claims of excessive force against an arrestee or pre-trial detainee are governed by the Due Process Clause of the Fourteenth Amendment, which prohibits before conviction "the use of excessive force that amounts to punishment." *Id.* at 395, 395 n.10; *accord Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008); *Young v. Prince George's Cnty., Md.*, 355 F.3d 751, 758 (4th Cir. 2004); *Taylor v. McDuffie*, 155 F.3d 479, 483 (4th Cir. 1998).   Claims of excessive force against a convicted prisoner are governed by the Eighth Amendment's prohibition of "cruel and unusual punishment . . . ." *Graham*, 490 U.S. at 394.

Defendant Officers, [and as a result,] the named Defendant Officers continued their pattern of assaulting/battering, pepper spraying, applying electro shocks to restrained persons and placing said battered, restrained, unarmed persons in a face down prone position with heavy weight on said person's back necessarily suppressing the retained person's ability to breath." *Id.* ¶ 66.   In addition, the Complaint alleges that the BPD "fail[ed] to implement policies that mandated Officers to render medical aid when necessary to persons in their custody . . . ." *Id.* ¶ 67.

The West Estate bolsters its allegations of the existence of a custom or policy of indifference to the use of excessive force with three examples: the "publicized beating of Mr. Abduljaami Salaam," allegedly perpetrated by defendants Chapman and Bernardez-Ruiz, which occurred on July 1, 2013, *id.* ¶ 40; the "unprovoked" assault and battery of Markita Smith, allegedly perpetrated by defendants Chapman and Bernardez-Ruiz, *id.* at 10 n.1; and the "killing of Anthony Anderson on September 21, 2012 by BPD Officers Michael J. Vodarick, Gregg B. Boyd and Todd A. Strohman . . . ." *Id.* ¶ 65.

According to Batts, "[p]laintiffs failed to assert what policies and practices Defendant Batts has established, enacted, or adopted which would support or encourage the denial of a citizens [sic] rights in violation of the constitution or law." ECF 20-1 at 19, Batts Memo.   In seeking dismissal, Batts argues that the Complaint's "threadbare recitals" do not amount to a policy or custom of deliberate indifference. ECF 27 at 8, Reply.   Rather, he contends that the incidents highlighted by the Complaint are "at best . . . isolated and scattershot allegations of constitutional misconduct that are insufficient to show §1983 *Monell* liability." *Id.*   As Batts sees it, the West Estate "[has] attempted to link two isolated instances to show a pattern of abuse." ECF 20-1 at 19, Batts Memo.   He asserts, ECF 27 at 8, Reply (emphasis in Reply):

These scarce allegations are hardly sufficient to state a *plausible* §1983 *Monell* claim.  First, the instances alleged in the Complaint do not contain facts sufficient to show that [the] alleged beating of Mr. Salaam, or in the in [sic] custody death of Mr. Anderson were constitutional violations at all, much less "widespread and persistent" violations.

The question, then, is whether the Complaint has adequately alleged that the conduct of Batts and the BPD amounted to a persistent and widespread practice of indifference so as to give rise to a custom or policy of condonation or tacit authorization.  *See Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402 (4th Cir. 2014), *cert. denied sub nom. Baltimore City Police Dep't v. Owens*, ⸺ U.S. ⸺, No. 14-887, 2015 WL 275612 (Apr. 27, 2015) (quotation omitted).  As explained by the Fourth Circuit, "[a]lthough prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier."  *Owens*, *supra*, 767 F.3d at 403.  Although the *Monell* claim based on a custom or policy of indifference to unconstitutional acts may not ultimately prevail, the *Monell* claim survives Batt's Motion.

