## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **TAWANDA JONES, et al.** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **CIVIL ACTION NO.: 1:14-cv-002627** |
| | * | |
| **NICHOLAS DAVID CHAPMAN et al.** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EXPERT OPINION OF CHARLES J. KEY, SR.

### I. QUALIFICATIONS

I retired from the Baltimore, Maryland Police Department as the Commanding Officer of the Firearms Training Unit, a position which I held for ten years. I have evaluated uses of force for over thirty years. I was a supervisor in the Baltimore Police Department for over twenty-one years. In that role I sat as a member of various tribunals in numerous Administrative Hearings; investigated dozens of uses of less than lethal force; assisted the Internal Investigation and Homicide Divisions in evaluating/investigating hundreds of police involved shootings; and wrote the Departmental General Order governing the use of force.

At the direction of the Police Commissioner, I also analyzed approximately six hundred police involved shootings to determine if the shootings were consistent with law, departmental policies, and training. In addition to issues of law and departmental policies, those analyses


EXHIBIT

EXPERT OPINION OF CHARLES J. KEY, SR.
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 2

included crime scene reconstruction, interpreting ballistic evidence, shell casing ejection pattern

testing, and technical issues related to firearms. In the ten years I was the Commanding Officer

of the Firearms Training Unit, I responded to the scene of more than one hundred police involved

shooting incidents.

During my career with the Baltimore Police Department, I acquired substantial

experience and developed significant expertise in the area of law enforcement officer supervision

and training. As part of my duties, I developed and evaluated numerous operational guidelines

and officer training programs, both for the department and for other law enforcement agencies. I

personally authored the draft of the regulations regarding firearms training for law enforcement

officers within the State of Maryland. Additionally, I developed and wrote, or assisted in writing,

hundreds of other operational protocols, supervisory memoranda, and training related documents,

including, but not limited to: the general order pertaining to the resolution of sniper, hostage,

barricade situations; the general order pertaining to police officer use of force; the special

weapons and tactics team's (SWAT) training program, operational protocols, physical training

program, and selection standards and protocol; the recruit and in-service officer training

programs for firearms, officer survival, defensive skills, riot and crowd control, use of pepper

spray, and use of force; and numerous other training guidelines, policy directives, and officer

training lesson plans.

My involvement with police officer training took place on several different levels. While

assigned to the Tactical Section, I was responsible for the selection, training, and operational

performance of SWAT personnel. After being assigned as the Commanding Officer of the

EXPERT OPINION OF CHARLES J. KEY, SR.
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 3

Firearms Training Unit, I was personally responsible for the training of several thousand police officers in subjects including, but not limited to: Fourth Amendment issues such as reasonable suspicion to detain, probable cause to arrest, and when and how to use appropriate levels of force; officer survival techniques; and firearms use. I developed and conducted numerous instructor-level courses in which police instructors were taught how to develop and implement effective training programs. I also assisted in selecting the shoot-no-shoot computer model for the Baltimore Police Department and both participated in designing scenarios for shoot-no-shoot situations and trained officers using those scenarios. In addition I developed live person training scenarios, which incorporated various use of lethal force circumstances to train police officers and civilians.

My experience and training as a supervisor with the Baltimore Police Department allowed me to develop broad expertise in law enforcement techniques as well as in the supervision and direction of individual police officers. During the course of my career with the Department, I directly supervised and/or managed hundreds of individual police officers. In my various supervisory capacities, including Quick Response Team (SWAT) Supervisor and Primary Instructor, District Shift Commander and District Operations Commander, I supervised the resolution of thousands of emergency or crisis situations and investigated, or supervised the investigation of, well over a thousand successfully prosecuted violent felonies.

As Central District Operations Commander, I was responsible for the supervision of approximately fifty personnel. Included in that number were officers detailed to narcotics enforcement activities. Such activities involved street possession and distribution arrests as well

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 4

as a wiretap, which resulted in the service of approximately fifty search and seizure warrants for

drug related crimes.  During the eight years I was the Operations Commander, I participated in

and/or supervised well over one thousand arrests for the possession and/or distribution of

controlled dangerous substances and other felonies.  All of these investigations involved

plainclothes officers and plainclothes operations.  As a result, I became well versed in the legal

and departmental requirements pertaining to the searches and seizures and/or arrests of persons

involved in the distribution of illegal narcotics as well as other felonies.

        As a result of this experience and training in law enforcement, I gained extensive personal

familiarity with the proper methods of police officer training as well as with the proper methods

of implementing policies and procedures to direct and guide individual officers in the effective

performance of their duties.

        I am currently employed as an independent consultant and expert witness in police

misconduct litigation.  In this capacity, I have reviewed well over a thousand cases involving

alleged police misconduct, for both plaintiffs' and defendants' counsel.  Included in that number

is approximately four hundred police involved shootings from various state, local, and federal

jurisdictions throughout this country and the Virgin Islands.  In such cases I have evaluated

various factors in order to determine if the conduct of the law enforcement personnel and/or

agencies involved in the case violated legal, ethical and/or constitutional standards of conduct.

Those factors include, but are not limited to:  the conduct of individual law enforcement officers,

EXPERT OPINION OF CHARLES J. KEY, SR.
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 5

the adequacy of the training and supervision received by such officers, and the adequacy and appropriateness of police department policies and procedures.

## II. <u>EXPERT COURT QUALIFICATIONS RELEVANT TO THIS CASE</u>

I have previously been qualified as an expert witness as to police officer use of force in eighty-eight (88) courts (seventy-one [71] state courts and seventeen [17] federal courts); police training in ninety-seven (97) courts (seventy-eight [78] state courts and nineteen [19] federal courts); police policies and procedures in one hundred (100) courts (eighty [80] state courts and twenty [20] federal courts); chemical agents and pepper spray in six (6) courts (five [5] state courts and one [1] federal court; and have been held qualified as an expert in defensive skills in thirty-three (33) courts (twenty-six [26] state courts and seven [7] federal courts). My relevant training, experience, educational background, and history of court qualifications and depositions are set forth in more detail in the Résumé/Curriculum Vitae attached to this Affidavit as 'Exhibit A.'

## III. <u>PUBLICATIONS</u>

I have published one article in the last ten years. It was co-authored with Officer Dan Rose, Baltimore County, Maryland SWAT. The article was published in *The Tactical Edge*, Winter 2010 Edition, and was entitled "Civil Court–Prepare Your SWAT Team for the Inevitable."

EXPERT OPINION OF CHARLES J. KEY, SR.
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 6

## IV. COMPENSATION

I am being compensated at the rate of $225.00/hour for consultation and review, and $250.00/hour for appearing in court, deposition, and/or submitting an expert report/affidavit. A minimum payment of four hours is required for appearing in court, deposition, and/or submitting an expert report/affidavit.

## V. METHODOLOGY IN EXPRESSION OF OPINIONS

All of the opinions provided in this report are expressed to a reasonable degree of certainty in my fields of expertise. They are offered in each subject on which an opinion is rendered and are presented in a general statement regarding whether the acts of the officers were objectively reasonable and consistent with accepted standards of police policies, practices, and training. Supporting opinions are then provided with more particularity in the bases for the generally held opinion.

## VI. STANDARD OF ANALYSIS

My opinions in this case were developed by viewing the facts contained in the provided materials from the perspective of an objectively reasonable officer confronted with the circumstances as they existed at the time the incident occurred. They are not conclusions as to the credibility of any of the parties.

