**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| TAWANDA JONES, *et al.*, | * |
| Plaintiff, | |
| | * |
| v. | CASE NO: |
| | *   14-CV-02627 ELH |
| OFFICER NICHOLAS CHAPMAN, *et al.* | |
| | * |
| Defendants | |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OF LAW IN SUPPORT OF THE BPD DEFENDANTS**
**MOTION FOR**
**<u>PARTIAL SUMMARY JUDGMENT</u>**

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION………...........................................................................................3

STATEMENT OF FACTS...........................................................................................5

STANDARD OF REVIEW........................................................................................16

ARGUMENT...............................................................................................................17

    **A:  PLAINTIFFS' § 1983 *MONELL* AND SUPERVISORY CLAIMS MUST FAIL, AS A MATTER OF LAW, IF THE INDIVIDUAL OFFICER DEFENDANTS DID NOT VIOLATE MR. WEST'S CONSTITUTIONAL RIGHTS UNDER THE FOURTH AND FOURTEENTHAMENDMENT**................................................................................17

    **B:  DEFENDANTS' CHAPMAN AND BERNADEZ-RUIZ ABSOLUTELY HAD "PROBABLE CAUSE" TO ARREST MR. WEST UNDER THE FOURTH AMENDMENT BASED ON THEIR OBSERVATION OF HIS TRAFFIC VIOLATIONS, MR. WESTS' ASSAULT OF ONE OF THEM IMMEDIATELY AFTER THE TRAFFIC STOP, AS WELL AS MR. WEST'S POSSESSION Of CDS**………..............................................................................................................18

    **C:  THE INDIVIDUAL OFFICER DEFENDANTS DID NOT VIOLATE MR. WEST'S FOURTEENTH AMENDMENT RIGHTS, BECAUSE HE WAS PROVIDED**

**WITH PROMPT MEDICAL ASSISTANCE SHORTLY AFTER THE USE OF FORCE AGAINST HIM**.......................................................................................................26

      **D: THE § 1983 *MONELL* AND SUPERVISORY LIABILITY CLAIMS UNDER THE FOURTH AND FOURTEENTH AMENDMENT PARTIALLY FAIL TO THE EXTENT THAT PLAINTIFFS COMPLAIN THAT MR. WEST DIED FROM POSITIONAL ASPHYXIA, AS THE BPD DEFENDANTS HAVE POLICIES AND TRAINING THAT IS INTENDED TO PREVENT POSITIONAL ASPHYXIA**…………………………………………………………….………..29

CONCLUSION....................................................................................................33

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| TAWANDA JONES, *et al.*, | * |
| Plaintiff, | |
| | * |
| v. | CASE NO: 14- CV- 02627-ELH |
| | * |
| OFFICER NICHOLAS CHAPMAN, *et al.* | |
| | * |
| Defendants. | |
| | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM OF LAW IN SUPPORT OF THE BPD DEFENDANTS'[1]**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.   INTRODUCTION

The above captioned action is a civil rights matter under 42 U.S.C.§ 1983 ("§1983")

involving the well-publicized, but unfortunate, death of Tyrone A. West ("Mr. West") while he

was in police custody on July 18, 2013 in Baltimore, Maryland.  (*ECF Paper No. 33, Amended*

*Complaint ¶¶*12-37).  Plaintiffs, who are the surviving members of Mr. West's family, filed an

Amended Complaint in this Court alleging the following causes of action against Defendant,

former Commissioner Anthony Batts ("Commissioner Batts"), and Commissioner Kevin Davis,

in his official capacity of the Baltimore Police Department ("BPD")(collectively, "the BPD

Defendants")[2] (1) a § 1983 claim for *Monell*  and supervisory liability[3] (Claim I, Count V); (2)

---

[1] This Court directed legal counsel for former Commissioner Anthony Batts to file a Motion to Substitute a Party (current Commissioner Kevin Davis) for former Commissioner Anthony Batts.  (*See ECF Paper No.85*).  Counsel complied with this Court's Order and filed their Motion to Substitute on September 29, 2016.  (*See ECF Paper No. 89*).  This Court granted the motion and effectively substituted Kevin Davis (in his official capacity only) for Anthony Batts.  (*See ECF Paper No.  90*).

[2] Although BPD is not named as a party in the caption of this case, paragraph 45 of the Amended Complaint is clear that Claim I, Count V is brought against former Commissioner Batts (now Commissioner Davis) in his official capacity.  (*See ECF Paper No. 33, Amended Complaint, ¶ 45*).  Therefore, the Court should construe Claim I, Count V as a § 1983 claim against BPD.  *See Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985)("As long as the government entity receives notice and an opportunity to respond, an official-

an apparent claim under Maryland common law for "funeral expenses" presumably for wrongful death (Claim I, Count VI); and (3) a wrongful death claim under Maryland common law (Claim II, Count I). (*ECF Paper No. 33, Amended Complaint ¶¶ 64-84*).[4]

This Court has bifurcated the § 1983 claims against Nicholas David Chapman, Jorge Omar Bernardez-Ruiz, Matthew Rea Cioffi, Alex Ryan Hashagen, Eric Maurice Hinton, Danielle Angela Lewis, Derrick Dewayne Beasley, Latreese Nicole (collectively, "the Individual Officer Defendants") from the § 1983 *Monell* and supervisory claims against the BPD Defendants. (*ECF Paper Nos. 84 and 85*). This Court also denied, without prejudice, a second motion to dismiss filed by the BPD Defendants against the Amended Complaint. (*ECF Paper Nos. 84 and 85*). Discovery is complete on the § 1983 claims and Maryland state law claims against the Individual Officer Defendants.

The BPD Defendants have now filed a motion for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") against Claim I, Count V, alleging § 1983 *Monell* liability and supervisory liability against them for a "custom and practice" of Fourth Amendment and Fourteenth Amendment violations, as well as a failure to train.

---

capacity suit is, in all respects other than name, to be treated as a suit against the entity… It is *not* a suit against the official personally, for the real party in interest is the entity.")

[3] A "§ 1983 *Monell* claim" refers to the well settled precedent authorizing § 1983 civil rights lawsuits against municipalities for money damages, where an unconstitutional policy or custom is the moving force behind a violation of a party's constitutional rights. *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Moreover, a § 1983 supervisory liability claim" refers to the well settled precedent in this Circuit authorizing § 1983 lawsuits against supervisory government officials for money damages, where the supervisor's "deliberate indifference" to his or her subordinates' prior unconstitutional conduct proximately causes a violation of a party's constitutional rights. *See e.g., Wilkins v. Montgomery*, 751 F.3d 214, 226-227 (4th Cir. 2014); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994); *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 984), *cert. denied*, 470 U.S. 1035 (1985).

[4] Plaintiffs have acknowledged that the Court previously dismissed all state law claims against Commissioner Batts, with prejudice. *See ECF Paper No. 28, pp. 16-21; ECF Paper No. 56, Opposition to Motion to Dismiss, ¶¶ 1, 2*. Therefore, the state law claims against Commissioner Batts are barred by the doctrines of res judicata, collateral estoppel and the "law of the case."

Although this case is bifurcated against the BPD Defendants, this case is ripe for partial disposition of the § 1983 *Monell* or supervisory liability claims, as a matter of law. This is because it is now clear that: (1) none of the Individual Officer Defendants committed any constitutional violation under the Fourth Amendment against Mr. West, because they absolutely had probable cause to arrest him; (2) none of the Individual Officer Defendants committed any constitutional violation under the Fourteenth Amendment, to the extent that Plaintiffs' contend that they failed to render medical assistance to Mr. West after using force against him; and (3) The BPD Defendants could not have been "deliberately indifferent" to Mr. West's Fourth and Fourteenth Amendment rights, at least to the extent that Plaintiffs argue that Mr. West died from "positional asphyxia," *i.e.*, the BPD has in place policies and training that require the decontamination of suspects, that prohibit BPD officers from placing arrestees in a prone position after a use of force involving pepper spray, and that require BPD Officers to obtain prompt medical assistance for arrestees who are injured during the course of arrest (including after the use of pepper spray).