Significantly, the West Estate does not rely solely on conclusory assertions and the singular incident with Mr. West.  In the Complaint, the West Estate identified three purported instances of the BPD's use of excessive force prior to the occurrence with the Decedent.  To be sure, the precise circumstances surrounding the three citizen encounters with BPD officers, and the extent to which the alleged use of force in those matters may have been justified, is unclear from the Complaint.  Nor has the Complaint placed these three examples in the larger context of the thousands of arrests that occur in Baltimore City each year, and how many (or how few) have resulted in serious injury or death.[25]  The Complaint fails to indicate when the incident involving

---

[25] Baltimore City is a rather large city.  According to the Baltimore Commissioner of Public Health, there are "more than 73,000 arrests made every year [in Baltimore]."  Lena S. Wen, "A Prescription for Baltimore's Health," WASH. POST (May 24, 2015),

Ms. Smith occurred.  As a result, the events in question may have occurred prior to Batts's appointment as Commissioner.  Moreover, in connection with the death of Mr. Anderson, the Complaint does not state whether the BPD officers involved were disciplined.  Nonetheless, the Fourth Circuit has made clear that a plaintiff in a *Monell* action need not "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Jordan by Jordan*, *supra*, 15 F.3d at 339-40.

*Garcia v. Montgomery Cnty., Md.*, No. JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013), is instructive.  There, Garcia, his wife, and a family friend were leaving a restaurant when Garcia observed two young men being arrested by the Montgomery County Police ("MCP").  *Id.* at *1.  Concerned that the arresting officers were using excessive force, Garcia, "an award-winning freelance photojournalist," began to photograph the incident from at least thirty feet away.  *Id.*  One of the officers flashed Garcia with a spotlight, and he moved across the street to continue photographing the incident from a distance of about one hundred feet.  *Id.*

Garcia was then approached by an officer.  Garcia identified himself as a member of the press, and opened his hands to show that he held nothing in his possession save his camera.  *Id.* The officer "shouted that Mr. Garcia was under arrest, placed him in a chokehold, and forcibly dragged him along the ground to the police cruiser."  *Id.*  Subsequently, the officer "placed Mr. Garcia in handcuffs and confiscated his camera."  *Id.*  The officer then "kicked Mr. Garcia's

---

http://www.washingtonpost.com/opinions/a-prescription-for-baltimores-health/2015/05/22/582 cbb4c-fa83-11e4-9030-b4732caefe81_story.html.  Of course, not everyone who is arrested in Baltimore City necessarily resides in Baltimore City.

right foot out from under him, causing Mr. Garcia to hit his head on the police cruiser as he fell to the ground." *Id.* He was subsequently taken into custody and charged with disorderly conduct. *Id.* At a trial in a Maryland court, Garcia was acquitted of disorderly conduct. *Id.*

Subsequently, Garcia filed suit against the County and, among other counts, he lodged a *Monell* claim. Garcia's complaint stated "that his injury resulted from 'Montgomery County's policy or custom of indifference to misconduct by [MCP] officers' and a 'lack of training and supervision requiring the police to follow the law and established departmental policies.'" *Id.* at *5 (quoting the complaint). Further, Garcia alleged that, despite a written media relations policy, which provides that police should maintain a cooperative working relationship with members of the media, there is a '"custom and practice among [MCP] officers of obstructing and/or preventing members of the media from filming police activity conducted in public."' *Id.* (quoting the complaint). He also complained that Montgomery County has a policy, custom, or practice of '"failing to supervise and discipline officers who unlawfully obstruct and/or prevent members of the media and the public from recording police activity conducted in public view, despite its awareness that these violations happen."' *Id.* (quoting the complaint). According to Garcia, Montgomery County effectively sanctioned and endorsed his treatment by the police because of its inadequate investigation of the incident. *Id.*

The defense moved to dismiss, arguing: "Mr. Garcia's complaint mentions only his incident and . . . he has pled nothing more than an isolated constitutional deprivation . . . ." *Id.* at *5. Relying on the Fourth Circuit's decision in *Jordan by Jordan*, Judge Motz reasoned, *id.*:

> Mr. Garcia has stated a valid *Monell* claim. Contrary to the defendants' assertion that Mr. Garcia's complaint mentions only his incident and that he has pled nothing more than an isolated constitutional deprivation, the complaint alleges that Montgomery County was aware of unconstitutional actions by [MCP]

officers directed towards members of the media but chose to ignore such behavior. The Fourth Circuit has made clear that a *Monell* plaintiff need not "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 339–40 (4th Cir. 1994) (citations omitted).