## VII. MATERIALS REVIEWED

In reaching my conclusions and opinions as to these issues, I have relied upon my

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 7

extensive personal experience and training in the field of law enforcement, which I have

developed as a law enforcement officer, administrator, trainer, and as an expert witness and

consultant in police-related matters.  I have also reviewed various documents and materials in

forming my opinions in this specific case, including, but not limited to:

1. Amended Civil Complaint
2. Electronic File Entitled Homicide File
   a. Criminal Investigation Division Final Report (PDF page 2)
   b. Synopsis of Incident (PDF page 4)
   c. Summary of Autopsy (PDF page 7)
   d. Summary of Statement of Officer David Chapman (PDF page 8)
   e. Summary of Statement of Officer Jorge Bernardez-Ruiz (PDF page 9)
   f. Summary of Statement of Officer Derrick Beasley (PDF page 10)
   g. Summary of Statement of Officer Latreese Lee (PDF page 11)
   h. Summary of Statement of Officer Danielle Lewis (PDF page 12)
   i. Summary of Statement of Officer Matthew Cioffi (PDF page 12)
   j. Summary of Statement of Officer Eric Hinton (PDF page 12)
   k. Summary of Statement Officer Alex Hashagen (PDF page 13)
   l. Summary of Statement of Officer Taras Hnatyshyn (PDF page 14)
   m. Summary of Statement of Officer Cory Jennings (PDF page 15)
   n. Summary of Statement of Witness Corinthea Servance (PDF page 17)
   o. Summary of Statement of Witness Chuma Obineme (PDF page 17)
   p. Summary of Statement of Witness Duane Bonds (PDF page 18)
   q. Summary of Statement of Witness James Price (PDF page 19)
   r. Summary of Statement of Witness Shawanda Lewis (PDF page 19)
   s. Summary of Statement of Witness Ayesha Rucker (PDF page 20)
   t. Interview of Officer David Chapman, 10/28/13 (PDF page 28)
   u. Interview of Officer Latreese Lee, 10/03/13 (PDF page 45)
   v. Baltimore Police Department Supplement Report, Assault on Police, by Officer R. Weese, 07/18/13 (PDF page 113)
   w. Baltimore Police Department Supplement Report, Questionable Death, by Officer R.  Weese, 07/18/13 (PDF page 115)

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 8

x.  Crime Scene Photos (PDF page 149-151, 1112-1115, 1124-1146)

y.  Interview of Officer Jorge Bernardez-Ruiz, 10/28/13 (PDF page 171)

z.  Interview of Officer Matthew Cioffi, 10/28/13 (PDF page 264)

aa.  Interview of Officer Eric Hinton, 10/24/13 (PDF page 278)

bb.  Autopsy Photos (PDF page 463-468)

cc.  Transcript of Taped Statement of Officer Taras Hnatyshyn, 07/23/13 (PDF page 471)

dd.  Transcript of Taped Statement of Officer Cory Jennings, 07/30/13 (PDF page 513)

ee.  Transcript of Taped Statement of Witness James Price, 07/18/13 (PDF page 538)

ff.  Transcript of Taped Statement of Witness Corinthea Servance, 07/18/13 (PDF page 572)

gg.  Transcript of Taped Statement of Witness Duane Bonds, 07/23/13 (PDF page 591)

hh.  Application for Search and Seizure Warrant for the Mercedes-Benz (PDF page 619)

ii.  Transcript of Taped Statement of Witness Chuma Obineme (PDF page 651)

jj.  Transcript of Taped Statement of Witness Shawanda Lewis (PDF page 703)

kk.  Transcript of Taped Statement of Witness Ayesha Rucker (PDF page 726)

ll.  Baltimore City Fire Department Comprehensive Report, 07/18/13 (PDF page 838)

mm.  Incident History Detail-CAD (PDF page 844)

nn.  Crime Scene Diagram (PDF page 859)

oo.  Baltimore Police Department Laboratory Section Drug Analysis Report (PDF page 900)

pp.  Autopsy of Tyrone West (PDF page 944)

qq.  Photographs of Involved Officers (PDF page 1071, 1116-1123)

rr.  Homicide Section's Summary of Communications Tape (PDF page 1156)

ss.  Summary of Encounter (PDF page 1157)

tt.  Description of Involved Officers (PDF page 1167)

3.  Baltimore Police Department Pepper Spray Guideline, Effective 05/06/11

4.  Office of the State's Attorney for Baltimore City Memorandum, Interview of Officer Alex Hashagen, 12/13/13

5.  Office of the State's Attorney for Baltimore City Memorandum, Interview of Officer Derrick Beasley, 11/18/13

6.  Article, *Pepper Spray's Effects on a Suspect's Ability to Breathe.* National Institute of Justice.

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 9

7.   Article, *Impact of Oleoresin Capsicum Spray on Respiratory Function in Human Subjects in the Sitting and Prone Maximal Restraint Positions, Final Report.* National Criminal Justice Reference Service

8.   IACP Model Policy on the Use of Pepper Aerosol Restraint Spray, September 1994

9.   Baltimore Police Department Pepper Spray Guideline, 05/06/11

10.  https://www.wunderground.com/history/

11.  Communications Tape Recordings of Incident

## VIII. PURPOSE OF ENGAGEMENT FOR SERVICES

I have been retained to review the facts of this case and to provide an expert opinion as to: 1) Whether the actions of the Defendant Baltimore Police Officers in stopping and attempting to arrest Mr. Tyrone West were objectively reasonable and consistent with accepted standards of police policies, practices, and training; 2) Whether the actions of the Defendant Baltimore Police Officers in using force in attempting to effect the arrest Mr. Tyrone West were objectively reasonable and consistent with accepted standards of police policies, practices, and training; and 3) Whether the Baltimore Police Department as a matter of custom and policy failed to adequately train, supervise, and discipline the Defendant Baltimore Police Officers.

## IX. INCIDENT SYNOPSIS

### 1) *Account According to Plaintiff* [1]

On July 18, 2013, at or about 7:15 P.M., Defendants Chapman (Chapman)[2] and

---

[1]Taken from Civil Complaint.

[2]At the time of this incident, the names of the occupants of the car were not known to the officers, nor were the officers' names known to the occupants. For the purposes of clarity and brevity in this report, all names will be used when and where applicable.

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 10

Bernandez-Ruiz (Ruiz) initiated a traffic stop of Mr. Tyrone West (West). They never articulated to West any legal justification for stopping the vehicle he was operating. At the time of the stop, West was driving Tawanda Jones' vehicle, a 1999 green Mercedes Benz, in the 5200 block of Kelway Road, Baltimore City. Riding in the front passenger seat with West was Ms. Corinthia Servance (Servance). Chapman and Ruiz were driving an unmarked Baltimore Police Department (BPD) vehicle. They activated the vehicle's emergency lights to stop West, who was, at that time, driving in a prudent and safe manner, obeying all traffic laws, and had not broken any laws of the road.

Chapman and Ruiz exited their vehicle aggressively, approached West's vehicle, and shouted verbal abuses, including "fu**ing ni**er, get out of the fu**ing car!" They commanded both West and Servance to exit the vehicle. As West began voluntarily exiting the vehicle, Ruiz forced him out of the vehicle and onto the ground by dragging him by his hair. Chapman then ran to the driver's side of West's vehicle, struck him with his departmentally issued baton, and sprayed West in the face with his departmentally issued pepper spray. Chapman and Ruiz both tased West on his neck and on the side of his abdomen while continuing to spray West in his face with their pepper spray. Immediately thereafter, Chapman and Ruiz continued their assault against West beating him with their batons and fists, and administering kicks to his body and head. West begged the Defendants to stop the assault on his person, and yelled, "Help me, help me, somebody help me! Please stop beating me!" West succumbed to the illegal and excessive

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
**Page - 11**

police force. He lay on the ground exclaiming, "Ahhh, you got me, stop beating me, why are you beating me, stop beating me? My face is burning!"