For these reasons, the Court should at least grant partial summary judgment in favor of the BPD Defendants, even if the Court is inclined to allow the Fourth Amendment excessive force claims against the Individual Defendants to go forward.

## II.     STATEMENT OF FACTS

The relevant facts are contained in the following depositions and evidence: (1) the deposition Corinthea Servance, the passenger who was in the automobile with Mr. West when he first encountered Defendants Bernardez-Ruiz and Chapman; (2) the recorded interview of Ms. Servance on July 18, 2013 by BPD detectives who were investigating the death of Mr. West;  (3) the depositions of Defendants Bernardez-Ruiz and Chapman, who first encountered Mr. West on

July 18, 2013; (4) relevant portions of the BPD homicide investigation file, reflecting BPD's initial criminal investigation into Mr. West's death; and (5) BPD's policies and training material on the use of pepper spray.

From this testimony and evidence, the following undisputed material facts emerge:

A.      The Initial Encounter Between Mr. West and Defendants Bernadez-Ruiz and Chapman.

Ms. Servance is the only non-party witness who observed the initial encounter between Mr. West and Defendants Bernardez-Ruiz and Chapman, and the only witness who observed what led up the arrest of Mr. West and the use of force against him.   On July 18, 2013, Ms. Servance states that she was at her mother's home (located on Winston Avenue near Loch Raven Boulevard in Baltimore, Md) when she called Mr. West to drive her home.  (*Exhibit A, Servance Dep. 15:9-16:12; Exhibit B, Servance Interview, 2:16-25, 3:11-20, 16:3-6*).   Ms. Servance called Mr. West because no one was answering the door at her mother home.  (*Exhibit A, Servance Dep. 16:4-11;  Exhibit B, Servance Interview, 2:16-25, 3: 11-20, 18:18-20*).

Mr. West picked up Ms. Servance on Stonewood Road (near her mother's home) and they began driving towards Northwood Drive.  (*Exhibit A, Servance Dep. 24:2-13; Exhibit B, Servance Interview, 3:21-23; 4: 1-6*).  Ms. Servance instructed Mr. West that she wanted to wait 10-15 minutes for her mother to possibly return to her home.  (*Exhibit B, Servance Interview, 4:2-7).* Mr. West eventually parked his car near the intersection of Kitmore Road and Northwood Drive (not far from Winston Avenue and near an apartment complex).  (*Exhibit A, Servance Dep. 24:16-20, 30:16-20, 32:1-4; Exhibit B, Servance Interview, 4:2-7).*

Ms. Servance has testified that Mr. West parked slightly past Kitmore Road (on Northwood Drive).  (*Exhibit A, Servance Dep. 24:19-20, 30:16-20, 32:1-4, 157:14-21, 158:1-10; Exhibit B, Servance Interview, 4:9-12*).  Ms. Servance specifically described how Mr. West

parked his car: "The rear wheel of the car had not cleared the intersection.  (*Exhibit A, Servance Dep. 24:19-20*).   Ms. Servance later clarified that the rear of the car was slightly in the intersection of Kitmore Road: "He [was][sic] in the intersection.   The rear wheels ha[d] not passed the curb. The front of the car was like at the curb. The rear of the wheels were still kind of in the intersection...We were in the intersection, so he backed more into the intersection we were currently sitting in so he could make the turn down Kitmore." (*Exhibit A, Servance Dep.  30:16-20, 32:1-4*).

More importantly, Ms. Servance now concedes during her deposition that she and Mr. West were sitting in the car, talking and eating chicken, when the car was parked at the intersection and Kitmore Road and Northwood Drive, with its rear end in the intersection:

Q.     Okay.  And at that point Mr. West parked· the car?
A.     We sat there because, as I said, it was a car going past, so we sat there.  He ate like a piece of chicken or something and drank some water. I said the car, and we went down the street.

Q.     So it was at that point where the back of Mr. West's car was partially in the intersection of Kitmore and--
A.     Yeah.  The car was still running.  So we never parked and cut the motor off. But the back of the car, because he pulled, because he passed the street, so I said you went past Kitmore, you need to go down.  He thought it was a one-way street because there's no line in the street.

Q.     At the point that you parked, you were eating chicken and talking for a little bit before he backed up?
A.     Maybe for like a minute or two, yeah. Wasn't a long period of time.

Q.     But did you park the car temporarily?
A.      We stopped the car.

Q.     Stopped the car temporarily?
A.     Yes.

Q.     Then you backed up?
A.      Yes.

Q.     Then he made a right down Kitmore?

A.      Yes.

(*Exhibit A, Servance Dep. 157:14-158:10*).

Ms. Servance instructed Mr. West to back into the intersection and proceed down Kitmore Road:  "So he asked me, he said; well, I can just go back around. I said; well, you were sitting right on the corner and nobody was behind him, it was like no kids be outside playing. I said; so just back up a little bit and go down the street." (*Exhibit B, Servance Interview, 4:21-25*).  Most importantly, it is now undisputed that Mr. West complied with Ms. Servance instructions, *i.e.*, he backed his car into the intersection of Kitmore Road and Northwood Drive proceeded to make a right hand turn at Kitmore Road. (*Exhibit A*, *Servance Dep. 24:19-20, 30:16-20, 32:1-4, 157:14-21, 158:1-10*; *Exhibit B, Servance Interview, 5:1-3, 9-12*). Significantly, Ms. Servance also admits that a car passed Mr. West when he made the stop on Northwood Drive and Kitmore Road.  (*Exhibit A, Servance Dep. 28:18-21, 29:1-4, 30:3-8*).

At the same time that Mr. West was backing his car into the intersection of Kitmore Road and Northwood Drive, Defendants Chapman and Bernadez-Ruiz, who were in an unmarked police car, were traveling up Northwood Drive in the travel lane.  (*Exhibit C, Chapman Dep*. 12:1-19; *Exhibit D, Bernadez-Ruiz Dep. 15:11-20*).  Defendant Bernardez-Ruiz observed Mr. West stop his car Northwood Road and unsafely back up his car into the intersection of Northwood Drive of Kitmore Road and make a right hand turn.  (*Exhibit D, Barnardez-Ruiz Dep. 16:1-17:21*).[5]  Defendant Bernardez-Ruiz testified that he had to drive around Mr. West, and that Mr. West backed up a substantial distance down Northwood Drive (back into the intersection) before making the right hand turn.  (*Exhibit D*, *Bernadez-Ruiz Dep. 16:1-17:21*).

---

[5] Although Defendant Bernadez-Ruiz could not initially remember during the deposition whether Mr. West illegally backed his car into the intersection of Kitmore Road, or Kelway Road and Northwood Drive, Ms. Servance was clear that Mr. West backed into the intersection of Kitmore Road and Northwood Drive and proceeded to make a right hand turn down Kitmore Road.  (*Servance Dep. 24:19-20, 30:16-20, 32:1-4, 157:14-21, 158:1-10; Exhibit B, Servance Interview, 5:1-3, 9-12*).

On the other hand, Defendant Chapman remembers the incident slightly different, *i.e.*, Chapman testified that he observed Mr. West stop his car in the travel lane (the same lane that Defendant Barnardez-Ruiz was driving in) and that Defendant Bernardez-Ruiz had to go around Mr. West as he was backing up his car into the intersection of Northwood Drive and Kitmore Road. (*Exhibit C, Chapman Dep. 12:14-13:9, 14:1-8*).