Judge Motz concluded: "At this stage, it is enough that Mr. Garcia has alleged that Montgomery County was aware of ongoing constitutional violations by [MCP] officers and that the county's failure to supervise and discipline its officers allowed a pattern and/or practice of unconstitutional actions to develop." *Id.* Judge Motz added, *id.*:

> Under *Twombly* and *Iqbal*, the factual allegations in the complaint are sufficient to survive a motion to dismiss as they are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Jordan,* 15 F.3d at 338 (stating that "section 1983 claims are not subject to a 'heightened pleading standard' paralleling the rigors of proof demanded on the merits") (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)).

A similar result was reached in *Chen v. Mayor*, No. L-09-47, 2009 WL 2487078, at *4 (D. Md. Aug. 12, 2009). In that case, plaintiff alleged that Baltimore City had a "'policy, practice and custom to seize and raze private property without due process of law. . . .'" *Id.* at *3 (quoting the complaint). The complaint, filed against the Mayor and City Council of Baltimore, three employees of Baltimore's Department of Housing and Community Development, and a contracting company, cited two separate incidents in which Baltimore City violated the City Code's notice requirements by failing to provide posted notice prior to demolishing property. *Id.* Mr. Chen also suggested that "the failure to provide proper notice was part of the City's scheme 'to conceal the damage to Plaintiff's property caused during the demolition of an adjacent City-owned property.'" *Id.* at *4 (quoting the complaint). The *Chen* Court concluded that the allegations of two "separate incidents" in which Baltimore City had purportedly committed due

process violations were sufficient to establish a plausible claim for municipal liability and to survive defendants' motion to dismiss.  *Id.* at *4.

Here, as described, the Complaint has paired general averments of an unconstitutional policy or custom with particular examples.  Although the examples are not without flaws, the allegations are sufficient to survive dismissal.  Therefore, I will deny Commissioner Batt's Motion as to claims of an unconstitutional policy or custom of deliberate indifference to the use of excessive force.

### 2.  Failure to Train

In addition to alleging a policy or custom of deliberate indifference to the use of excessive force, the Complaint alleges that Batts and the BPD failed to train BPD officers as to the proper use of force.  ECF 2 ¶¶ 66-67, 70, Complaint.  In *City of Canton v. Harris*, *supra*, 489 U.S. at 389, the Supreme Court said that "where a municipality's *failure to train* its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . such a shortcoming [can] be properly thought of as a city *'policy or custom'* that is actionable under § 1983." (Emphasis added).  The manner in which a police force chooses to train its officers is "necessarily a matter of 'policy' . . . ."  *Spell*, *supra*, 824 F.2d at 1389.  As a result, "the inadequacy of police training may serve as the basis for § 1983 liability[, but] only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Canton*, 489 U.S. at 388.

"[W]hen alleging an inadequate training policy, a complaint should contain facts revealing: (1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the officer's conduct resulted from said training."  *Lewis*

*v. Simms*, No. AW-11-CV-2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (quoting *Drewry v. Stevenson,* No. WDQ–09–2340, 2010 WL 93268, *4 (D. Md. Jan. 6, 2010)), *aff'd*, 582 F. App'x 180 (4th Cir. 2014).   The *Connick* Court observed, 131 S. Ct. at 1359-1360:  "To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  (Alteration in *Connick*). *See also Canton*, 489 U.S. at 388.  Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389.

Moreover, even if "a particular officer may be unsatisfactorily trained[, that] will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  *Canton*, 489 U.S. at 390-91.  The *Canton* Court said, 489 U.S. at 391:

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Although the procedural posture of this case distinguishes it from *Connick v. Thompson*, *supra*, 131 S. Ct. 1350, *Connick* is pertinent, as it highlights the challenge a plaintiff faces when seeking to prevail on a failure to train claim.  In *Connick*, the Court said:  "[P]rov[ing] that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice."  *Id.* at 1363-64 (alteration in *Connick*) (internal quotations omitted).