After approximately fifteen minutes of the unprovoked assault on West, Chapman radioed a "Signal 13",[3] because both Chapman and Ruiz had sprayed pepper spray so vigorously, and at such a close range to West, that some had gotten on them. Soon thereafter, multiple BPD squad cars arrived on the scene, carrying the remaining Defendants. Defendant Besley [*sic*] (Beasley), passenger, and Defendant Morgan State University Officer David Lewis (David Lewis), driver, arrived first in a Morgan State University campus police car, jumped out of their vehicle and immediately began striking West in the head with their batons. A BPD police vehicle containing Defendants Danielle Lewis (Danielle Lewis), who was driving, Latresse Lee (Lee), who was in the front passenger seat, and Matthew Cioffi (Cioffi), who was seated in the rear passenger seat, arrived next. Danielle Lewis struck the MSU vehicle in the rear. The officers then exited their vehicle and immediately joined the beating of West. A third BPD marked patrol vehicle arrived. It was transporting Defendants Hinton (Hinton) and Hashagen (Hashagen), who immediately jumped out of their vehicle and ran to join the beating of West. The officers used their batons to strike West with so much force to his head, torso, neck, back, arms, shoulders, thighs, and legs that both subcutaneous and intramuscular bruising were visible days after his death.

---

[3]In the 10-Code used by the BPD to shorten and clarify radio transmissions, a Signal 13 is used when officers are in need of immediate assistance.

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 12

Ultimately, West became unconscious from the beatings. As his seemingly lifeless body lay on the ground, he was handcuffed behind his back, left on the concrete ground in a prone position, and, after a few more kicks to his face, David Lewis sat on the back of West, intentionally restricting his breathing. Eventually West turned gray, stopped breathing, and had no pulse.

All of the Defendant Officers reported in their statements to the BPD Homicide Unit or the State's Attorney for Baltimore City that West was sprayed with pepper spray. Fellow police officers washed the eyes of Chapman and Ruiz with water, but no treatment was administered to West. In fact, no call was made for a paramedic prior to his death. When Medic 13, which was dispatched for "an injured officer," finally arrived, West non-responsive body was taken from the scene and transported to Good Samaritan Hospital, where he was pronounced dead.

He was then transported to the Office of the Chief Medical Examiner at or about 9:00 a.m. July 19, 2013. The Medical Examiner's Office on December 11, 2013 concluded that Tyrone West's manner of death "could not be determined" and the cause of death was "Cardiac Arrhythmia and Cardiac Conduction System Abnormality complicated by dehydration during police restraint."

## 2)   *Account According to Defendant Officers* [4]

On July 18, 2013 at approximately 7:15 p.m., Officers Ruiz and Chapman were working

---

[4]Taken from police reports and witness statements.

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 13

in plainclothes, operating an unmarked vehicle. They initiated a vehicle stop of a green

Mercedes-Benz, occupied by West and Servance, at Kitmore and Kelway Road in Baltimore,

because they had observed the car backing up in the intersection at Kitmore and Northwood

Drive, turning onto Kitmore Road, and driving off well below the posted speed limit. Their

account of the car's driving pattern was supported by Servance in her taped statement provided

on the night of the incident to Homicide detectives. Ruiz approached the driver's side, while

Chapman approached the passenger's side. While they were pulling the vehicle over, the officers

observed West and Servance making numerous furtive movements. West was observed dipping

his shoulder in an attempt to conceal something. Servance was observed leaning over and

placing items near the center console of the vehicle. Their description of these actions were

supported by Servance, who said, in her taped statement, that she and West were eating chicken

and reaching toward where it was lying on the console of the car. She also said she was putting

money or her phone in her purse.

Based on these movements and the belief that West and Servance were attempting to

conceal evidence of a crime, Chapman and Ruiz asked them to get out of the vehicle. After they

got out of the vehicle, they were instructed to sit on the curb and cross their ankles. Servance

refused to sit down, but West complied. Ruiz observed a bulge in West's right sock that he

believed to be suspected narcotics and attempted to recover them. West resisted the effort and

began to assault Ruiz and Chapman. Servance, also, reported that Ruiz saw something, bent

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 14

down to retrieve it, and West reacted by pushing and striking out at Ruiz, then attempting to get up.

After Ruiz bent over to check out the bulge and West assaulted him, Ruiz punched West with body strikes. Ruiz was then able to grab West in a bear hug and a push him against the unmarked vehicle. During the struggle, they both fell to the ground. Ruiz was on top of West attempting to restrain him and Chapman was holding onto his legs, but was unable to control him. West was kicking violently. Chapman used his baton to strike West on his calf, but it had no effect. While Chapman was on West's back, West reached back and attempted to grab Chapman's service weapon. Chapman then punched West in the face. West was still fighting and punched Chapman in the chest. West suddenly raised his hands and temporarily stopped resisting, looking at both officers he said, "Okay, you got me." The officers attempted to handcuff West, but West immediately jerked his arms away from them. Both officers again began attempts to control West. The three of them ended up on the grassy area next to the vehicle. As Ruiz was attempting to hold down West, Chapman sprayed West with his Oleoresin Capsicum (OC) spray. The spray affected all of them.

West stood up and ran towards Kelway and then toward the alley on Kitmore Road. As he was running, he was yelling, "Trayvon Martin, help." West then assumed a boxing stance, which caused Chapman to strike him again with his ASP baton. West fell to the ground and Chapman kicked him once or twice in the head. West then got up, backpedaled across the street, and hid behind a truck. When Chapman approached him, West charged toward him and poked

him in the eye. Other officers then arrived on the scene. Ruiz and Chapman retreated from the incident, because they were blinded and incapacitated from the pepper spray and heat.

Beasley responded to Chapman's call for a Signal 13 and was the first backup officer on the scene. When he arrived, he saw West on his feet throwing punches at Ruiz and Chapman. Beasley grabbed West around the chest area, but West was sweaty and escaped his grip. Both Chapman and Ruiz backed off when the other officers arrived. West hit Beasley in the head and Beasley struck him in his upper body. West went to the ground and Beasley got a cuff on one hand. West continued pulling his arms away, trying to keep from being handcuffed. Beasley got OC spray in his eyes as a result of transfer from West. When the other officers arrived and became engaged, he drew back because he was having trouble seeing.

Beasley saw West continuing to resist by kicking even after they got the cuffs on him. Beasley stated that MSU Officer Lewis was the last person who was engaged with West. After West was cuffed, Beasley saw MSU Officer Lewis put his knee on top of West's back in an effort to control his kicking. Beasley demonstrated to the interviewing State's Attorney and Homicide detective how David Lewis placed a knee on West's back while he, West, was prone. He demonstrated that David Lewis was on the left side of West, facing his head, with his, Lewis', knee/leg somewhat covering West's left arm. He said that Lewis had the knee in West's back for "a minute or two" and that West never stopped resisting during this time.

As Lee arrived, she saw West struggling with Ruiz and Chapman. When West was on the ground, she assisted in trying to handcuff his left wrist. She couldn't get control of it, causing

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 16

her to strike him on the shoulder with her fist. When this still didn't get him to comply, she

struck him on the shoulder with her baton.

When Hashagen arrived on scene, he observed West on the sidewalk next to a truck,

where he was fighting with Ruiz and Chapman. Ruiz and Chapman appeared to have a hard time

seeing, because of their exposure to the OC. Hashagen reported that the Morgan State officer

arrived before him, but they all engaged West at the same time. They tackled him and took him

to the ground. Hashagen recalled Lee and other officers telling West to "give me your hands" so

that he could be handcuffed. West didn't comply, so Hashagen punched West around the temple

area with a closed fist. He didn't believe that the punch was effective, because it glanced off.