Regardless, both Defendant Bernardez-Ruiz and Defendant Chapman simultaneously concluded that Mr. West had committed a traffic violation (unsafe backing) and they followed Mr. West down Kitmore Road in order to make a traffic stop. (*Exhibit C, Chapman Dep. 13:10-21*; *Exhibit D, Bernadez-Ruiz Dep. 17:4-21, 18:1-9).* However, Defendant Chapman observed Mr. West commit a second traffic violation as they were following Mr. West down Kitmore Road, *i.e.*, Mr. West was driving significantly slower than the posted speed limit.  (*Exhibit C, Chapman Dep. 15:1-12*).

In her statement to BPD homicide detectives who were investigating the death of Mr. West, Ms. Servance flatly states that Mr. West was driving slowly down the road:  "And we went down the street --he moved away from the car, but he was driving like slower than you would normally drive… But I remember saying to him; you need to pull up and drive a little faster, you need to kind of like hurry up.  Because they was driving slow…Anyway, at that point I looked back and there was a car coming like kind of fast. I said; you need to drive up a little bit, you're driving, you know -- I don't think I used the words impeding traffic, but I was like, you drive slower than the traffic or something" (*Exhibit B, Servance Interview*, *5:13-14, 24-25; 6:1, 4-8*). In her deposition under oath, Ms. Servance also ratified her prior statement to BPD detectives that Mr. West was driving slowly:

> Q.     Throughout the time that Mr. West was driving east on Kitmore, did you notice that he was driving slow enough that it got your attention?

A.      Well, when the car -- I guess so because I made the statement.

(*Exhibit A, Servance Dep. 55:12-16*).

In any case, both Defendants Bernardez-Ruiz and Chapman also observed Mr. West and Ms. Servance make furtive movements as they followed them Kitmore Road.   (*Exhibit C, Chapman Dep. 15:15-20; Exhibit D, Bernardez-Ruiz Dep. 18:13-19:13*).   Both Officers believed that Mr. West or Ms. Servance might be armed or trying to conceal contraband, as Ms. Servance kept reaching for the center console of the car, and Mr. West was ducking down as if he were trying to disarm himself.   (*Exhibit C, Chapman Dep. 15:15-16:2; Exhibit D, Bernardez-Ruiz Dep. 18:10-19:13*).   Ms. Servance admits that while she and Mr. West were traveling down Kitmore Road, they were both eating chicken, which was located in the center console of the car, and that Mr. West was "wiping his hands off" as Defendants Bernadez-Ruiz and Chapman followed them down Kitmore Road.   (*Exhibit B, Servance Interview, 5:6-8, 14- 18, 6:1-14*).

Defendants Chapman and Bernadez-Ruiz were able to initiate a traffic stop at or near the intersection of Kitmore Road and Kelway Road.   (*Exhibit C, Chapman Dep. 15:9; Exhibit D, Bernardez-Ruiz Dep. 19:15-20:1*; *Exhibit A*, *Servance Dep*. *66:18-67:5*; *Exhibit B, Servance Interview*, *6:9-17*).   Defendants Chapman and Bernardez-Ruiz asked Mr. West and Ms. Servance to step out of the car and sit on curb.   (*Exhibit C, Chapman Dep*. *16:16-18*; *Exhibit D, Bernardez-Ruiz Dep. 21:7-9; Exhibit A, Servance Dep*. *68:6-14;  Exhibit B, Servance Interview*, *8:9-19; 9:10-18*).   In her statement to BPD detectives investigating the death of Mr. West, Ms. Servance admits that Defendant Bernardez-Ruiz suspected that she and Mr. West were engaged in criminal activity based upon their furtive movements before the traffic stop: "So he said; do you have any drugs or anything on you or anything in your possession. I said; no. He said; why were you moving so much. I said; because I had my money, my phone, and my keys, and we

were eating chicken. He said; no, you stuffed something in your pocketbook. And I went to say here, he was like; stop moving. I'm like, as you can see, I talk with my hands. So when I do stuff, I just move like the motion. He was like; you're making me kind of nervous or something he said." (*Exhibit B, Servance Interview, 7:7-15*).

During her deposition, Ms. Servance ratifies her prior statement about the suspicions of Defendants Chapman and Bernardez-Ruiz:

> Q.  All right.  Tell me what happened after he stopped the car.
> A.  After he stopped the car, the two  policemen got out the car.  Both were male cops.   One Caucasian, one African American.  The African American-- they both proceeded to the car simultaneously.  The black cop came to the driver's side, and the white cop came on my side.  He asked us did we have any drugs or anything in the car.
>
> Q.  Who did?
> A.  Well, I'm speaking to the white cop.  That's what he asked me through my window, did I  have any drugs or anything on me.  I was like no.
> He asked me why was I moving, what did I put in my pocket, and I explained that I had my phone and my keys.  He repeatedly asked me did I have any drugs, did I have any guns, and I told him no repeatedly. The black cop was engaging him in conversation, asked him did he have anything on him, any weapons in the car. No.  Asked him did he object to a search of the car. He said no. The white cop asked me to step out the car.

(*Exhibit A, Servance Dep. 67:3-21, 68: 1-7*)

Defendant Chapman's and Bernardez-Ruiz' suspicion that Mr. West was involved in criminal activity proved to be correct. (*Exhibit C, Chapman Dep*. 19:18-19; *Exhibit D, Bernadez-Ruiz Dep. 23:15-20*; *Exhibit A, Servance Dep. 77:2-7*; *Exhibit E(1)*, *Homicide File,  Chemical Analysis of Recovered CDS from scene*).  As Mr. West sat on the curb, Defendant Bernardez-Ruiz observed a "bulge" in the sock of Mr. West.  (*Exhibit D, Bernardez-Ruiz Dep. 23:15-20).* When Defendant Bernardez-Ruiz reached for Mr. West towards Mr. Wests' sock, Mr. West assaulted Defendant Barnardez-Ruiz by pushing him away.  (*Exhibit D, Bernardez-Ruiz Dep. 24:20-25:13; Exhibit A, Servance Dep. 82:1-18; Exhibit B, Servance Interview 11:6-11*).

Ms. Servance describes the assault during her initial interview with BPD detectives immediately following Mr. West's death: "I can't remember if he had his legs crossed this way or he had his legs crossed this way. But however he had his legs crossed, when he went down towards his sock, which he had on like -- not the footies, but the ankle socks, James pushed him back. So I'm assuming he must have had something on him in his sock." (*Exhibit B, Servance Interview, 11:6-11*).

Later, Ms. Servance was absolutely clear that Mr. West pushed the hand of one of the officers away, as that officer is reaching for the sock of Mr. West[6]:

> Q.    In your Homicide statement where it refers to James, are we talking about Mr. West?
> A.    Yes.
>
> Q.    Let me refer you to page 4 of your Homicide statement.  I'm about 12 lines from the bottom where it says, "so he had."  Tell me when you have found that.
>
> MR. SACKS:  Do you have another copy?
>
> A.    Can you read me the first line?
>
> Q.    "So he had his legs crossed."  12 lines up from the bottom.
> A.     Okay, okay.
>
> Q.    See the statement, "so he had his legs crossed.  I don't remember if he had his legs crossed his way, or he had his legs crossed this way, but however he had his legs crossed, when he went down towards his sock, which he had like not the footies but the ankle socks, James pushed him back.  So I was assuming he must have had something on him in his sock."
> A.    I didn't actually see him take something out of his sock.
>
> Q.    *Is that a correct statement as far as James pushing the cop back?*
> A.    *If I said it, it's a true statement.*
>
> Q.    Is that the first contact you saw between Mr. West and the black cop?
> A.    Yes.