In *Connick*, respondent Thompson was prosecuted and convicted for attempted armed robbery and murder. *Id.* at 1353.   But, his convictions were overturned when it was discovered that the prosecution failed to disclose the existence of a certain crime lab report. *Id.*   Based on the violation of *Brady v. Maryland*, 373 U.S. 83 (1963), Thompson filed a § 1983 suit against Harry Connick, in his official capacity as the Orleans Parish District Attorney. 131 S. Ct. at 1355.   He alleged, *inter alia*, a "deliberate indifference to an obvious need to train prosecutors to avoid such constitutional violations." *Id.* at 1357.   The district court ruled that, in order to establish deliberate indifference, Thompson was not required to show a pattern of similar *Brady* violations, *id.* at 1353-54, when he could demonstrate that "the need for training was obvious." *Id.* at 1354.   The jury found for Thompson and awarded him damages. *Id.*  A divided Fifth Circuit affirmed.   *Id.*   The Supreme Court considered whether a "district attorney's office [could be] held liable under § 1983 for failure to train its prosecutors based on a single *Brady* violation." *Id.* at 1356.

The *Connick* Court "sought not to foreclose the possibility . . . that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."   *Id.* at 1361.   Nevertheless, the Court said, *id.* at 1359:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.   A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

In *Peters v. City of Mount Rainier*, No. GJH-14-00955, 2014 WL 4855032 (D. Md. Sept. 29, 2014), the plaintiff lodged a § 1983 claim for failure to train the police force.  *Id.* at *5.  The complaint stated, *id.* (alteration in *Peters*) (quoting the complaint):

> [T]he City maintained an "official policy" of . . . "fail[ing] to properly train and supervise its officers; fail[ing] to implement effective procedures for investigating allegations of police misconduct; fail[ing] to discipline officers who violate the Constitutional rights of private citizens through false arrests, malicious prosecutions, and brutal conduct; and generally fail[ing] to provide safeguards against Constitutional abuses by its overzealous officers."

In considering whether to dismiss the failure to train claim, Judge Hazel highlighted the complaint's failure to allege facts concerning the "'nature of the training'" or "'that the officer's conduct resulted from said training.'"  *Peters*, 2014 WL 4855032, at *5 (quoting *Lewis v. Simms*, *supra*, 2012 WL 254024, at *1).  He noted: "Peters has not even attempted to allege any such facts; instead, he has simply stated in broad, conclusory terms and in a variety of different ways that the City failed to train and supervise its officers."  *Id.* at *5 (citation to the record omitted). Emphasizing this deficiency, Judge Hazel concluded that the plaintiff's allegation was "nothing more than a bare-bones generalization that a legal element (*i.e.* the policy[-]or-custom element) is met. Without more, Peters has failed to adequately allege the existence of a policy or custom through the City's purported failure to train its officers."  *Id.*

*Hall v. Fabrizio*, No. JKB-12-754, 2012 WL 2905293 (D. Md. July 13, 2012), is also instructive.  There, Judge Bredar dismissed a failure to train claim against the Baltimore Police Department because "the complaint [did] not allege any facts regarding the sort of training that Baltimore police officers actually receive or how that training reflects the decision of any municipal policymaker."  *Id.* at *2.

In view of *Canton*, *Connick*, *Hall*, and *Peters*, among other cases, it is clear that stating a claim for failure to train requires more than bald assertions that police officers were not properly trained.  Here, the West Estate baldly asserts that Mr. West's death resulted from BPD's "failure to train . . . the named Defendant Officers[.]"  ECF 2 ¶ 67, Complaint.  The West Estate relies on the same facts that support its claim for a custom or policy of deliberate indifference to the use of excessive force.  For instance, according to the Complaint, the "failure to train, supervise, and/or discharge" the BPD Defendant Officers resulted in "the named Defendant Officers continu[ing] their pattern of assaulting/battering, pepper spraying, applying electro shocks to restrained persons and placing said battered, restrained, unarmed persons in a face down prone position with heavy weight on said person's back necessarily suppressing the restrained person's ability to breath."  *Id.* ¶ 66.

Although the West Estate contends that BPD failed to train the BPD Officer Defendants, it failed to identify a particular BPD training practice or any specific defect or omission in the BPD training program.  Moreover, the West Estate does not draw a connection between the three examples of alleged use of excessive force prior to the incident with Mr. West and a particular shortcoming in the BPD training program.  This defect is fatal.  As explained in *Connick*, *supra*, 131 S. Ct. at 1360:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.,* 520 U.S. at 410. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.,* at 407[ ].