West began to buck and Hashagen delivered another punch to the same area, which was also

ineffective. Hashagen tried to control West's legs by grabbing them and bending one leg at a

right angle while applying pressure over the bent leg with the other leg. Hashagen attempted this

maneuver twice. The first time, West bucked and kicked, throwing Hashagen backwards. The

second time, Hashagen applied all his weight behind the top leg. Both attempts lasted for

roughly fifteen to twenty seconds, with the total time approximately thirty to forty-five seconds.

It was during the second attempt that MSU Officer Lewis placed his knee on West's back.

After the handcuffs were secured and West was no longer a threat, Hashagen attended to

Ruiz and Chapman, who were suffering from the effects of the OC combined with the heat.

Hashagen saw that West was still alive at this point.

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 17

Officer Taras Hnatyshyn (Hnatyshyn), sector officer-in-charge (OIC) that night, arrived

after West had been handcuffed.  He observed that West was lying in a prone position.

Hnatyshyn told MSU Officer Lewis to roll him over, noticed that West's leg appeared to be stiff,

and that he did not appear to be breathing.  He had the handcuffs removed and he and Jennings

carried West to a grassy area.  Hnatyshyn opened West's mouth with a pen and attempted to open

his airway.  He then performed CPR and continued chest compressions until medics arrived.

One of the officers connected a defibrillator, but a failsafe did not allow it to provide a charge.

West was transported to Good Samaritan Hospital by ambulance, where he was pronounced

dead.

None of the officers who responded were equipped with a TASER, nor did the autopsy

document any injuries which were consistent with a TASER deployment.

### 3)   *Documented Facts Pertinent to Opinions*

#### a)   **Baltimore City Fire Department Comprehensive Report, 07/18/13**

Fire Department Dispatch notified at 19:17 hours (7:17 p.m.).
Ambulance arrived on scene at 19:23 hours.
Ambulance departed scene at 19:33 hours.

#### b)   **Summary of Communications Tape**

Communications Tape 1-8
Initiated at approximately 1909 hrs.  Total chapter time 3:32
0:46    Chapman calls for a 10-16 (backup unit)
1:09    Chapman calls for a Signal 13

EXPERT OPINION OF CHARLES J. KEY, SR.
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 18

2:30    Chapman calls for a 2nd Signal 13

2:37    Chapman calls for a 3rd Signal 13

2:57    Barely audible voice says 13

3:23    Chapman says I need a medic


Communications Tape 9-16

Initiated at 1913 hrs.  Total chapter time 3:06

1:22    Suspect is in custody.  Give me a medic up here.  (4:08 from 10-16 request)

1:40    Dispatch 10-32 at 1914 hours (Dispatcher Time)

2:34    23 (Hinton) medic requested for suspect injuries. (1:12 from suspect in custody)

3:03    Dispatcher request status for officers.  Officers OK just need medic (CAD 19:16:06)


Communications Tape 17-24

Initiated at 1916 hrs.  Total chapter time 4:19.

0:00    2 medics requested.  (CAD 19:16:36)

0:34    supervisor requested to respond

0:41    460 calls on scene (CAD 19:17:50)

2:34    09 (Kelley) medic needed ASAP (8:26 from the time of Chapman's 1st call for a 10-16)

2:54    400 (Davis) gives route for Ambo (CAD 19:19:47)

3:39    09 asks about fire apparatus (CAD 19:20:27)


      **c)**    **West's Autopsy by Dr. Pamela E. Southall, Medical Examiner**


The external injuries were associated with bruising of superficial soft-tissue layers. Autopsy revealed neither signs of asphyxia, nor significant injury to vital structures or vital areas of the body.  The abnormalities found in Mr. West's heart and signs of dehydration are certainly causes for sudden cardiac death.  Another factor that may have contributed to his death was the extreme environmental temperature.  Temperature is on the day of his death in parentheses July 18, 2013, were reportedly in the high 90s with a heat index in the low 100 (degrees Fahrenheit).  The manner of death could not be determined.


Other than a superficial abrasion to the glabella region of the forehead and an internal injury caused by a catheter insertion to his neck, no injuries to West's head and neck were noted.

EXPERT OPINION OF CHARLES J. KEY, SR.
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 19

## X. OPINIONS AND BASES OF OPINIONS

*1)*      *Opinion Regarding Whether the Actions of the Defendant Baltimore Police*

*Officers in Stopping and Attempting to Arrest Mr. Tyrone West Were*

*Objectively Reasonable and Consistent with Accepted Standards of Police*

*Practices, Policies, and Training.*

It is my opinion that the actions of the Defendant Baltimore Police Officers in stopping

and attempting to arrest Mr. Tyrone West were objectively reasonable and consistent with

accepted standards of police practices, policies, and training.

*BASES*

> The Fourth Amendment "reasonableness" inquiry is whether the
> officers' actions are "objectively reasonable" in light of the facts
> and circumstances confronting them, without regard to their
> underlying intent or motivation. The "reasonableness" of a
> particular use of force must be judged from the perspective of a
> reasonable officer on the scene, and its calculus must embody an
> allowance for the fact that police officers are often forced to make
> split-second decisions about the amount of force necessary in a
> particular situation.[5]

Consistent with the instructions articulated in *Graham,* my review of this case is based

upon the facts and circumstances known to the officers at the time they were confronting Mr.

West. In accordance with the officers' and Servance's accounts, those facts and circumstances

not in dispute were: 1) West was stopped after Chapman and Ruiz observed him backing his car

into the intersection of Kitmore and Northwood Drive and driving at a slow speed down

---

[5]*Graham v. Connor* (490 U.S. 386,1989) Pp. 396-397.

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 20

Kitmore; 2) After the police vehicle's emergency lights were activated, Chapman and Ruiz observed West and Servance moving suspiciously inside the car; 3) Once the car was stopped, West and Servance were asked to get out and sit on the curb; 4) Servance refused to sit on the curb, but West did; 5) Ruiz saw a bulge in one of West's socks and moved to retrieve the item; and 6) West pushed Ruiz away, attempted to strike him, or struck him, and attempted to get up.

While Plaintiffs' Amended Civil Complaint contains various allegations of police misconduct, there is no present record to support many of those allegations. The opinions expressed in this report are based upon contemporaneous witness reports of both civilians and police officers. Particular emphasis was given to Ms. Servance's account, because she was the only witness to the initial stop other than Officers Ruiz and Chapman. Plaintiffs allege that the officers used racial slurs and obscenities directed toward West and Servance and that West was pulled out of the car by his hair. Servance's account of the stop mirrors the statements given by Chapman and Ruiz and does not contain any mention of either racial slurs, obscenities, or of West being jerked out of the car by his hair.

Hypothetically, even if the allegations in the Amended Civil Complaint concerning the racial slurs and obscenities were accurate, the subjective motivations or feelings of the officers cannot affect opinions expressed by a police practices expert as to the objective reasonableness inquiry into the officer's actions. Regarding the potential underlying intent or motivation of the officers, *Graham* specifically instructs as follows:

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 21

> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.  (Citations Omitted)

Consistent with *Graham*, therefore, the analysis of the officers' actions in this incident does not consider the alleged racist and obscene statements and, instead, focuses entirely on whether those actions were objectively reasonable and consistent with accepted standards of police policies, practices, and training.  For the record, any such statements by any police officer are vile, unprofessional, and should be dealt with harshly in administrative procedures.

Backing into an intersection on well traveled city streets can certainly be interpreted by any objectively reasonable and well trained officer as unsafe backing.  This, by itself, could result in a traffic stop.  In this case the officers also observed the car driving very slowly down Kitmore Road after it backed into the intersection.  This act would also lead an objectively reasonable and well trained officer to stop the car and inquire if there was a problem, both for the safety of the occupants and traveling public.  Given these facts, the stopping of West and Servance was objectively reasonable and consistent with accepted standards of police policies, practices, and training.