---

[6] Based upon her description of this officer as the "black cop", it appears that Ms. Servance is testifying that Defendant Chapman was the police officer who Mr. West pushed away.

Q.      Was that the first contact you saw between Mr. West and any cop on the scene that day?

A.      Yes.

Q.      All right.  So after Mr. West pushed the black cop, what happened?

A.      Okay.  They proceeded to arrest him.

…

Q.      Is it your testimony here today that immediately after Mr. West pushed the black cop, that the black cop and the white cop got Mr. West down on the ground and were trying to cuff him?

A.      They were cuffing him. He had his hand behind his back. He had the one cuff on his wrist.  The white cop got down, he was down on the ground like this. He was down on the ground with one hand behind him. The white cop was on his back with his left knee in Mr. West's back.

Q.      And this all happened immediately after Mr. West pushed the black cop?

A.      Right.  He must have pushed his hand back or something like that. He didn't like push him physically, he must have just moved him away from whatever he was reaching to because he had already padded him down.

…

Q.      Tell me what actually happened.

A.      When he moved his hand, when he came back up with the bag, he moved his hand.  He came back up—

Q.      Who moved whose hand?

A.      The black cop reached down to his sock. Mr. West made a gesture like moving his hand back like because he was reaching for him.

Q.      When you use pronouns, it's going to be confusing. Who was reaching for who?

A.      Let me slow down.  The black cop who made the gesture towards Mr. West, because he was approaching his sock, *Mr. West made the gesture to move his hand away from him as he was reaching for him.*

Q.      How did he do that?

A.      As I just demonstrated to you.

Q       But that won't be picked up on the transcript.

A.      Extended his form forward and to the direction of the black officer.

(*Exhibit A, Servance Dep. 81:9-21; 82:1-21, 83:20-21, 84:1-15; 98:18-21; 99:1-17* )(emphasis

added).

13

Lastly, it is undisputed that the substance that Mr. West had in his possession was an illegal controlled dangerous substance, crack cocaine.  (*Exhibit E(1), Homicide File, Chemical Analysis of Recovered CDS from scene ; Exhibit A, Servance Dep. 78:6-21, 80:1-13; Exhibit B, Servance Int., 30:21-22*).   During her interview with BPD Detectives, and later on in her deposition, Ms. Servance acknowledges that Mr. West knew that he had illegal drugs on him. (*Exhibit A, Servance Dep. 78:6-21, 79: 1-3, 80:1-13; Exhibit B, Servance Int., 30:21-22*).

B.  <u>Medical Assistance Is Given To Mr. West Moments After The Use Of Force Against Him.</u>

It is also undisputed that Defendants Chapman and Bernardez-Ruiz were unable to immediately arrest Mr. West, and that it took as many as Six (6) additional law enforcement officers to finally bring Mr. West into custody.  (*Exhibit G, In-Custody Fatality Independent Review Board for the Death of Tyrone West – Findings and Recommendations, August 8, 2014, at page 5*).  Defendant Chapman testified that he called for a paramedic himself because he was injured during the use of force against Mr. West, *i.e.*, Mr. West intentionally poked Defendant Chapman in the eye. (*Exhibit C, Chapman Dep. 34:18-21, 35:1-3*).   Importantly, Defendant Chapman had no idea of the severity of Mr. West's condition after the use of force:  "Yeah. When I called for the medic it was for me because I didn't think that Mr. West had any injuries because he was able—I didn't think he had anything wrong with him whatsoever, the way he was fighting us.  I didn't think that anything that we did had any effect on him.  So when I got poked in the eye is when I called the medic.  (*Exhibit C, Chapman Dep. 34:18-21, 35:1-3*).

However, once the medic arrived, he began to immediately work on Mr. West, instead of Defendant Chapman, because he (West) was not responsive. (*Exhibit C, Chapman Dep. 34:11-14*).  Most importantly, it is also undisputed that at least one BPD officer (Officer Taras Hnatyshyn) administered cardio pulmonary resuscitation ("CPR"), to Mr. West, not long after

the use of force against him, but *before* paramedics arrived.  (*Exhibit E(2), Homicide File, Summary of Statement from Officer Hatnshyn*; *see also Exhibit G, Independent Review Board Report, at page 5*).  This fact is confirmed by independent witnesses to the incident involving Mr. West and the Individual Officer Defendants.  (*Exhibit E(3)(4)(5), Homicide File, Summary of Statement from Defendant Officer Hinton; Summary of Independent Witness Account Mr. Duane Bond; Summary of Independent Witness Ms. Shawanda Lewis*).

C.       BPD Policies Addressed The Phenomenon Of "Positional Asphyxia," As Well As Required BPD Officers To Render Medical Assistance To Mr. West After The Use Of Force Against Him.

BPD's Training Bulletin titled "Pepper Spray Guideline" from May 2011, specifically provides that persons that have been pepper sprayed should at no time be left in a "face down/prone position."  (*Exhibit F, BPD Training Bulletin – Pepper Spray Guideline, at pages 4-5*).  The pepper spray training bulletin details that medical assistance for persons that have been pepper sprayed are to receive treatment "as soon as tactically feasible." (*Id. at 5*).  Further, BPD's lesson plan on the use of "Chemical Agent Pepper Spray" taught to Officers in the academy, addresses the need to render medical attention to subjects that have been pepper sprayed.  (*Exhibit H, BPD Lesson Plan on Paper Spray, Pages 16-17, Test questions 1-8*).  The lesson plan (which must be in compliance with minimum training objectives of the Maryland Police and Correctional Training Commission) shows that BPD Officers are taught that medical assistance for a suspect is *mandatory after the use of pepper spray.*  (*See Id.*).  These principles are also reflected in BPD's policy on "Persons in Police Custody" in force on the date of the incident, as the policy absolutely required BPD members to administer first aid and/or seek medical treatment for any persons in police custody in need of emergency medical treatment.  (*Exhibit J, General Order K-14 "Persons on Police Custody," at pages 1 and 2*).

Finally, BPD's Arrest and Control training taught from 1997-2012 specifically addressed the dangers of "Positional Asphyxiation" and commands members to not place handcuffed prisoners in face down prone positions.   (*Exhibit I, BPD's Training Manual, Arrest and Control Techniques, page 5 (Bates numbered BPD000001855 & BPD006478*).

## III.   **STANDARD OF REVIEW**

A.    Summary Judgment

The standard of review for the BPD Defendants' Rule 56 motion for partial summary judgment is well settled, and needs little discussion. Under Rule 56, summary judgment against any claim in the complaint is appropriate, where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (*en banc*). When ruling on a motion for summary judgment, this Court must construe the facts that are alleged by the party opposing the motion in the light most favorable to that party. *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962); *Nguyen v. CNA Corp*., 44 F.3d 234, 237 (4th Cir. 1995).

Nevertheless, a party who bears the burden of proof on a particular claim must factually support each element of his claim. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," and Rule 56 must be interpreted and applied "in a way that allows it to accomplish this purpose."" *Celotex Corp. v. Catrett,* 477 U.S. at 324-25; *Carr v. Deeds*, 453 F.3d 593, 605 (4th Cir. 2006). It is for this reason that a motion for summary judgment must be granted unless there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted."
*Anderson*, 477 U.S. at 249-50 (citations omitted).

IV.   **ARGUMENT**

A.   PLAINTIFFS' § 1983 *MONELL* AND SUPERVISORY CLAIMS MUST FAIL, AS A MATTER OF LAW, IF THE INDIVIDUAL OFFICER DEFENDANTS DID NOT VIOLATE MR. WEST'S CONSTITUTIONAL RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENT.