The Complaint offers no facts to support an inference that Batts and the BPD were on notice of any defects in the BPD training program.  Rather, the West Estate relies solely on conclusory statements, without any particular information about the nature of existing training methods.  Accordingly, the Complaint's allegations fall short of stating a claim for failure to train.  This claim shall be dismissed, without prejudice.

### 3.  Supervisory Liability

Even in the absence of an unconstitutional policy or custom, a supervisor's "continued inaction in the face of documented widespread abuses . . . provides an independent basis" for liability against a supervising official in his personal capacity for deliberate indifference or acquiescence "in the constitutionally offensive conduct of his subordinates."  *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984).  The West Estate alleges that Batts is personally subject to supervisory liability pursuant to § 1983.  ECF 2 ¶ 63-70, Complaint.

A public official or agent "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."  *Iqbal*, 556 U.S. at 676; *see Monell*, 436 U.S. at 691; *Love–Lane*, 355 F.3d at 782 (finding no respondeat superior liability under § 1983); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (finding no respondeat superior liability in a Bivens suit).  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.

The Fourth Circuit has stated:  "A supervisor can only be held liable for the failings of a subordinate under certain narrow circumstances."  *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013).  In particular, to state a claim for supervisory liability under § 1983, plaintiffs must allege:

"(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to the knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted); *see also Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014). In other words, the liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan*, 737 F.2d at 372).

With respect to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799 (quoting *Slakan*, 737 F.2d at 373-74); *see Wilkins*, 751 F.3d at 226. As to the second element, "a plaintiff [o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (alteration in *Randall* and internal quotations omitted). "Deliberate indifference, however, may be satisfied by showing [a]

supervisor's continued inaction in the face of documented widespread abuses." *Id.* (alteration in *Randall* and internal quotations omitted); *see Wilkins*, 751 F.3d at 226-27.   As to the third element, "'proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions.'"   *Wilkins*, 751 F.3d at 226-227 (quoting *Shaw*, 13 F.3d at 799).

In *Shaw*, 13 F.3d 791, a North Carolina State trooper shot and killed a suspect during the course of an arrest.   Thereafter, the victim's family filed a § 1983 suit, as well as State law claims, against the trooper and several of his supervisors. *Id.* at 796-97.   A supervisor, Stroud, filed an interlocutory appeal with respect to the district court's denial of his summary judgment motion. *Id.* at 797.   The Fourth Circuit concluded that plaintiffs presented sufficient evidence to withstand summary judgment as to the causation element. *Id.*  at 800-01.

According to the Court, the plaintiffs demonstrated that the supervisor "had knowledge of at least three incidents in which [the trooper] used excessive force which posed an unreasonable risk of harm to arrestees," yet the supervisor failed to discipline the officer. *Id.* at 800.   The evidence showed the supervisor's knowledge of the trooper's "violent propensities." *Id.*   Given such knowledge, said the Court, "it follows that [the supervisor] knew that [the trooper's] unchecked service on the force posed a constant and dangerous threat to the welfare of arrestees.[]" *Id.*

In *Baynard v. Malone*, *supra*, 268 F.3d 228, a student who was repeatedly molested by a teacher over the course of several years sued the school principal, among others, under § 1983. *Id.* at 233-34.   The claim against the principal was based on a theory of supervisory liability. *Id.*

at 234-35.  The principal appealed the district court's denial of summary judgment, and the Fourth Circuit affirmed.  *Id.* at 234, 244.

The Court determined that a jury could conclude that Malone was "deliberately indifferent" to the risk of the teacher's abuse, reasoning that she took no action to protect the student, despite knowing that the teacher was "very physical" with students and that students accompanied him on camping trips when no other adults were present.  *Id.* at 235-36; *see also Slakan*, 737 F.2d at 375 (finding prison supervisors were liable for failure to implement policies restricting the use of force by guards where the supervisors knew of at least seven prior instances of the conduct that caused injury to the plaintiff).