Officers are trained that car stops are a very dangerous police activity.  They are dangerous, in part, because the identity and criminal history of the driver are unknown, the cars may contain weapons, and will almost always contain weapons of opportunity.  Weapons of

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 22

opportunity are objects which have a function not normally associated with being used as a weapon; i.e., tools, pens, pencils, bottles, hot drinks, etc. These items are commonly found in automobiles. Additionally, officers are trained to watch the actions of the occupants for movements that may signal an attempt to hide contraband or weapons. The officers in this case observed just such movements after they activated their vehicle's emergency lights. Officers are trained that if they see these types of movements or other actions which lead them to reasonably believe that the occupants of the vehicle are attempting to secrete contraband or weapons, they are to ask the occupants to step out of the vehicle for their safety and the safety of the officers. The officers' requests that West and Servance exit the vehicle were, therefore, objectively reasonable and consistent with accepted standards of police policies, practices, and training.

Once West was out of the car and sitting on the curb, Ruiz saw the bulge in his sock. This would lead any objectively reasonable and well trained officer to believe that the bulge was either contraband or a weapon. Considering these circumstances, officers are trained to retrieve the item for their safety and/or in furtherance of an investigation into the possibility that the item is contraband. According to the accounts of the officers and Ms. Servance, West pushed Ruiz, attempted to strike him, or struck him, and attempted to stand up. The push, attempt to strike, or strike would reasonably be considered an unwanted, offensive touching and, therefore, a second degree assault. Based on these facts, the attempt by Chapman and Ruiz to arrest West was objectively reasonable and consistent with accepted standards of police policies, practices, and training.

EXPERT OPINION OF CHARLES J. KEY, SR.
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 23

2)   *Opinion Regarding Whether the Actions of the Defendant Baltimore Police Officers in Using Force in Attempting to Effect the Arrest Mr. Tyrone West Were Objectively Reasonable and Consistent with Accepted Standards of Police Practices, Policies, and Training.*

It is my opinion that the actions of the Defendant Baltimore Police Officers in using force in attempting to effect the arrest Mr. Tyrone West were objectively reasonable and consistent with accepted standards of police practices, policies, and training.

*BASES*

> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation. (Citations Omitted)[6]

The circumstances of this case embody the holdings in *Graham* concerning, "split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." From the time the car was stopped until West was taken into custody was approximately four minutes. An ambulance was called for West approximately one minute and twelve seconds after he was finally brought under control. These

---

[6]Ibid.

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 24

times are established by the Communications Tape Recordings, which were recorded during the time this incident was occurring. These times refute the hyperbole contained in the Amended Civil Complaint regarding the amount of time the officers were "beating" West and that no medical assistance was sought for him. The Incident History Detail Report (CAD) documents the ambulance on scene at 19:22:37, or approximately eleven minutes after Chapman's first call for a backup unit. It should be noted that CAD entries are always made after the event actually occurs.

During the four minutes it took to gain control of West, West assaulted officers by hitting them with his feet and hands, reached for Chapman's weapon, feigned surrender, ran away, and violently resisted while having a steel handcuff attached to his hand. According to https://www.wunderground.com/history/, the temperature at the time this was occurring was ninety degrees and both of the officers and West were suffering from the effects of pepper spray. By the time other officers arrived to assist, Chapman and Ruiz were nearly blinded by the pepper spray and nearing exhaustion. The officers were wearing their bullet resistant vests, which greatly increases body temperature during extreme physical exertion, particularly on hot days. Officers are trained that if a subject is not brought under control within the first thirty seconds, their ability to continue to attempt to control is greatly decreased because of oxygen deprivation. The longer a struggle lasts, therefore, the more force must be used to gain control. When officers become so exhausted they can no longer defend themselves, their force options may include lethal force.

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 25

Officers are trained to respond to the resistance or threatened resistance of an individual by utilizing various levels of force. This training is generally called force continuum, ladder of force, wheel of force, badge of force, etc. The BPD uses a force continuum, which is consistent with nationally accepted standards, to train their officers. This training model teaches BPD officers what force options they may use to respond to various levels of resistance from subjects. According to the model, the level of resistance ranges from compliant, to passive, to active, to assaultive with the potential of physical injury, to assaultive with the potential of serious physical injury.

Passive resistance is an act which is contrary to the commands or efforts by an officer to control the person's actions. It is characterized by a person sitting down, lying down, standing still, etc. In this case Servance's refusal to sit on the curb would be considered passive resistance. The officers used no force against her to compel her to comply.

Active resistance is any physical act which is contrary to an officer's commands or efforts to control or arrest an individual. Examples of active resistance are pulling arms or hands away, holding arms under one's body, twisting the body, tensing the arms or hands, moving hands in a manner contrary to the commands of the officer, etc. Assaultive physical resistance is any act or threatened act that would lead an objectively reasonable officer to believe that the person presents a physical threat to the officer.

In this incident both active and assaultive resistance are exemplified by West's pushing Ruiz, attempting to strike him, striking various officers, poking Chapman in the eye, running

from them, refusing to present his hands to be handcuffed, and putting his hands underneath his body when the officers had one handcuff attached. This sequence of events would lead any objectively reasonable and well trained officer to believe that West's actions were active and assaultive physical resistance.

Officers are trained that they do not have to be battered before using force to prevent an attack. If a battery actually had to occur before the officers defended themselves or others, officers could be disabled to the point that they could not mount a defense. Further, the crime of second degree assault does not require that a person be struck. It only requires that a person be put in fear of being assaulted, that the perpetrator of the assault intentionally frightens the victim with the threat of immediate offensive physical contact, that the perpetrator has the ability to bring about the immediate physical contact, and that the perpetrator's actions are not legally justified. In this case the pushing and striking of Ruiz constituted a battery, the threatened strike a second degree assault, and the attempt to run resisting arrest. All of these occurred before any force was used against West.

Officers may use whatever force that is objectively reasonable to overcome the level of resistance offered. They are not required to use a lesser force before using the amount of force reasonably necessary to overcome the threat they are confronting. In this case the witness accounts are that West did strike various officers with his hands and feet. Officers are trained that they may use strikes with personal weapons,[7] batons, pepper spray, or TASERS to overcome

---

[7]Personal weapons are defined as a head, elbows, forearms, fists, knees, and feet.

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 27

an actively resisting subject or a subject who is physically assaultive. Contrary to the allegations in the Amended Civil Complaint, no officers were equipped with TASERS in this incident and the autopsy found no evidence that a TASER had been used against West.

In response to West's resistance and assaults, Ruiz grabbed West in a bear hug and pushed him against the unmarked vehicle. Ruiz punched West with body strikes. During the struggle, they both fell to the ground. Ruiz was on top of West, attempting to restrain him. Chapman was holding onto West's legs, but he was kicking so violently he was unable to control him. Chapman struck West on his calf with his baton, but it had no effect. While Chapman was on West's back, West reached back and attempted to grab Chapman's service weapon. Chapman then punched West in the face. West was still fighting and punched Chapman in the chest.

West, then, suddenly raised his hands and temporarily stopped resisting. He told the officers, "okay, you got me." When the officers attempted to handcuff him, West immediately jerked his arm away from them. Both officers again attempted to control West and they ended up on the grassy area next to the unmarked vehicle. While Ruiz was attempting to hold West down, Chapman used his OC spray. The spray affected all of them.