As an initial matter, the Court must grant the BPD Defendants' Rule 56 motion against Plaintiffs' § 1983 *Monell* and supervisory claims, to the extent that the undisputed material facts of this case show that the Individual Officer Defendants did not violate Mr. West's constitutional rights under the Fourth and Fourteenth Amendment. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)("But this was an action for damages, and neither [*Monell*], nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."); *Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012), *cert. denied,* 134 S.Ct. 617 (2013)("Because we hold that all plaintiffs failed to state predicate § 1983 claims against the individual officers, we must also hold that all plaintiffs have failed to state supervisory liability, *Monell* liability, and "stigma-plus" claims." (footnote omitted)); *see also Waybright v. Frederick County*, 528 F.3d 199, 209 (4th Cir.), *cert. denied*, 555 U.S. 1069 (2008); *Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999) *cert. denied*, 529 U.S. 1067 (2000); *Belcher v. Oliver*, 898 F.2d 32, 36 (4th Cir. 1990); *Giancola v. State of W.Va. Dept. of Public Safety*, 830 F.2d 547, 550 (4th Cir. 1987).

As shown below, the undisputed facts show that: (1) the Defendants Chapman and Bernadez-Ruiz had probable cause to arrest Mr. West under the Fourth Amendment; and (2) emergency medical assistance was rendered to Mr. West moments after their use of force, as

required by the Fourteenth Amendment. Simply put, because Plaintiffs' § 1983 claims against the Individual Officer Defendants partially fail (as a matter of law), their § 1983 *Monell* and supervisory claims against the BPD Defendants, likewise, must fail.

> B. DEFENDANTS' CHAPMAN AND BERNADEZ-RUIZ ABSOLUTELY HAD "PROBABLE CAUSE" TO ARREST MR. WEST UNDER THE FOURTH AMENDMENT BASED ON THEIR OBSERVATION OF HIS TRAFFIC VIOLATIONS, MR. WESTS' ASSAULT OF ONE OF THEM IMMEDIATELY AFTER THE TRAFFIC STOP, AS WELL AS MR. WEST'S POSSESSION OF CDS.

Second, there is now no doubt that the Defendants Chapman and Bernadez-Ruiz had probable cause to arrest Mr. West for numerous criminal offenses (even minor traffic violations) which occurred in their presence, and thus, they did not violate Mr. West's Fourth Amendment rights when they attempted to arrest him. *See Virginia v. Moore*, 553 U.S. 164, 171 (2008)("In a long line of cases, we have said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable." (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975); *Brinegar v. United States*, 338 U.S. 160, 170 (1949)); *see also*, *McDaniel v. Arnold*, 898 F.Supp.2d 809, 827, n. 17 (D. Md. 2012).

The rule under the Fourth Amendment permitting Defendants Chapman and Bernadez-Ruiz to arrest Mr. West for minor crimes extends to minor traffic violations under state law, as well as crimes where state law restricts their ability to arrest (so-called "citation only offenses"). *See Virginia v. Moore*, 553 U.S. at 176 ("We conclude that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections."); *Atwater*, 532 U.S. at 354 ("There is no dispute that

Officer Turek had probable cause to believe that Atwater had committed a crime in his presence. She admits that neither she nor her children were wearing seatbelts, as required by Tex. Transp.Code Ann. § 545.413 (1999). Turek was accordingly authorized (not required, but authorized) to make a custodial arrest without balancing costs and benefits or determining whether or not Atwater's arrest was in some sense necessary."); *McDaniel*, 898 F.Supp.2d at 827, n. 17 ("In general, Maryland law does not authorize a police officer to arrest a motorist for speeding or following too closely, unless additional circumstances are present… Nevertheless, an arrest for speeding or following too closely would not offend the Fourth Amendment.").

Indeed, Defendants Chapman and Bernardez-Ruiz did not have to resolve every doubt about Mr. West's guilt before arresting him, as probable cause is a "'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *See Maryland v. Pringle*, 540 U.S. 366, 370 (2003); *Illinois v. Gates,* 462 U.S. 213, 231, (1983)(quoting *Brinegar,* 338 U.S at 175–176)). Moreover, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Pringle*, 540 U.S. At 370–371 (quoting *Gates,* 462 U.S. at 232)).  For these reasons, "[t]he probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. *Pringle*, 540 U.S. at 371 (citing *Gates,* 462 U.S. at 232*; Brinegar,* 338 U.S. at 175)).  Accordingly, Defendants Chapman and Bernardez-Ruiz merely needed a reasonable belief the Mr. West was engaged in criminal misconduct, as "[i]t is also plain that an officer is not required to "exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable

cause is established." *Miller v. Prince_George's Cty., MD*, 475 F.3d 621, 630 (4th Cir. 2007)(quoting *Torchinsky v. Siwinski,* 942 F.2d 257, 264 (4th Cir.1991)).

Significantly, Defendants Champan's and Bernardez Ruiz's subjective motivation for arresting Mr. West are irrelevant to the Fourth Amendment analysis, so long as facts, viewed objectively, justify their action. *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006)("Our cases have repeatedly rejected this approach. An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed *objectively,* justify [the] action." (quoting *Scott v. United States,* 436 U.S. 128, 138 (1978)(emphasis added)); *see also Whren v. United States*, 517 U.S. 806, 813 (1996)("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

Nor were Defendants Chapman and Bernardez-Ruiz required, in the process of arresting Mr. West, to articulate each and every crime that they reasonably believed that Mr. West committed. *See Devenpeck*, 543 U.S. at 153 ("That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. As we have repeatedly explained, " 'the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'" (quoting *Whren,* 517 U.S.at 813; *Scott,* 436 U.S. at 128)).

In other words, the probable cause for Mr. West's arrest did not have to be "closely related" to the reasons articulated by Defendants Chapman and Bernardez-Ruiz for his arrest (so long as they were aware of the facts justifying his arrest). *See Devenpeck*, 543 U.S. at 153–54 ("The rule that the offense establishing probable cause must be "closely related" to, and based on

the same conduct as, the offense identified by the arresting officer at the time of arrest is inconsistent with this precedent. Such a rule makes the lawfulness of an arrest turn upon the motivation of the arresting officer—eliminating, as validating probable cause, facts that played no part in the officer's expressed subjective reason for making the arrest, and offenses that are not "closely related" to that subjective reason (citations and footnotes omitted)).

Once Defendants Chapman and Bernardez-Ruiz had probable cause to arrest Mr. West, the Fourth Amendment gave them the legal authority to search him incident to arrest. *See Arizona v. Gant*, 556 U.S. 332, 338 (2009)("Among the exceptions to the warrant requirement is a search incident to a lawful arrest." (citing *Weeks v. United States,* 232 U.S. 383, 392 (1914)). "The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Arizona v. Gant*, 556 U.S. at 338 (citing *United States v. Robinson*, 414 U.S. 218, 230-234 (1973); *Chimel v. California*, 395 U.S. 752, 763 (1969)).

Finally (and significantly), because Defendants Chapman and Bernardez-Ruiz had probable cause to arrest Mr. West, the remaining Individual Defendant Officers (Matthew Rea Cioffi, Alex Ryan Hashagen, Eric Maurice Hinton, Danielle Angela Lewis, Derrick Dewayne Beasley, Latreese Nicole) also had probable cause to arrest him. *See e.g., Guerrero v. Deane*, 750 F. Supp. 2d 631, 652 (E.D. Va. 2010), *aff'd sub nom. Guerrero v. Moore*, 442 Fed.Appx. 57 (4th Cir. 2011)("As officers arriving on the scene in response to a call for assistance, 'they were not required to conduct an independent investigation of the facts to come to their own determination regarding whether probable cause existed. Such a requirement would be unworkable in the environments in which the police operate.'" (quoting *Ware v. James City County Va.,* 652 F.Supp.2d 693, 703 (E.D. Va. 2009), *aff'd,* 380 Fed.Appx. 274 (4th Cir. 2010)); *Wilson v. Kittoe,* 229 F.Supp.2d 520, 537-538 (W.D. Va. 2002), *aff'd on other grounds,* 337 F.3d

392 (4th Cir. 2003); *Jackson v. City of Hyattsville*, No. 2012 WL 933207, at *4 (D. Md. Mar. 19, 2012)("When an assisting officer arrives late to the scene, the lawfulness of his or her arrest can be predicated on information relayed by officers already at the scene."(citations omitted)).