According to Batts, in addition to pleading the elements of supervisory liability, "a party is absolutely obligated to allege similar instances of unconstitutional conduct which would show that subordinate officers were engaged in 'pervasive and widespread' constitutional abuses comparable to abuses alleged in the pleadings."  ECF 20-1 at 21, Batts Memo.  Batts adds: "Most importantly, scattershot and isolated allegations of unconstitutional conduct are inadequate to establish widespread and pervasive unconstitutional behavior necessary for § 1983 supervisory liability."  *Id.* (internal quotations omitted).

Notably, Batts has not cited cases decided on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Id.* at 21.  Instead, the cases on which Batts draws to argue that the Complaint is deficient contemplate whether the plaintiffs proffered sufficient evidence to *prove* supervisory liability.  *See*, *e.g.*, *Randall*, *supra*, 302 F.3d at 211 (affirming district court's award of summary judgment to the County based on plaintiff's failure to provide sufficient evidence to support that police maintained a custom of unconstitutional detention); *Shaw*, 13 F.3d at 801 (granting

defendant's motion for summary judgment because plaintiffs presented insufficient evidence to establish supervisory liability); *Slakan*, 737 F.2d at 373 (affirming jury's decision to hold certain prison officials liable because plaintiff offered adequate evidence to establish supervisory liability).

In the posture of a motion to dismiss, *Lee v. Queen Anne's Cnty. Office of Sheriff*, No. RDB-13-672, 2014 WL 476233, at *8 (D. Md. Feb. 5, 2014), is informative.  In *Lee*, the plaintiff had allegedly driven through a stop sign.  *Id.* at *1.  He claimed that he was not driving the car nor did he drive through a stop sign.  Nonetheless, a warrant was issued for his arrest.  *Id.*  Upon learning about the warrant, Lee surrendered to law enforcement and was "briefly incarcerated before being released on bond that same day."  *Id.*  He was convicted of fraud, failure to stop, and driving with a revoked license.  *Id.*  But, an investigation of the events surrounding the stop revealed dashboard camera video evidence suggesting that the deputy had testified falsely.  Moreover, the prosecutor purportedly concluded that the camera footage revealed no probable cause for the traffic stop.  *Id.* at *2.  As a result, the "charges" were subsequently nol prossed.  *Id.* at *2.

Lee subsequently filed suit against Queen Anne's County Office of the Sheriff.  He alleged that the deputy's actions were "undertaken with malice and that he has suffered mental anguish, emotional pain and suffering, and financial loss as a result."  *Id.* at *2.  Further, Lee contended that the deputy "'acted with a wanton and reckless disregard for Plaintiff's civil rights by conducting an illegal traffic stop, causing an improper warrant to issue, [and] harassing Plaintiff and his family during a two-month period . . . .'"  *Id.* at *17 (quoting the amended

complaint).  And, pursuant to a theory of supervisory liability under § 1983, plaintiff sought to hold the sheriff of Queen Anne's County liable for the deputy's conduct. *Id.* at *8.

In Lee's amended complaint, he alleged that the sheriff "had constructive knowledge of his deputies' unconstitutional conduct" based on three incidents of prior conduct, *id.*  at *9 (quoting the amended complaint):

a. On May 12, 2011, Queen Anne's County deputy John Dennis Hofmann pled guilty to second-degree assault after groping a woman inside his patrol car in August 2009. Deputy Hofmann is the brother of the Queen Anne's County Sheriff, Gary Hofmann. Hofmann remains employed by the Queen Anne's Office of the Sheriff[.]

b. In August 2007, the Queen Anne's County Office of the Sheriff suspended three deputies for misconduct that occurred during a traffic stop. The misconduct concerned violations of departmental policies and procedures having to do with vehicle searches. After the investigation, all three deputies were reinstated even though two deputies had been found to have violated policies and procedures.

c. On March 17, 2004, Queen Anne's County Deputy Sheriff Mark Barbre shot and paralyzed Andrew Pope, III during a traffic stop. Deputy Barbre had signaled for Pope to stop and pull over, but Pope continued to drive his vehicle until he reached his house, where he exited his vehicle and raised his hands in surrender. Deputy Barbre shot his firearm at Pope, striking him in the neck, paralyzing him.