West stood up and ran toward Kelway. He then ran toward the alley on Kitmore Road, yelling, "Trayvon Martin, help." West then assumed a boxing stance, which caused Chapman to strike him with his ASP baton. West fell to the ground and Chapman kicked him once or twice in the head. Given the lethal threats which West had already presented, the exhaustion of the officers, and the effects of the pepper spray on the officers, Chapman's kicks to the head at this

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 28

point were an objectively reasonable force option in an attempt to control West's violent

resistance. West then got up, backed across the street, and hid behind the truck. When Chapman

approached him, West charged toward him and poked him in the eye. Pokes to the eye can cause

serious injuries. Other officers then arrived on the scene. Ruiz and Chapman retreated from the

incident, because they were blinded and incapacitated from the pepper spray and exhausted from

the struggle.

The officers used commendable restraint during this sequence of events. Any objectively

reasonable and well trained officer would consider West's attempt to take Chapman's firearm an

imminent threat of serious injury or death. That attempt, the poke to Chapman's eye, the effects

of the pepper spray, and the officers' exhausted physical condition made this incident a

potentially lethal force situation. Assaultive physical resistance with the potential for serious

injury is any act or threatened act that would lead an objectively reasonable officer to believe that

the person presents an imminent threat of serious injury or death to the officer or others. It is

exemplified by an individual attacking and overcoming an officer to the point where the officer

reasonably believes that he/she can no longer defend herself/himself, attempting to obtain the

officer's weapon, threatening or using a weapon against the officer, or acting in a manner which

would lead an objectively reasonable officer to conclude the person is armed and presenting an

imminent threat.

On the subject of nationally accepted standards of police officer training and policies

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 29

regarding the definition of an imminent threat, Federal Bureau of Investigation Supervisory

Special Agent John C. Hall (now retired), a nationally recognized authority and published author

in police use of force, wrote an article in April 1996 in The FBI Law Enforcement Bulletin,[8] also

a nationally recognized source in police use of force policies, that outlined the Department of

Justice's lethal force policy.  Following are excerpts from the policy that are relevant in this case:

> Imminent Danger: 'Imminent' does not mean 'immediate' or 'instantaneous,' but
> that an action is pending. Thus, a subject may pose an imminent danger even if he
> is not at that very moment pointing a weapon at the agent.  For example,
> imminent danger may exist if agents have probable cause to believe any of the
> following:
>
> a.     The subject possesses a weapon, or is attempting to gain
>        access to a weapon, under circumstances indicating an
>        intention to use it against the agents or others; or,
>
> b.     The subject is armed and running to gain the tactical
>        advantage of cover.

The imminent danger police training standard, as Supervisory Special Agent Hall

explained, specifically means that officers are trained that they do not have to see a weapon or

have a weapon employed against them before they are allowed to use lethal force to protect

themselves or others.  They are, of course, required to articulate why they reasonably believe that

a person presents a lethal threat, including the potential possession of and attempt to obtain a

weapon.

The polices and training of the Federal Bureau of Investigation are a source of nationally

---

[8]John C. Hall, "FBI Training on the New Federal Deadly Force Policy," *FBI Law Enforcement Bulletin*, Volume 38, Issue No. 4 (April 1996) Pages: 25-32.

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 30

accepted police policies, practices, and training because of that agency's responsibility for investigating allegations of criminal constitutional violations by police officers, particularly allegations of police officers using excessive force.

Instead of using lethal force to overcome West's assaults and resistance, the officers elected to use pepper spray and strikes to the body with a baton, fists, and kicks. Given the violent and potentially lethal nature of West's resistance, they could have used strikes to his head and neck with batons as was alleged in the Amended Civil Complaint. The officers reported no such strikes with a baton. Chapman, however, did report that he had kicked West in the head. The autopsy's findings determined to a certainty that West sustained only one injury to his head. That injury was a superficial linear abrasion on the glabella region of his forehead. There were no injuries noted to his neck, other than the injury attributed to the insertion of a catheter.

As a person who has trained in defensive skills for over forty years and as a FBI certified defensive skills instructor, I have received extensive training regarding the physical effects associated with strikes to the head or face with feet, fists, knees, or batons. An ASP baton is constructed of either steel or hardened aluminum. Any forceful contact with the skin will cause, at a minimum, severe bruising or lacerations, which will generally present in the linear outline of an ASP. Such strikes were noted on other parts of West's body. Forceful strikes to the face and head with feet, fists, and knees will also leave bruises and, depending on where they hit, lacerations. This is because the skin of the head is directly over unyielding bone, unlike other areas of the body which are protected by fat or muscle. The face and head area have no such

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 31

protection and the hard bone surface does not allow the skin the flexibility to yield to the force of

the strike; thus, the skin on the head and face areas are much more susceptible to visible,

bleeding injuries.

Plaintiffs also assert in the Amended Civil Complaint that Chapman and Ruiz sprayed

pepper spray so vigorously and at such a close range to West that some had gotten on them.

Pepper spray is at the low end of the force continuum and can be used to control a passively

resisting person. West's violent resistance and assaults on the various officers could certainly

have resulted in his having been sprayed more than once. The involved officers, however,

reported that West was only sprayed one time and that was done by Chapman early in the

struggle.

Pepper spray transfer in close quarters altercations is a common occurrence. Before it

evaporates, it is present on the skin, clothing, and hair of the sprayed subject. Generally,

evaporation begins in ten to fifteen minutes and takes thirty to forty-five minutes to complete. Its

effects are exacerbated by vigorous physical activity, particularly when the temperature is in the

90's. Those elements were present in this case. The fact that Ruiz and Chapman were seriously

affected by the spray directed at West does not support any allegation that the pepper spray was

used excessively or more than reported.

Additionally, there is a mistaken belief that pepper spray increases the likelihood that a

person who is sprayed and put in a prone position is more susceptible to breathing difficulties

and, therefore, to asphyxiation. Scientific studies have shown that pepper spray has no

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 32

deleterious effects on individuals who are put in a prone position.  Two articles containing

findings relevant to this issue follow:

> Study findings support the contention that OC spray inhalation, even when combined with positional restraint, poses no significant risk to subjects in terms of respiratory and pulmonary function. Although capsaicin spray has been studied extensively, this study assessed pulmonary and respiratory function after exposure to a commercially available OC spray used by law enforcement agencies nationwide. OC exposure produced no evidence of pulmonary dysfunction, hypoxemia, or hypoventilation in either the sitting or restraint positions. These findings also applied to the groups of overweight subjects and to those with potential respiratory abnormalities. On the issue of in-custody deaths, this study indicates that OC inhalation and exposure do not cause significant respiratory injury and should not lead to an increased risk of respiratory compromise, arrest, or death—thus lending credence to the large retrospective field studies that have found little evidence that OC causes significant respiratory injury.[9]

> We conducted a randomized, cross-over controlled study investigating the effects of OC inhalation and prone maximal restraint on respiratory function in human subjects. In our subjects, OC exposure resulted in no evidence of pulmonary dysfunction, hypoxemia, or hypoventilation when compared to placebo in both the sitting and restraint positions. Our findings support the contention that OC spray use by law enforcement personnel in the field does not result in respiratory compromise or increased risk for respiratory arrest and death in exposed subjects.[10]

It should be noted that the positional and maximal restraint referred to in these studies are terms

which refer to a person who is handcuffed with hands behind the back, ankles manacled, and the

---

[9]U.S. Department of Justice.  National Institute of Justice. *Pepper Spray's Effects on a Suspect's Ability to Breathe.* By Dr. Theodore C. Chan, Dr. Gary M. Vilke, Dr. Jack Clausen, Dr. Richard Clark, Paul Schmidt, Thomas Snowden, and Dr. Tom Neuman. NCJ188069.  (Washington, D.C.: United States Government Printing Office, 2001), 3.