In the case at bar, the facts, viewed objectively, show that Defendants Chapman and Bernardez-Ruiz absolutely had probable cause under the Fourth Amendment to arrest Mr. West for multiple criminal violations, irrespective of whether a finder of fact believes Ms. Servance's improbable version[7] of the initial encounter, or the version of Defendants Chapman and Bernardez-Ruiz (as well as the other witnesses to the use of force).   In this regard, there is no question that Defendants Chapman and Bernardez-Ruiz observed: (1) Mr. West stopping his car on Northwood Drive near Kitmore Road, and (2) Mr. West illegally backing his car into the intersection and then proceeding to make a right hand turn down Kitmore Road. (*Exhibit D, Barnardez-Ruiz Dep. 16:1-21, 17:1-21; Exhibit C, Chapman Dep. 12:14-21, 13:1-9, 14-1-8; Exhibit A, Servance Dep. 24:19-20, 30:16-20, 32:1-4, 157:14-21, 158:1-10; Exhibit B, Servance Interview, 5:1-3, 9-12* ).   According to both Defendants Chapman and Bernardez-Ruiz, Mr. West *was in the travel lane* as he was backing his car down Northwood Drive before proceeding to make the right hand turn on Kitmore Road.  (*Exhibit D, Barnardez-Ruiz Dep. 16:1-21, 17:1-21; Exhibit C, Chapman Dep. 12:14-21, 13:1-9, 14-1-8*).

Defendant Bernardez-Ruiz testified that Mr. West backed his car a substantial distance down Northwood Drive before making the turn down Kitmore Road.  (*Exhibit D, Barnardez-Ruiz Dep. 16:1-17:21*).   On the other hand, Defendant Chapman testified that Mr. West forced them (Chapman and Bernardez-Ruiz) to maneuver around him as he was backing his car into the

---

[7] During her deposition, Ms. Servance significantly departed from her earlier statement provided to BPD homicide investigators on July 18, 2013 (the same day of the incident in question) about the initial encounter and the amount and character of the force used against Mr. West.  Thus, the BPD Defendants will not be moving for summary judgment on the Fourth Amendment excessive force claims under § 1983.

intersection of Kitmore Road and Northwood Drive. (*Exhibit C, Chapman Dep. 12:14-13:9, 14:1-8; Exhibit D, Bernardez-Ruiz Dep. 16:1-17:21).* According to Ms. Servance, Mr. West was parked or stopped his car at the intersection of Northwood Drive and Kitmore Road, *with the with the rear end of his car partially in the intersection of Kitmore Road*, *and they were eating chicken and talking while they were stopped.* (*Exhibit A, Servance Dep. 157:14-21, 158:1-10*). Ms. Servance also confirms that a car maneuvered around them as they were sitting in the intersection of Northwood Drive and Kitmore Road. (*Exhibit A, Servance Dep. 157:14-15*)

Under any of these scenarios, Defendants Chapman and Barnardez-Ruiz, at a minimum, had probable cause to believe that Mr. West violated the following provisions of the Transportation Article of the Maryland Annotated Code: (i) Md. Code Ann., Transp. § 21-1003(d) (West 2016)("A person may not stop, stand, or park a vehicle in an intersection."); (ii) Md. Code Ann., Transp. § 21-603(a)(West 2016)("A person may not start a vehicle that is stopped, standing, or parked until the movement can be made with reasonable safety."); (iii) Md. Code Ann., Transp. § 21-603(b)(West 2016)("A person may not start a vehicle that is stopped, standing, or parked until, if any other vehicle might be affected by the movement, he gives an adequate signal to approaching traffic."); (iv) Md. Code Ann., Transp. § 21-601(a)(West 2016)("If the driver of a vehicle intends to turn right at any intersection, he shall approach the intersection and make the right turn as close as practicable to the right-hand curb or edge of the roadway."); (v) Md. Code Ann., Transp. § 21-603(a)(West)("A person may not start a vehicle that is stopped, standing, or parked until the movement can be made with reasonable safety."); (vi) Md. Code Ann., Transp. § 21-604(a)(West 2016)("A person may not turn a vehicle at an intersection, unless the vehicle is in the position required by § 21-601 of this subtitle."); (vii) Md. Code Ann., Transp. § 21-604 (e)(West 2016)("If there is an opportunity to signal, a person may

not stop or suddenly decrease the speed of a vehicle until he gives an appropriate signal in the manner required by this subtitle to the driver of any other vehicle immediately to the rear.").

Furthermore, as Defendants Chapman and Ruiz-Barnardez followed Mr. West down Kitmore Road, Defendant Chapman observed another violation, *i.e.*, Mr. West driving significantly slower than the posted speed limit.[8] (*Exhibit C, Chapman Dep. 15:1-12*;   *Exhibit B, Servance Interview, 5:13-14, 24-25; 6:1, 4-8; Exhibit A, Servance Dep. 55:12-16*).   Thus, Defendant Chapman had probable cause to believe that Mr. West violated Md. Code Ann., Transp. § 21-804(a)(West)("Unless reduced speed is necessary for the safe operation of the vehicle or otherwise is in compliance with law, a person may not willfully drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic.").

Third, Defendants Chapman and Barnardez-Ruiz had probable cause to arrest Mr. West for the additional crimes of: (i) obstruction of justice under Md. Code Ann., Crim. § 9-306[9] ("A person may not, by threat, force, or corrupt means, obstruct, impede, or try to obstruct or impede the administration of justice in a court of the State." (West 2016); (ii) second degree assault under Md. Code Ann., Crim.§, 3-203(a)("A person may not commit an assault."); and (iii) unlawful escape in the second degree under Md. Code Ann., Crim. Law. 9-405(a)("A person who has been lawfully arrested may not knowingly depart from custody without the authorization of a law enforcement or judicial officer.").

This is based upon two undisputed facts: (1) Mr. West pushed away either Defendant Bernardez-Ruiz or Defendant Chapman, as one of them attempted to reach for Mr. West sock after the traffic stop was initiated; and (2) Mr. West attempted to flee from police custody as

---

[8] The Court can take judicial notice of the posted speed limit on the 1300 block of Kitmore road (where Mr. West was traveling). *See*  https://www.google.com/maps/@39.3506971,-76.595949,3a,75y,90h,90t/data=!3m6!1e1!3m4!1spLrmtm8zTCQl3B6-u7A02g!2e0!7i13312!8i6656!6m1!1e1
[9] *See Bretemps v. Town of Brentwood, Md.*, 9 F. Supp. 3d 571, 580 (D. Md. 2014).

Defendant Bernardez-Ruiz or Defendant Chapman attempted to arrest him. (*Exhibit D, Bernadez-Ruiz Dep. 24:20-25:13; Exhibit A, Servance Dep. 82:1-18; Exhibit B, Servance Interview 11:6-11*).