Based on these facts, the plaintiff insisted "that these allegations are sufficient to support his claim that [the sheriff] had constructive knowledge of his deputies' unconstitutional conduct" and acted with deliberate indifference. *Id.*  Urging dismissal, the sheriff argued that plaintiff relied too heavily on conclusory statements and lacked adequate factual detail to state a claim for supervisory liability. *Id.* at *8.

In effect, the question before the court was whether the "Amended Complaint contain[ed] sufficient examples of past occurrences to state a valid claim and avoid dismissal at this early

stage of the litigation." *Id.* at *9.   The *Lee* Court found that the allegations "present[ed] a close case," and it ruled that plaintiff adequately pleaded a claim for § 1983 supervisory liability.   *Id.*

The court noted that "the specific instances of misconduct adequately supplement that claim and demonstrate the requisite constructive knowledge and deliberate indifference." *Id.*  In particular, it said that "[t]he 2007 event pertaining to the traffic stop clearly raises potential Fourth Amendment issues" similar to the case at bar.   *Id.*  The court also noted that "[t]he 2009 and 2007 incidents, as alleged, also suggest that the Sheriff's Office-and Sheriff Hofmann in particular-have failed to properly supervise and discipline the deputies because the deputies allegedly remained a part of the Sheriff's Office despite their misconduct." *Id.*   The court observed:  "Above and beyond these incidents, [plaintiff's] claims involve repeated instances of harassment spanning a two month period." *Id.*

Akin to the amended complaint in *Lee*, the Complaint here attempts to establish supervisory liability on the basis of general averments that a supervisor failed to respond to prior constitutional violations.  It includes three specific incidents of alleged prior police misconduct.

In particular, the West Estate alleges:  "It has been widely reported in the community, by news media, about the activities and excessive force allegations against members of the BPD, including specific BPD Officer Defendants in this suit.  Some resulting in settlements and awards."[26]  ECF 2 ¶ 10, Complaint.  The Complaint also states: "The [C]ommissioner is either aware of or should have been aware of these matters, and, therefore, has actual or constructive knowledge that some of his BPD officers were engaged in conduct posing a pervasive and

---

[26] As noted, in my analysis I have not considered events that occurred after Mr. West's death.

unreasonable risk of actual harm and constitutional deprivation to citizens such as Tyrone West[.]"   *Id.*   These conclusory assertions that Batts should have known about the unconstitutional conduct of "some of his BPD officers," standing alone, are not sufficient to state a claim for the *personal* liability of Batts.  *Id.*

To bolster its claim, the West Estate also recounts three other police-citizen encounters (out of thousands of arrests annually) in Baltimore City, which allegedly involved the use of excessive force by the BPD.  Upon inspection, these examples fall short of demonstrating that Batts exhibited "continued inaction in the face of documented widespread abuses."  *Randall*, 302 F.3d at 206 (internal quotations omitted).

First, the West Estate refers to the killing of Mr. Anderson on September 21, 2012.  But, any reliance on the unfortunate death of Mr. Anderson to establish personal liability as to Batts is unpersuasive, given the timing of the incident.  As noted, Batts was appointed Commissioner in September 2012, but he was not sworn into office until November 8, 2012.  Taking this chronology of events into account, plaintiffs fail to plausibly allege that Batts did not supervise adequately the BPD officers involved, when the event occurred more than one month *before* he assumed his post as Commissioner.

Second, the West Estate refers to the assault of Ms. Smith, allegedly perpetrated by defendant Officers Chapman and Bernardez-Ruiz.  Although this assault involves two of the BPD Officer Defendants in this case, plaintiffs do not place the event in context, beyond describing the attack as "unprovoked."  ECF 2 at 10 n.1, Complaint.  Indeed, the particular details of the incident are scant.  For example, the Complaint does not include a date on which the alleged assault occurred, necessary to create the inference that it happened on Batts's watch.

Akin to the death of Mr. Anderson, the incident may have taken place well before Batts took office.  Without more information, this example does little to establish that Batts had knowledge of prior constitutional abuses or acted with indifference to the risk posed by the officers involved.