[10]Chan, T.C., G.M. Vilke, J. Clausen, R.F. Clark, P. Schmidt, P. Snowden, and T. Neuman (2000). *Impact of Oleoresin Capsicum Spray on Respiratory Function in Human Subjects in the Sitting and Prone Maximal Restraint Positions, Final Report.*  National Criminal Justice Reference Service, 55.

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 33

hands' and ankles' restraints joined together. This is what is commonly referred to as the "hog-tie" position. The BPD does not use a maximal restraint position, nor was West so restrained. It should also be noted that the autopsy of West established to a scientific certainty that his death was not due to asphyxiation.

Beasley and MSU Officer David Lewis were the first officers to arrive in response to Chapman's call for a Signal 13. Beasley saw West fighting with Chapman and Ruiz, who backed off when the other officers arrived. He grabbed West around the chest area, but, because West was sweaty, West escaped his grip. West hit Beasley in the head and Beasley struck West in his upper body. West went to the ground and Beasley got a cuff on one hand, but West continued to pull the hand away and would not surrender the other hand. Lee had joined the effort by this time. She struck West on the shoulder with her fist and then a baton, when he wouldn't surrender his hand to be cuffed. Hashagen had also arrived by then. He, too, saw that West wouldn't surrender his hand and was violently resisting. He punched West around the temple area with a closed fist. He didn't believe that the punch was effective, because it glanced off. West began to buck and Hashagen delivered another punch to the same area. This punch was, also, ineffective. Hashagen then tried to control West's legs by grabbing them and bending one leg at a right angle, while applying pressure over the bent leg with the other leg. He attempted this maneuver twice. The first time, West bucked and kicked, throwing Hashagen backwards. The second time, Hashagen applied all his weight behind the top leg. Both attempts

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 34

lasted for roughly fifteen to twenty seconds, with the total time approximately thirty to forty-five

seconds. It was during the second attempt that David Lewis placed his knee on West's back.

David Lewis, who had arrived with Beasley, put his knee on top of West's back and

shoulder in an effort to control him. In his interview with an Assistant State's Attorney and a

Homicide Unit detective, Beasley stated that David Lewis was the last person who was engaged

with West. Beasley demonstrated how Lewis placed a knee on West's back while he, West, was

lying prone. Beasley said he could not remember which way Lewis was facing, but he

demonstrated that Lewis was on the left side of the body and was facing West's head, with his

knee/leg also somewhat covering the individual's left arm. He said that Lewis had the knee in

West's back for "a minute or two" and that West never stopped resisting.

Placing a knee in the back of a subject who is actively resisting on the ground and being

handcuffed is not considered a use of force. It is a procedure that is taught in the Baltimore

Police Department and every other agency in the country of which I'm aware. The FBI teaches

its agents to put a knee on the upper back in order to handcuff an actively resisting person.[11]  As

previously stated, the FBI is a model of nationally accepted standards of police policies,

practices, and training because it is the federal agency charged with the responsibility of

investigating criminal constitutional violations of police use of excessive force. Police

departments throughout the country, therefore, look to it as a source of nationally accepted

---

[11]      Federal Bureau of Investigation, United States Department of Justice. *Defensive Tactics Manual.* (Washington D.C.: 1970) 87-89.

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 35

standards on use of force. Once again, it is important to note that the autopsy determined to a

scientific certainty that West did not die of asphyxiation as could have been the case if Lewis'

knee had severely restricted his breathing.

Regarding West being put in a prone position and taken to the ground during the incident,

taking a subject to the ground is called a take-down and is classified as a nonlethal, empty-hand

control technique. A take-down is placed in the force continuum near the bottom of a range of

force options. Take-downs can be used when an individual is passively resisting an officer's

attempt to establish control or arrest the offender. Officers are permitted to take someone to the

ground when they have a reasonable belief that the person is potentially a threat to their safety.

Officers are trained that taking subjects to the ground is safer for the officer and the

subject. As long as subjects are standing, they can strike with arms or legs, move about, reach

for a weapon, etc. If any of those things occur, the officer may have to use more force to control

them; potentially including deadly force. When subjects are on the ground, they are much more

restricted in their movements and, therefore, much less likely to do something which will cause

the officer to have to escalate the amount of force used; thus, it is generally safer for both the

officer and the subject to put her/him on the ground.

There are, of course, circumstances which permit the officer to use force techniques when

the person is on the ground. In this incident West was described as keeping a cuffed hand

underneath his body and continuing to attempt to kick the officers after he was on the ground and

even after he was cuffed. This is still active/assaultive resistance and officers are still permitted

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 36

to use pepper spray, joint manipulation, and strikes with personal weapons and batons to overcome the resistance. West's having a metal cuff on one hand and actively resisting is considered assaultive physical resistance with the potential for serious injury. A steel handcuff on the wrist of a person who is violently resisting can inflict serious, even deadly, injuries. Further, he had not been frisked and had been violently trying to escape police apprehension. All of these elements would lead any objectively reasonable and well trained officer to believe that he presented an imminent threat of serious injury or death to the officers or others. As stated previously, when an officer reasonably believes that a person presents an imminent threat of serious bodily harm or death, the officer may use lethal force to overcome the threat. Once again, the officers attempting to control West continued to use strikes and leverage techniques rather than elevate their use of force.

Regarding injuries sustained as a result of an officer's use of force, anytime an officer goes hands-on with someone there is an increased risk of injury to both the officer and the subject. Use of force means exactly what it implies: physical coercion used to force compliance. There are no magic use of force procedures which are guaranteed not to result in injury. Unintended injuries can, and do, happen. Further, by their very nature, strikes and take-downs can possibly break bones and/or cause internal injuries. There is simply no way to train officers how to restrict the power of a punch or, in some manner, cushion the force that is used in a way that will prevent any injuries to a subject and, at the same time, ensure that it will be of sufficient force to convince the subject to comply with commands. Injuries in a use of force are directly

related to the amount of resistance offered by the subject: the more the subject resists, the more force will have to be used to effect control, and the more likely serious injuries will occur.

The nature and severity of injuries resulting from an officer's use of force are not determinative as to whether the use of force was objectively reasonable. West is reported to have sustained numerous minor abrasions and contusions to various parts of his body, including only one superficial injury to his head. These injuries are consistent with the accounts of the officers and, given West's violent and assaultive resistance, demonstrate the restraint exercised by those officers under circumstances when more force could have been used to control him. The use of force by the Defendant Officers was, therefore, objectively reasonable and consistent with accepted standards of police practices, policies, and training.

3)      *Opinion Regarding Whether the Baltimore Police Department as a Matter of Custom and Policy Failed to Adequately Train, Supervise, and Discipline the Defendant Baltimore Police Officers.*

It is my opinion that the Baltimore Police Department properly trained, supervised, and determined that discipline was not warranted for the Defendant Officers.

*BASES*

In the Amended Civil Complaint Plaintiffs allege the following as the bases for their claim that the Baltimore Police Department failed to adequately train, supervise, and discipline the Defendant Officers:

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 38

Nationwide, various other Police Departments, including the Philadelphia Police Department, adopted comprehensive policies regarding the use of Pepper Spray and appropriate medical treatment to be rendered to the person sprayed. A 1995 comprehensive policy on pepper spray use included strict rules regarding post-spray medical treatment and special reporting requirements. The Baltimore City Police Department PEPPER SPRAY GUIDELINE merely suggests "treatment" for a person in custody who was sprayed with Pepper Spray. It does not provide a mandatory rule or directive that medical attention must be provided to persons sprayed with pepper spray. Further, the guidelines provide absolutely no rule, directive or requirement against placing a person sprayed in a prone position or placing weight on the person's back as it is known that this will restrict his or her breathing. As a direct result of Defendants Batts' and Hatcher's failure to train and supervise the named Defendant Officers; and /or failure to implement mandatory policies that prohibit physically dragging unarmed citizens out of their vehicles during traffic stops when unnecessary; and/or failing to implement policies that mandated Officers to render medical aid when necessary to persons in their custody, such as in the present case, Tyrone West was killed.