Fourth and perhaps most importantly, Defendants Bernardez-Ruiz or Defendant Chapman had probable cause to arrest Mr. West for possession of a controlled dangerous substance (once Mr. West was out of the car) in violation of Md. Code Ann., Crim. § 5-602 (West 2016)("Except as otherwise provided in this title, a person may not:(1) distribute or dispense a controlled dangerous substance; or (2) possess a controlled dangerous substance in sufficient quantity reasonably to indicate under all circumstances an intent to distribute or dispense a controlled dangerous substance."), as well as 21 U.S.C. § 841.  It is undisputed that Mr. West possessed four baggies containing crack cocaine, and that either Defendants Bernardez-Ruiz or Defendant Chapman discovered the drugs on Mr. West, as he sat down outside of the car after the initial car stop. (*Exhibit C, Chapman Dep. 19:18-19*; *Exhibit D, Bernadez-Ruiz Dep. 23:15-20*; *Exhibit A, Servance Dep. 77:2-7*; *Exhibit E(1)*, Homicide File, Lab Chemical Analysis of Recovered CDS).[10]  Of course, once Defendants Bernardez-Ruiz and Chapman had probable cause to arrest Mr. West, the remaining Individual Officer Defendants also had probable cause to arrest Mr. West when they arrived on the scene to assist.

In short, none of the Individual Officer Defendants violated the constitutional rights of Mr. West under the Fourth Amendment, at least to the extent that they had probable cause to arrest him for numerous violation of law.  Therefore, partial summary judgment against Claim I,

---

[10]  Because Defendants Chapman and Bernardez-Ruiz had the right to arrest Mr. West under the Fourth Amendment, they necessarily had the right to search him, when he was out of the car.  Thus, Chapman and Bernardez would have lawfully discovered the drugs on the person of Mr. West, irrespective of whether they searched him because of the furtive movements that Mr. West and Ms. Servance were making before the traffic stop (*see Exhibit A, Servance Dep. 67:3-21, 68: 1-;7 Exhibit B, Servance Interview, 5:6-8, 14- 18, 6:1-14; Exhibit C, Chapman Dep. 15:15-20; Exhibit D, Bernardez-Ruiz Dep. 18:13-19:13*), as a result of a lawful arrest.

Count V is appropriate in favor of the BPD Defendants because Plaintiffs cannot meet the elements of a Fourth Amendment claim based upon a theory of unlawful arrest.

C.     THE INDIVIDUAL OFFICER DEFENDANTS DID NOT VIOLATE MR. WEST'S FOURTEENTH AMENDMENT RIGHTS, BECAUSE HE WAS PROVIDED WITH PROMPT MEDICAL ASSISTANCE SHORTLY AFTER THE USE OF FORCE AGAINST HIM.

Next, the Court may now grant summary judgment in favor of the BPD Defendants on Plaintiffs' Fourteenth Amendment Due Process claim, because it is undisputed that Mr. West received prompt medical assistance after the use of force against him.  *See e.g., Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 302 (4th Cir. 2004)("Although Parrish asserts four independent constitutional claims in the complaint, his claims boil down to one relevant question: whether the individual defendants violated Lee's Fourteenth Amendment rights as a pre-trial detainee through their deliberate indifference to a substantial risk of physical harm to Lee." (footnotes omitted)); *Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001)("Thus, deliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause (citations omitted)); *Grayson v. Peed,* 195 F.3d 692, 695 (4th Cir. 1999)("Appellant first challenges Officer Royer's decision to take Collins to the ADC rather than to a hospital. Appellant argues that this decision reflected a 'deliberate indifference to [Collins'] serious medical needs' and thus violated the Due Process Clause of the Fourteenth Amendment." (citations omitted)); *Martin v. Gentile*, 849 F.2d 863, 870–71 (4th Cir. 1988)("The due process clause may require state officials to provide medical care to detainees who have been injured during the course of arrest." (citations omitted)).

There, are two elements to Plaintiffs' Fourteenth Amendment Due Process claim for failure to provide Mr. West with prompt medical care: (1) Mr. West must have suffered a serious medical injury (the objective prong); and (2) the Individual Officer Defendants must have been

"deliberately indifferent" to Mr. West's serious medical needs (the subjective prong).  *See Parrish ex rel. Lee,* 372 F.3d at 302; *Young,* 238 F.3d at 575; *Grayson*, 195 F.3d at 695; *Martin*, 849 F.2d at 871. The second element of Plaintiffs' Fourteenth Amendment claim (requiring deliberate indifference) is an extraordinarily high standard, *i.e.*, mere negligence (or even gross negligence) are insufficient to meet the standard.  *See Bd. of Commissioners of Bryan County Okla. v. Brown,* 520 U.S. 397, 407 ("...a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences… A showing of simple or even heightened negligence will not suffice. (internal citations omitted)); *Young,* 238 F.3d at 575 ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."  (quoting *Grayson,* 195 F.3d at 695)).

Instead, Plaintiffs must show that the Individual Officer Defendants possessed the facts showing that Mr. West had a serious medical need, that they ignored that need, and that *they actually drew the inference that their conduct is inappropriate in Mr. West's medical needs*. *See Parrish ex rel. Lee v. Cleveland,* 372 F.3d at 303 ("Liability under this standard thus requires two showings. First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers should have recognized it; they actually must have perceived the risk." citations omitted)); *Young,* 238 F.3d at 576 ("Thus, to the extent the Parents' claims are premised upon the use of pepper spray on a person under the influence of PCP, the original complaint does not allege the existence of a serious risk of harm that was faced by Young, much less a risk known to and disregarded by the law enforcement officers.").

Stated another way, where the underlying facts fail to show that any of the Individual Officer Defendants knew and understood that Mr. West needed medical attention (and failed to act), the deliberate indifference standard cannot be met. *See Parrish ex rel. Lee v. Cleveland*, 372 F.3d at 308 ("In contrast, the record before us here contains no evidence suggesting that these officers recognized that their actions were inappropriate under the circumstances. To the contrary, the evidence shows that the officers believed that their actions were sufficient to mitigate the risks created by Lee's intoxicated condition."); *Young v. City of Mount Ranier*, 238 F.3d at 577 ("...the complaint simply establishes that Young struggled with law enforcement officers, was sprayed with pepper spray, restrained, transported to a hospital in a prone position, and died sometime thereafter. While the complaint alleges that the officers knew or should have known about the potential problems with the use of pepper spray and restraints on PCP users, these allegations, particularly absent any suggestion that Young exhibited any distress during the time he was in the custody of the officers, at most support an inference that the defendants were negligent in some unidentified way."); *Grayson*, 195 F.3d at 695–96 ("At the most, Officer Royer's decision to take Collins to the ADC rather than to a hospital was a simple mistake. But the Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences.").

Lastly, (as stated earlier) where none of the Individual Officer Defendants violated Mr. Wests' constitutional rights under the Fourteenth Amendment, the BPD Defendants cannot be liable, as a matter of law. *Grayson*, 195 F.3d at 696 ("Appellant would next hold Sheriff Peed liable under § 1983 for his role in running the ADC... This claim fails for a variety of reasons, most notably because Peed's officers have not violated any of Collins' constitutional rights.") (citations omitted)).

Here, the undisputed facts of this case unquestionably fail the second prong of the Fourteenth Amendment test (the subjective element requiring a showing of deliberate indifference).  First, Plaintiffs will be unable to present any admissible evidence showing that any of the Individual Officer Defendants knew Mr. West was in distress and did nothing about it. To the contrary, the evidence before the Court shows that Defendants Chapman and Bernardez-Ruiz had no idea that Mr. West was severely injured and needed immediate medical assistance. (*Exhibit D, Bernardez-Ruiz Dep. 35:10-38:5; Exhibit C, Chapman Dep. 30:4-33:10, 34:15-35:3*).