The West Estate's reliance on the beating of Mr. Salaam is similarly unavailing.  As noted by Batts, the alleged beating of Mr. Salaam on July 1, 2013, involving defendant officers Chapman and Bernardez-Ruiz, took place "just 17 days before the date the incident involving Mr. West is alleged to have occurred[, on July 18, 2013]."  ECF 20-1 at 5 n.3, Batts Memo.  The Complaint suggests that, had Chapman and Bernardez-Ruiz been properly disciplined or dismissed by Batts as a result of their participation in the incident with Mr. Salaam, they would not have been able to harm Mr. West.

Batts is critical of this position, given the close proximity in time between the incident with Mr. Salaam and the death of Mr. West.  He observes that, based on the allegations in the Complaint, "it is not clear whether no actions were taken as of the date of the alleged incident or [as of the] date of filing [of the Complaint]."   ECF 20-1 at 5 n.3, Batts Memo.

Notably, Batts points out that, "under Maryland law, Defendant Batts does not have the power to summarily punish or discipline a BPD member without affording him the due process." ECF 27 at 8, Reply; *see also id.* at 8 n.3 (citing Public Local Laws of Baltimore City, §§16-7(7), 16-11;  Md. Code (2011 Repl. Vol., 2014 Supp.) § 3- 107 of the Public Safety Article ("P.S")). Batts maintains that, "even assuming arguendo that Mr. Salaam filed his complaint [to BPD internal affairs] nearly two weeks prior to the officer Defendants [sic] encounter with Mr. West that would not surely have given BPD adequate time to conduct a proper internal investigation

into his allegations and complete a state required administrative hearing prior to the Defendant BPD officers [sic] encounter with Mr. West." ECF 27 at 8, Reply.

Batts's reasoning is sound. Even if the death of Mr. Salaam resulted from unconstitutional conduct of BPD officers, including Chapman and Bernardez-Ruiz, it is implausible that a thorough investigation and appropriate discipline of those involved could have occurred within seventeen days of when the incident at issue took place. In this respect, the West Estate appears to overlook Batts's obligation to abide by Maryland statutory law governing the rights of police officers accused of misconduct. Indeed, under Maryland law, a reasonable amount of time is required to perform an investigation and if necessary, hold a hearing. In particular, P.S. § 3- 107 provides:

> [I]f the investigation or interrogation of a law enforcement officer results in a recommendation of demotion, dismissal, transfer, loss of pay, reassignment, or similar action that is considered punitive, the law enforcement officer is entitled to a hearing on the issues by a hearing board before the law enforcement agency takes that action.

In light of the allegations, I cannot draw an inference of continued inaction on the part of Batts, when a mere seventeen days passed between the incident of Mr. Salaam and the death of Mr. West. The alleged unlawful beating of Mr. Salaam fails to lend support for plaintiffs' claim of supervisory liability as to Batts.

In sum, when the Complaint is subjected to close scrutiny, it becomes apparent that, even assuming police misconduct with respect to the three police-citizen encounters referenced in the Complaint, the West Estate fails to allege facts to show that Batts was deliberately indifferent to a pervasive and unreasonable risk of unconstitutional action by the BPD. Accordingly, I will

dismiss the supervisory liability claim as to Batts, without prejudice.[27]

### IV.  Conclusion

For the foregoing reasons, Batts's Motion to Dismiss (ECF 20) will be granted in part and denied in part.   The state law claims as to Batts in his official capacity are dismissed, with prejudice.  The federal claims pursuant to § 1983 for supervisory liability as to Batts, and for the failure to train BPD officers will be dismissed, without prejudice.  With respect to the remaining federal claim pursuant to § 1983 as to Batts and the BPD, the Motion to Dismiss will be denied. In particular, the West Estate's claim against Batts and the BPD with respect to a custom or policy of deliberate indifference to the use of excessive force will survive the Motion to Dismiss.

A separate Order follows, consistent with this Memorandum Opinion.

Date:   July 24, 2015                              _____/s/_____
                                                             Ellen Lipton Hollander
                                                             United States District Judge

---

[27]   In the Motion, Batts also argues that plaintiffs fail to state a claim for "Racially Charged Conspiracy" pursuant to § 1985(3).  ECF 20-1 at 22, Batts Memo. As stated, in their Opposition plaintiffs clarify that they did not intend to lodge a claim pursuant to § 1985(3).  ECF 24-1 at 13, Opposition.