Plaintiffs put forth no substantive facts on which an opinion can be rendered regarding their claim that Baltimore Police Officers were inadequately trained, supervised, and disciplined. The Civil Complaint contains some very vague generalizations suggesting that the actions of the Defendants in this incident and some of the Defendants' actions in other cases serve to establish that the BPD, as a matter of policy and custom, inadequately trained, supervised, and disciplined its officers. It does not, however, include any specific information regarding the policies and practices of the BPD and/or failure to adhere to or enforce such policies and practices, which support the allegations contained therein. To be clear, and as previously stated, it is my opinion that the Defendants' actions in this incident were objectively reasonable and consistent with nationally accepted standards of police policies, practices, and training; thus, those actions cannot serve as a basis for a claim that the BPD inadequately trained, supervised, and disciplined the officers. Even if one or more of their actions had deviated from accepted standards of conduct,

**EXPERT OPINION OF CHARLES J. KEY, SR.**
*Tawanda Jones, et al., v. Nicholas Chapman, et al.*
Page - 39

such deviation, by itself, would not be sufficient to permit offering an opinion on the adequacy of the police department's training, supervising, and disciplining its officers.

Further, my review of the Arrest Procedures and Use of Force policies, including pepper spray guidelines, of the BPD determine that they are consistent with nationally accepted standards and those of the Maryland Police Training Commission (MPTC). The MPTC is the governmental entity responsible for determining and approving the content of the subjects that must be taught to an agency's members in order to certify the agency to perform law enforcement functions in the state of Maryland. MPTC entrance level training objective Section 01.40 includes reasonable force and when it can be used as subjects which must be taught. Section 10, Protective Strategies and Tactics, describes various levels of force, when force can be applied, deployment of chemical agents, elements of weaponless defense, and use of batons as required subjects. The BPD is a certified agency and, therefore, its policies in the listed areas have been reviewed and approved by the MPTC, which determines that those policies are adherent to state mandated standards.

Regarding the specific issue of pepper spray and appropriate national standards, the Philadelphia police department does not set nationally accepted standards, although it is assumed that its policies are in line with such standards. One organization, The International Association of Chiefs of Police (IACP), does publish training and policy standards that are adopted by thousands of police agencies/departments throughout the country. The IACP's Model Policy on the Use of Pepper Aerosol Restraint Spray, September 1994, holds in relevant part the following:

- The effects of OC vary among individuals. Therefore, all suspects shall be handcuffed as soon as possible after being sprayed. Officers should also be prepared to employ other means to control the suspect—to include, if necessary, other force options consistent with agency policy—if he does not respond sufficiently to the spray and cannot otherwise be subdued.

- Immediately after spraying a suspect, officers shall be alert to any indications that the individual needs medical care. This includes, but is not necessarily limited to, breathing difficulties, gagging, profuse sweating and loss of consciousness. Upon observing these or other medical problems or if the suspect requests medical assistance, the officer shall immediately summon emergency medical aid.

- Suspects that have been sprayed shall be monitored continuously for indications of medical problems and shall not be left alone while in police custody.

- Officers should provide assurance to suspects who have been sprayed that the effects are temporary and encourage them to relax.

- Air will normally begin reducing the effects of OC spray within 15 minutes of exposure. However, once the suspect has been restrained, officers shall assist him by rinsing and drying the exposed area.

The BPD's policy on the use of pepper spray that was in effect at the time this incident occurred guides Baltimore police officers in their use of pepper spray as follows:

## BACKGROUND

There are few enforcement situations so clearly defined that an Officer can react with absolute certainty as to the necessary level of force required. Thus, the goal of the Baltimore Police Department in providing its members with pepper spray is to offer a less injurious force option to Officers for those times where police action is unavoidable, but where the suspect's level of resistance is not sufficiently high enough to justify the use of a weapon such as the firearm or espantoon.[12]

## DISCHARGING PEPPER SPRAY

In general, there are three types of encounters that may require the use of pepper spray:

1. When an Officer intends to take lawful police action (such as making an arrest or serving an Emergency Petition), the subject refuses to comply

---

[12]Espantoon is the name used in the BPD for a wooden baton.

2. When an Officer has reasonable suspicion to conduct an investigative detention ("Terry Stop"), the suspect refuses to comply with the Officer's verbal commands, and that failure to comply with the Officer's commands jeopardizes the safety of the Officer or others.

3. In self-defense, or in defense of another person.

Officers are cautioned to remember that the use of pepper spray should not provide a false sense of security, and that they must be prepared to quickly change tactics if the pepper spray appears ineffective. If pepper spray fails to gain compliance within 3-4 bursts, additional applications may also be ineffective and Officers should consider an alternative to the continued use of their spray.

Whenever an Officer feels that a sprayed suspect can be safely approached and controlled, his/her primary focus should be on handcuffing the suspect, ***then ensuring that appropriate treatment measures begin*** (Emphasis Added). At no time may a person who has been sprayed with pepper spray, then brought under control and handcuffed, be left lying in a face-down/prone position, at any location or in any type of prisoner transport vehicle.

## TREATMENT

Once a person who has been sprayed with pepper spray is under control and in custody, or when an Officer becomes aware that a bystander has been affected, ***treatment measures must begin as soon as tactically feasible*** (Emphasis Added). Because the Department's pepper spray is biodegradable and does not contain any toxic chemicals, no special decontamination procedures are necessary. Treatment measures may be as minimal as physically removing the person from the immediate area where pepper spray was deployed, advising the person not to rub his/her eyes, or providing the person with the opportunity to rinse his/her eyes and face with water.

Whenever it is determined that a suspect's eyes and face must be rinsed, Officers must give careful consideration to the potential for renewed resistance before removing the suspect's restraints. In cases where only minimal treatment measures are required, Officers or ambulance personnel can, with the appropriate care and caution, provide a suitable application of cool, clear water for the suspect.

**NOTE:** For the purposes of this Guideline, Officers may consider a person who has been sprayed with pepper spray to be "recovered" when the person is able to keep his/her eyes open and normal breathing has resumed. If a person or suspect requests medical attention, or if significant

relief has not been achieved after forty-five minutes, an ambulance must be requested.

Suspects who have been sprayed with pepper spray should not be left alone for extended periods of time while in police custody and should be monitored for any difficulty breathing, loss of consciousness, severe distress, etc. If any of these conditions are observed, an ambulance must be requested immediately.

It is clear from reading the IACP's Model Policy on the use of pepper spray and the BPD's guidelines for its use that the BPD guidelines are in conformance with nationally accepted standards. It is also clear from reading these documents that the allegations contained in the Amended Civil Complaint concerning the inadequacy of the guidelines are without merit. Consistent with the guidelines, contemporaneous documentation of the incident determines that an ambulance was summoned for West approximately one minute and twelve seconds after it was broadcast that he was in custody. During this time, officers were assessing potential injuries to themselves and to West. As to Plaintiffs' claim that West was jerked out of the car by his hair, there is no record that act occurred and the only independent witness, Servance, provided an account that does not support that claim. Even if, hypothetically, it did occur, that single event cannot determine that the customs and policies of the Baltimore Police Department in training, disciplining, and supervising the Defendant officers were inadequate.

## XI. RIGHT TO AMEND RESERVED

I reserve the right to amend my opinions as expressed in this report when or if further facts, materials, reports, and/or any other evidence is submitted/presented for my review.

June 13, 2016
DATE

CHARLES J. KEY