In any event, the undisputed evidence of this case demonstrates that medical assistance, in fact, was provided to Mr. West in two forms: (1) one officer (Officer Hatnshyn) began CPR when he realized the Mr. West was unresponsive; and (2) the medic who was originally called for Defendant Chapman, instead, began to immediately work on Mr. West.  (*Exhibit E(2), Homicide File, Summary of Statement from Officer Hatnshyn*; *Exhibit G, Independent Review Board Report at 5; Exhibit C, Chapmen Dep. 34:9-14).*

In light of these undisputed facts of the case, the Individual Officer Defendants could not have violated Mr. West's constitutional rights under the Fourteenth Amendment.  Thus, their claims against the BPD Defendants under the same legal theory must also fail.

> D.      THE § 1983 *MONELL* AND SUPERVISORY LIABILITY CLAIMS UNDER THE FOURTH AND FOURTEENTH AMENDMENT PARTIALLY FAIL, TO THE EXTENT THAT PLAINTIFFS COMPLAIN THAT MR. WEST DIED FROM POSITIONAL ASPHYXIA, AS THE BPD DEFENDANTS HAVE POLICIES AND TRAINING THAT IS INTENDED TO PREVENT POSITIONAL ASPHYXIA.

Finally, the BPD Defendants are entitled to partial summary judgment against the § 1983 *Monell* and supervisory liability claims, to the extent that Plaintiff's argue that Mr. West died from positional asphyxia, as again, they cannot be "deliberately indifferent" to his constitutional

rights.  *See Grayson*,  195 F.3d at 697 ("Even if there were constitutional violations committed by one of his employees, Sheriff Peed still could not be held liable as appellant has not pointed to any actionable deficiency in Sheriff Peed's policies, customs, or training.").

This is particularly so where the BPD Defendants took affirmative steps to prevent the very harm that Plaintiffs complain about, *i.e.*, positional asphyxia.  *See Grayson*, 195 F.3d at 697 ("Appellant's claims that Peed provided inadequate training for his employees must also fail. As of the time of this incident, the ADC had been accredited for more than ten years by both the American Correctional Association and the National Commission on Correctional Health Care, two organizations whose training requirements often surpass minimal constitutional standards. Moreover, appellant has not explained how any deficiency in training "actually caused" a constitutional violation of any sort."); *see also Sims v. Greenville Cty.*, 211 F.3d 1265 (4th Cir. 2000)(Unpublished)("It is undisputed that Greenville County had a use-of-force policy requiring its detention officers to use the minimum amount of force necessary when dealing with a violent or potentially violent situation. It is further undisputed that GCDC officers are trained in that policy and taught techniques for properly taking an inmate to the floor, using the least amount of force necessary, and avoiding placing a knee on the inmate's back or neck so as to prevent asphyxiation.").

In other words, the alleged failure of any of the Individual Officer Defendants to follow an established policies and training of the BPD on the use of pepper spray, in and of itself, is not definitive proof of "deliberate indifference" necessary for an individual liability claim, much less for a § 1983 *Monell* or supervisory liability claim.[11]  *See Belcher v. Oliver*, 898 F.2d 32, 35–36

---

[11] By no means are the BPD Defendants conceding that, in fact, the individual Officer Defendants named in this litigation,  failed to follow the standards under General Order K-15 and the Training Policies regarding the use of pepper spray.

(4th Cir. 1990)("The actions of officers Lowe and Carnegie in failing to remove decedent's belt and shoelaces also do not reach the level of "deliberate indifference." At most the conduct amounted to negligence—a showing which is insufficient under *Estelle*. It is true that the police chief of Clendenin had directed his officers to remove shoelaces and belts from prisoners to prevent self-inflicted harm, and officers Lowe and Carnegie testified that it was their usual practice to do so. However, a failure to carry out established procedures, without more, does not constitute "deliberate disregard for the possibility" that Belcher "would take his own life." (citations omitted);  *Chennault v. Mitchell*, 923 F. Supp. 2d 765, 781 (E.D. Va. 2013)("Plaintiff initially alleges that Defendants Sink and Barnhouse acted with deliberate indifference by failing to follow the Jail Annex policies regarding inmate intake. But a violation of jail policies alone fails to provide a cause of action under 42 U.S.C. § 1983." (citations and footnote omitted)); *see also Sims v. Greenville Cty.*, 211 F.3d 1265.

Here, the undisputed evidence shows that the BPD Defendants have in place policies and training that are intended to prevent positional asphyxia.  Plaintiffs' allegations and arguments that the Individual Officer Defendants committed any acts purportedly in violation of General Order K-15 and the Training Guidelines in place on the use of pepper spray, are not enough to prove that the BPD Defendants were "deliberately indifferent" to the risk that Mr. West would die from positional asphyxia.  (*See Exhibit F, BPD Training Bulletin – Pepper Spray Guideline; Exhibit H, Pepper Spray Lesson Plan; Exhibit K, General Order K-15*).  For example, the Pepper Spray Guideline provides officers with explicit directions regarding medical treatment. (*Exhibit F, BPD Training Bulletin – Pepper Spray Guideline, at Page 5*). Specifically, the guideline states "Once a person who has been sprayed with pepper spray is under control and custody…treatment measures *must* begin as soon as tactically feasible." *Id.* (emphasis added). The guideline further

states that, "suspects who have been sprayed with pepper spray should not be left alone for extended periods of time while in police custody and should be monitored for any difficulty breathing, loss of consciousness, severe distress, etc." *Id.*

The guideline also gives explicit instructions on the general treatment of an individual who was the subject of a pepper spray discharge. The policy states that "at *no time* may a person who has been sprayed with pepper spray, then brought under control and handcuffed, be left lying in a face-down/prone position, at any location or in any type of prisoner transport vehicle." *Id at 4-5.* (emphasis added).

Further, BPD's lesson plan on the use of "Chemical Agent Pepper Spray" taught to BPD Officers in the academy, addresses the need to render medical attention to subjects that have been pepper sprayed. (*Exhibit H, BPD Lesson Plan on Paper Spray, Pages 16-17, Test questions 1-8*). Indeed, BPD's policy on "Persons in Police Custody" in force on the date of the incident, required BPD members to administer first aid and/or seek medical treatment for any persons in police custody in need of same. (*Exhibit J, General Order K-14 "Persons on Police Custody," at pages 1 and 2*).

Finally, BPD's Arrest and Control training taught from 1997-2012 specifically addressed the dangers of "Positional Asphyxiation" and commands members to not place handcuffed prisoners in face down prone positions. (*Exhibit I, BPD's Training Manual, Arrest and Control Techniques page 5 (Bates numbered BPD000001855 & BPD006478*).

Significantly, the Amended Complaint is devoid of any pattern of circumstances where a suspect has died (in BPD custody) under circumstance similar to Mr. West, *i.e.*, lying in a prone position after the use of pepper spray. In short, Plaintiff's belated contention that Mr. West died from positional asphyxia does not mean that the BPD Defendants were "deliberately indifferent"

to his constitutional rights.   To the contrary, the undisputed evidence shows that the BPD Defendants took reasonable steps to prevent suspects like Mr. West from expiring from positional asphyxia.   Summary judgment is appropriate in favor of the BPD Defendants on Claim I, Count V.

## IV.   **CONCLUSION**

For all of the foregoing reasons, the Court should grant BPD Defendants' partial dispositive motion.

Respectfully submitted,


_____/s/_____
Glenn T. Marrow
Chief Solicitor
Federal Bar. No. 23731
Email: glennmarrow@baltimorepolice.org

_____/s/_____
Brent D. Schubert
Assistant City Solicitor
Federal Bar No.:19593
Email: brent.schubert@baltimorepolice.org

BALTIMORE CITY DEPARTMENT
OF LAW-Office of Police Legal Affairs
100 N. Holiday Street, Suite 101
Baltimore, Maryland 21202
Telephone: (410) 396-2496
Facsimile: (410) 396-2126
*Attorneys for Defendants BPD and Commissioner Kevin Davis*