IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TAWANDA JONES, *et al.*
    *Plaintiffs*,

v.

                                                     Civil Action No. ELH-14-2627

NICHOLAS DAVID CHAPMAN, *et al.*,
    *Defendants*.

**MEMORANDUM OPINION**

This civil rights case arises from the unfortunate death of forty-four year old Tyrone A. West, Sr. ("Mr. West" or the "Decedent") on July 18, 2013, following a traffic stop.[1] Tawanda Jones, as Personal Representative of the Estate of Tyrone A. West, Sr.; Nashay West; Tyrone West, Jr.; and T.W., a minor child, by Mary Agers, as Guardian and next friend of T.W., plaintiffs, filed an Amended Complaint (ECF 33) alleging, *inter alia*, that Mr. West died as a result of the use of excessive force by the police during an illegal traffic stop. *See* ECF 33, ¶¶ 3, 14.[2]

In particular, plaintiffs filed suit against Baltimore City Police Officers Nicholas David Chapman; Jorge Omar Bernardez-Ruiz; Matthew Rea Cioffi; Eric Maurice Hinton; Alex Ryan Hashagen; Danielle Angela Lewis; Derrick Dewayne Beasley; and Latreese Nicole Lee

---

[1] Suit was initially filed in the Circuit Court for Baltimore City and removed to this Court on the basis of federal question jurisdiction. ECF 1 (Notice of Removal); ECF 2 (Complaint); *see* 28 U.S.C. § 1331.

[2] The Decedent was born on May 22, 1969. *See* ECF 97-16, Pl.'s Answer to Def. Interrog., Interrog. No. 9 at 2. Tawanda Jones is the sister of the Decedent. ECF 33, Amended Complaint, ¶ 4. Nashay West; Tyrone West, Jr.; and T.W. are the children of the Decedent. *Id.* ¶¶ 5-7.

(collectively, "BPD Officers" or "BPD Officer Defendants").  Plaintiffs also sued Anthony W. Batts, who was the Commissioner of the Baltimore City Police Department ("BPD") at the relevant time.  ECF 33, Amended Complaint, ¶ 10.  In addition, plaintiffs sued David Lewis, an officer with the Morgan State University Campus Police ("MSU Police"), and Lance Hatcher, Chief of the MSU Police[3] (collectively, MSU Defendants). All defendants were sued in their official and individual capacities.  *Id.* at 1-3, 25.

The suit was instituted pursuant to 42 U.S.C. § 1983, based on alleged violations of the Fourth and Fourteenth Amendments to the federal Constitution.  Plaintiffs also claim violations of Articles 24 and 26 of the Maryland Declaration of Right, and assert various tort claims under Maryland law.[4]  According to plaintiffs, Officers Chapman and Bernardez-Ruiz effected an illegal traffic stop of Mr. West, unnecessarily sprayed him with "pepper spray" (ECF 33, ¶ 21), and they, along with officers who responded to the scene, repeatedly beat Mr. West with batons and fists, until he became unconscious and then died.  *Id.* ¶¶ 12-20, 26-31.

The Amended Complaint (ECF 33) contains two claims and various counts within each "Claim," as follows.  Claim I–Count I asserts a survival action by the Estate of Mr. West

---

[3] In the Amended Complaint (ECF 33), plaintiffs refer to Lance Hatcher as the Interim Chief.  However, Hatcher has since become the Chief.  *See* http://www.morgan.edu/ student_affairs/police_and_public_safety/our_staff.html.

[4] By Memorandum Opinion (ECF 28) and Order (ECF 29) of July 24, 2015, I granted in part and denied in part the motion to dismiss filed by former BPD Commissioner Batts (ECF 20). In particular, I dismissed with prejudice all State law claims against Batts in his official capacity, because a suit against Batts in his official capacity is, in effect, a suit against the BPD.  And, as an agency of the State of Maryland, the BPD enjoys Eleventh Amendment immunity.  ECF 28 at 16-21.  However, I denied the motion to dismiss as to the "*Monell*" claim, alleging the existence of an unconstitutional policy or custom of deliberate indifference by the BPD as to the use of excessive force.  *Id.* at 23-33.  *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  And, I dismissed, without prejudice, the claims against Batts in his individual capacity, alleging supervisory liability.  ECF 28 at 33-48.  I also granted plaintiffs leave to amend their Complaint.  ECF 28; ECF 29.  The Amended Complaint followed.  *See* ECF 33.

("Estate") against the BPD Officers and MSU Officer David Lewis for assault and battery. Claim I–Count II is a survival action by the Estate against BPD Officers and MSU Officer Lewis for false arrest. Claim I–Count III asserts a survival action by the Estate against BPD Officers and MSU Officer Lewis for false imprisonment. Claim I–Count IV asserts a survival action by the Estate against BPD Officers and MSU Officer Lewis for violations of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. §1983, and Articles 24 and 26 of the Maryland Declaration of Rights. Claim I–Count V is a survival action by the Estate against Batts and Hatcher, in their official and individual capacities, "for negligent supervision, training and retention and custom or policy of deliberate indifference." *Id.*, ¶ 45. Claim I–Count VI sets forth a claim by the Estate against all defendants for funeral expenses. And, Claim II–Count I is a wrongful death claim lodged by the Decedent's children against all defendants.

Batts and the BPD subsequently moved to bifurcate the claims against the individual police officers and to stay discovery as to the *Monell* claim. ECF 69. By Memorandum (ECF 84) and Order of September 15, 2016 (ECF 85), I granted that motion. Specifically, I bifurcated Claim I – Count V as to Batts and stayed *Monell* discovery.[5] *Id.*

By Order of October 14, 2016 (ECF 90), Commissioner Kevin Davis was substituted for former Commissioner Batts, in his official capacity only, as to the *Monell* and supervisory claims. *See* ECF 89; ECF 90; *see also* Fed. R. Civ. P. 25(d). Based on the Court's prior rulings (ECF 28; ECF 29), the Amended Complaint (ECF 33), and the substitution of Commissioner Davis for former Commissioner Batts in his official capacity (ECF 89; ECF 90), the only claim

_____

[5] Curiously, Hatcher did not join the bifurcation motion or file his own. But, I have determined that the bifurcation applies to Hatcher. *See* ECF 176. In view of the bifurcation, I denied the motion to dismiss filed by Batts (ECF 55), which asserted, *inter alia*, sovereign immunity, public official immunity, and failure to state a claim, without prejudice to his right to refile it after resolution of the claims against the BPD Officers. *See* ECF 84 at 4; ECF 85.

remaining against Batts, in his individual capacity, and Commissioner Davis, in his official capacity, is "Claim I - Count V," the "survival action for negligent supervision, training and retention and custom or policy of deliberate indifference." ECF 33, Amended Complaint, ¶¶ 64-76.[6] As indicated, that claim was bifurcated. *See* ECF 85.

The BPD Officer Defendants have moved for summary judgment (ECF 97), supported by a memorandum of law (ECF 97-3) (collectively, "BPD Officers' Motion") and numerous exhibits. *See* ECF 97-4 to 97-19; ECF 98 (Autopsy Report). Plaintiffs oppose the BPD Officers' Motion (ECF 106), supported by a memorandum of law (ECF 106-1) (collectively, "Opposition"), and several exhibits. *See* ECF 106-5 to 106-27. Defendants have replied (ECF 117, "Reply"), supported by additional exhibits. *See* ECF 117-2 to ECF 117-5.[7]

MSU Officer David Lewis also filed a motion for summary judgment (ECF 100), in which he joined the BPD Officers' Motion.[8] Plaintiffs oppose the motion. ECF 101.[9]

---

[6] The Amended Complaint appears to reassert the State law claims against Batts that were dismissed, with prejudice, in the Court's prior ruling. *See* ECF 33, Amended Complaint, at 25-26; ECF 28 at 16-21 (dismissing the State law claims against Batts based on sovereign immunity). However, the parties have acknowledged that all State law claims against Batts have been dismissed, with prejudice. *See* ECF 55-1, Memorandum in support of Motion to Dismiss, at 4-5; ECF 56, Opposition to Motion to Dismiss, ¶¶ 1, 2. Chief Hatcher never moved to dismiss the State law claims lodged against him.

[7] The BPD Officers also filed a motion to strike the Opposition. ECF 113 ("Motion to Strike"). Plaintiffs opposed the Motion to Strike (ECF 121), supported by a memorandum of law. ECF 121-1. The BPD Officers replied. ECF 128. By Memorandum (ECF 159) and Order (ECF 160) of April 28, 2017, I granted the Motion to Strike, in part, and denied it, in part. In accordance with the Memorandum and Order, I shall disregard plaintiffs' Exhibit T (ECF 106-27), which consists of excerpts from the U.S. Department of Justice, Civil Rights Division, Investigation of the Baltimore City Police Department. ECF 159 at 9. But, there is no merit to the BPD Officers' challenge to the pretrial statements that were provided by various police officers to the Internal Affairs Division of the BPD. *Id.* at 8.

[8] The text of the motion clearly indicates that it was filed *only* on behalf of MSU Officer David Lewis. *See* ECF 100.

In addition, the BPD, former Commissioner Batts, and Commissioner Davis ("BPD Defendants") have moved for partial summary judgment (ECF 99), supported by a memorandum of law (ECF 99-1) (collectively, "BPD Motion") and several exhibits. ECF 99-3 to ECF 99-13.[10] Plaintiffs oppose the motion (ECF 103), supported by a memorandum of law (ECF 103-1) (collectively, "BPD Opposition") and many exhibits. *See* ECF 103-3 to ECF 103-22. The BPD Defendants have replied (ECF 115, "BPD Reply"), supported by additional exhibits. *See* ECF 115-2 to ECF 115-5.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow I shall grant in part and deny in part the BPD Officers' Motion, which was joined by MSU Officer David Lewis. And, I shall grant in part and deny in part the BPD Motion.

---

[9] In ECF 101, plaintiffs state that they "move to strike any reference to Exhibit N – Charles Key Expert Report as MSU Defendants failed to designate any use of Force Expert within the discovery deadline or the Parties' expert designation deadline." The expert report is located at ECF 97-18.

Plaintiffs did not file an actual motion to strike, nor did they provide any additional information regarding their request. Local Rule 105.1 states that a motion must be "accompanied by a memorandum setting forth the reasoning and authorities in support of it." ECF 101 at 2. The one sentence, seeking to strike, does not suffice to constitute a motion to strike.

[10] The motion is titled "BPD Defendants[] Motion for Partial Summary Judgment." The BDP Defendants state that because Claim I-Count V is "brought against former Commissioner Batts (now Commissioner Davis) in his official capacity…the Court should construe Claim I, Count V as a § 1983 claim against BPD." ECF 99 at 1, n. 2. Relying on *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), they assert that "'an official capacity suit is . . . to be treated as a suit against the entity . . . . It is *not* a suit against the official personally, for the real party in interest is the entity.'" (Emphasis in *Graham*).

# I. Factual Background[11]

Corinthea Servance appears to be the only non-party witness to the initial encounter between Mr. West and BPD Officers Chapman and Bernardez-Ruiz.[12] She knew Mr. West as a "hack" cab driver. ECF 106-6, Deposition of Corinthea Servance ("Servance Dep.") at 12:19-13:1. Because Ms. Servance does not drive, she would sometimes call Mr. West if she needed a ride. *Id.* at 13:2-13:11; 14:20-21.

During the early evening of July 18, 2013, Ms. Servance contacted Mr. West for a ride. *Id.* at 15:11-16:11.[13] It was an "exceptionally hot" day in Baltimore. ECF 106-5, Deposition of Jorge Bernardez-Ruiz ("Bernardez-Ruiz Dep."), at 14:11-13. Mr. West picked up Ms. Servance at the corner of Stonewood Road and Loch Raven Boulevard in Baltimore City, driving a green Mercedes. Servance Dep., ECF 106-6 at 17:11-13; 18:8-12. Although Ms. Servance initially planned to go to her home, she decided instead to go to her mother's home, which was in the vicinity. *Id.* at 18:16-18; 19:12-18. Mr. West began driving westbound on Stonewood towards

---

[11] In the BPD Officers' presentation of facts, they appear to have forgotten the legal principle that, in reviewing a motion for summary judgment, a court must consider the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017). Rather, the BPD Officers have construed the facts in the light most favorable to themselves.

For their part, plaintiffs sometimes mischaracterized the facts. For example, plaintiffs state that Officer Chapman "admits" that he opened the trunk of Mr. West's car without consent. *See* ECF 106-1 at 19. However, at his deposition, Officer Chapman clearly testified that he asked for permission to search the trunk. ECF 106-7, Deposition of Nicholas Chapman, at 18:19-19:17.

In presenting the factual summary, I have not set forth every detail of Mr. West's interaction with the defendants. And, given the standard of review, I need not outline in detail the defendants' version of events. When citing to deposition transcripts, I have cited to the particular deposition pages and lines, rather than to the specific ECF page numbers.

[12] Apparently, Ms. Servance filed her own suit in State court against many of the same defendants. ECF 106-6, Deposition of Corinthea Servance, at 5:9-13.

[13] The parties have not cited to evidence establishing the precise time that Mr. West picked up Ms. Servance.

Northwood Drive.  *Id.* at 23:5-19.  But, he missed the right turn onto Kitmore Road.  *Id.* at 24:5-17.  As a result, Mr. West stopped his car near the intersection of Kitmore Road and Northwood Drive to allow another vehicle to pass.  Servance Dep., ECF 106-6 at 30:3-8; *id.* at 30:16-20; 28:18-29:1; 157:14-21.  According to Ms. Servance, "the rear wheel of the car had not cleared the intersection."  *Id.* at 24:19-20; *see also id.* at 30:16-20 ("He [was] in the intersection. The rear wheels hat [sic] not passed the curb. The front of the car was like at the curb. The rear of the wheels were still kind of in the intersection."); *id.* at 31:7-9.

At her deposition, Ms. Servance testified that she and Mr. West sat in the car for "a minute or two," while the vehicle was "stopped."  *Id.* at 158:9; *id.* at 158:12.  She recalled, *id.* at 157:14-17:  "We sat there because, as I said, it was a car going past, so we sat there. He ate like a piece of chicken or something and drank some water. I said [sic] the car, and we went down the street."  Then, Mr. West backed his vehicle into the intersection of Northwood Drive and Kitmore Road, so that he could make a turn onto Kitmore Road.  Servance Dep., ECF 106-6 at 31:11-21.  Servance stated, *id.* at 32:2-4: "We were in the intersection, so he backed more into the intersection we were currently sitting in so he could make the turn into Kitmore."  *See also id.* at 158:15-18.

The following deposition testimony of Ms. Servance is pertinent, *id.* at 157:18-158:14:

Q. So it was at that point where the back of Mr. West's car was partially in the intersection of Kitmore and—

A. Yeah. The car was still running. So we never parked and cut the motor off. But the back of the car, because he pulled, because he passed the street, so I said you went past Kitmore, you need to go down. He thought it was a one-way street because there's no line in the street.

Q. At the point that you parked, you were eating chicken and talking for a little bit before he backed up?

A. Maybe for like a minute or two, yeah. Wasn't a long period of time.

Q. But did you park the car temporarily?

A. We stopped the car.

Q. Stopped the car temporarily?

A. Yes.

While Mr. West was on Northwood, he backed his vehicle into the intersection of Kitmore and Northwood. Officers Chapman and Bernardez-Ruiz were traveling on the same road, in an unmarked police car. Bernardez-Ruiz Dep., ECF 106-5 at 15:11-20; ECF 106-7, Deposition of Nicholas Chapman ("Chapman Dep."), at 12:14-17. Bernardez-Ruiz did not remember the name of the street where he initially saw the Mercedes. ECF 106-5 at 15:8-10; *see also id.* at 17:6-9 (stating that the driver of the Mercedes had made a right hand turn onto either Kelway or Kitmore). And, Chapman said: "I forget which road it was." ECF 106-7 at 13:9. However, Ms. Servance was clear that Mr. West was on Northwood Drive. *See, e.g.,* ECF 106-6 at 24:2-17, 30:9-11, 52:18-20. [14] And, in the parties' submissions, they seem to agree on the specific roads.

The police vehicle was equipped with lights, but no siren, and the officers were in plain clothes with tactical vests. ECF 106-7 at 10:19-11:17. Both Bernardez-Ruiz, the driver, and Chapman agree that Bernardez-Ruiz had to drive around Mr. West's vehicle, into the opposing lane. Bernardez-Ruiz Dep., ECF 106-5 at 15:11-16:4; Chapman Dep., ECF 106-7 at 12:14-19; *id.* at 14:2-4.[15]

Bernardez-Ruiz claims he had to drive around the Mercedes because it had stopped in the lane of traffic. ECF 106-5 at 16:2-12. After Bernardez-Ruiz passed the Mercedes, he saw Mr.

---

[14] In any event, the names of the roads are not material to the resolution of the motions.

[15] Based on deposition testimony, it appears that Northwood Drive is a two-lane road, with one lane in each direction. The parties have not specified the direction of the road.

West reverse his car and then back his car in an "unsafe" manner. ECF 106-5 at 16:1-17:3. According to Bernardez-Ruiz, Mr. West backed up "like almost an entire city block" before making the right turn onto Kitmore Road. *Id.* at 16:18-20. According to Officer Chapman, Bernardez-Ruiz had to go around Mr. West "into the other lane of traffic" because Mr. West was backing up his car into the intersection. ECF 106-7 at 12:14-19; *id.* at 14:1-8.

Both Bernardez-Ruiz and Chapman concluded that Mr. West had committed a traffic violation, *i.e.*, unsafe backing up. *See, e.g.*, ECF 106-7 at 13:20-21; ECF 106-5 at 16:13-17:3. Chapman claimed that the backing maneuver was "unsafe" because "[i]t would be like driving down the road and then all of a sudden just putting it in reverse and going in reverse." *Id.* at 13:10-14:8.[16] Similarly, Bernardez-Ruiz claimed the backing maneuver was unsafe and explained: "[T]here's a difference between backing up to do a parallel parking, and backing up like almost an entire city block." ECF 106-5 at 18:20. As a result, they followed Mr. West on Kitmore Road and activated their lights in order to effect a traffic stop. Chapman Dep., ECF 106-7 at 13:10-21; Bernardez-Ruiz Dep., ECF 106-5 at 17:4-18:9.

As Officers Bernardez-Ruiz and Chapman followed Mr. West on Kitmore Road, they observed Mr. West and the passenger, Ms. Servance, making movements that, in their view, suggested they were trying to conceal something in the vehicle. Chapman testified, ECF 106-7 at 15:15-16:2:

> So when we were behind the vehicle, we could, or I would see both the passenger and Mr. West just moving around like they were trying to hand something off to each other. You could just tell, it was like they were trying to hide something. So our training experience [sic] says that if there is affirmative movements, that they maybe [sic] possibly trying to hide a gun or arm themselves with a gun.

---

[16] The BPD Defendants and the BPD Officers also suggest that Mr. West was driving significantly slower than the posted speed limit. ECF 97-3 at 3; ECF 99-1 at 9. However, neither officer suggested that Mr. West was stopped for driving too slowly.

The following deposition testimony of Officer Bernardez-Ruiz is also pertinent, ECF 106-5 at 18:10-19:13:

> Q. Did you ever see any indication regarding that car that it had observed your light?
>
> A.  Oh, yes, sir. I saw both passengers turn around and literally saw full face the same way I'm looking at you, they turned around and saw us and they started making movements. I even saw a dip on Mr. West.
>
> Q. When you say dip, would you describe what you mean?
>
> A. A dip. He lowered I'm going to say his right shoulder.
>
> Q. Did you think that was unusual?
>
> A. Yes, sir.
>
> Q. Why?
>
> A. According to our training and experience, any overt movement in the vehicle, once people realize a police presence, it maybe [sic] an indication of hiding something.

Ms. Servance acknowledged the movement within the Mercedes.  She explains that, while she and Mr. West were traveling on Kitmore Road, they were both eating chicken and wiping their hands.  ECF 106-6 at 39:1-9; *see also* ECF 99-4, Servance Police Interview, July 18, 2013, at 5:6-8, 5:14-17, 6:1-14.

Officers Chapman and Bernardez-Ruiz initiated a traffic stop at or near the intersection of Kitmore Road and Kelway Road. The parties agree that at the time of the stop it was still light outside. *See* Servance Dep., ECF 106-6 at 126:4-7 ("It was about 6, broad daylight."); Bernardez-Ruiz Dep., ECF 106-5 at 14:5-10 ("It was light out").  Bernardez-Ruiz approached Mr. West's side of the vehicle; Chapman approached the passenger side.  Ms. Servance described one officer as "Caucasian" and the other as "African American."  Servance Dep., ECF

106-6 at 67:10:[17]  Servance stated: "[T]he white cop came on my side. He asked us did we have any drugs or anything in the car."  *Id.* at 67:13-15.

Ms. Servance denied possession of drugs.  *Id.* at 67:18-19.  Further, she testified, *id.* at 67:20-68:7:  "He asked me why was I moving, what did I put in my pocket, and I explained that I had my phone and my keys. He repeatedly asked me did I have any drugs, did I have any guns, and I told him no repeatedly. The black cop was engaging [Mr. West] in conversation, asked him did he have anything on him, any weapons in the car. No. Asked him did he object to a search of the car. He said no. The white cop asked me to step out the car."

Officers Chapman and Bernardez-Ruiz asked Mr. West and Ms. Servance to exit the vehicle and sit on the curb.  Mr. West complied.   Servance Dep., ECF 106-6 at 74:11-12; Bernardez-Ruiz Dep., ECF 106-5 at 21:19-22-4.   Although Ms. Servance exited the vehicle, she refused to sit on the ground because she was wearing a suit.  Servance Dep., ECF 106-6 at 69:9-14.   As Officer Chapman put it, he then "started conducting a frisk of the vehicle to locate a possible weapon due to [their] observations."  Chapman Dep., ECF 106-7 at 18:20-19:1.[18] Officer Chapman stated that he did not ask for permission prior to conducting the "frisk" of the vehicle.  *Id.* at 19:2-4.  Nor did he find anything "of significance."  *Id.* at 19:5-7.

While Officer Chapman searched the vehicle, Mr. West sat on the curb with his legs extended and crossed.  He was six feet tall and weighed 237 pounds. ECF 97-16, Pl's Answer to Def. Interrog., Interrog. No. 9 at 2.  And, according to Ms. Servance Mr. West "had muscles." ECF 106-6 at 148:7.

---

[17] Officer Bernardez-Ruiz is African American and Officer Chapman is Caucasian. ECF 97-3 at 6, n. 7.

[18] The reference to a "frisk" of a vehicle is curious.  To my knowledge, people are frisked; vehicles are searched.

Ms. Servance stated that one of the officers asked Mr. West for permission to search the trunk of the vehicle and Mr. West responded, "'go ahead.'" ECF 106-6 at 74:5-6. Similarly, Chapman claimed he asked for permission to search the trunk. ECF 106-7 at 18:19-19:17. He explained that he sought "permission" because Mr. West "had no access to it. So there is no way that he could have put a firearm in there." *Id.* at 19:16-17. Chapman also stated that he never actually observed what was in the trunk because his attention was drawn away when he heard Officer Bernardez-Ruiz ask Mr. West about his sock. *Id.* at 19:17-20:5.

Notably, as Mr. West sat on the curb, Officer Bernardez-Ruiz observed a "bulge" in Mr. West's sock about the size of a golf ball, with lumps. Bernardez-Ruiz Dep., ECF 106-5 at 23:12-16; *id.* at 24:5-12. Believing that Mr. West had "an illegal substance" in his sock, Officer Bernardez-Ruiz reached towards Mr. West's sock. *Id.* at 24:15-20.

The parties agree that as Officer Bernardez-Ruiz reached for Mr. West's sock, Mr. West had physical contact with Officer Bernardez-Ruiz. Officer Bernardez-Ruiz stated that when he reached for the sock, Mr. West pushed him on the shoulders. ECF 106-5 at 24:18-25:12. However, Ms. Servance claims that Mr. West "didn't push [Bernardez-Ruiz] physically." ECF 106-6 at 84:12-13. Rather, she described contact akin to a gesture by Mr. West to move Bernardez-Ruiz's hand away from the sock. *Id.* at 82:10-18; *id.* at 84:11-15; *id.* at 92:6-93:1; *id.* at 98:7-9. Servance stated, *id.* at 92:11-17: "It wasn't like [Mr. West] pushed him away in a physical contact. He may have moved his hand away from him or something, but it wasn't like in the way that you are perceiving, that I am perceiving you are making the statement like he pushed him physically."

Ms. Servance did not see Officer Bernardez-Ruiz look into Mr. West's sock, but she did see him reach towards Mr. West's foot area. ECF 106-6 at 78:6-13. She testified that after the

officer reached towards the sock, the officer stood up, holding a plastic bag containing a green substance. ECF 106-6 at 78:13-79:7. Ms. Servance recalled that Officer Bernardez-Ruiz opened the bag and commented that there was cocaine inside. *Id.* at 80:3-5. According to Ms. Servance, Mr. West responded: "'[Y]ou got a measly four bags.'" *Id.* at 79:19-20; *see also id.* at 79:17-80:8. Moreover, she stated that when the bag was "opened up… you could see it was crack cocaine." *Id.* at 80:9-13.

According to Bernardez-Ruiz, the bag was recovered after Mr. West threw it. ECF 106-5 at 32:6-33:21. Officer Chapman stated that he "heard Officer Ruiz say let me see your sock." ECF 106-7 at 19:18-19. But, he only "became aware" of the recovery of the cocaine "through the media." *Id.* at 41:3-5. He said: "I don't think we were ever able to recover [the bag of CDS.]" *Id.* at 41:8-12. Chapman explained that he did not "believe that Officer Ruiz ever recovered it because Mr. West was fighting us the whole time." *Id.* at 41:19-42:1.

According to the defendants, the plastic bag contained thirteen green zip-lock baggies with a white rock substance. The substance was subsequently identified as cocaine. *See* ECF 97-19, BPD Lab Section Drug Analysis report.[19]

After the discovery of the cocaine, the officers attempted to arrest Mr. West. Ms. Servance claims that Mr. West "consented" to being cuffed. ECF 106-6 at 109:15-16 ("[H]e was on the ground being cuffed and had consented"). Further, she testified, ECF 106-6 at 100:19-101:5:

---

[19] The BPD has provided a chain of custody for the controlled dangerous substance ("CDS"). *See* ECF 115-2, Affidavit of Lt. Scott Dressler, ¶¶4, 8 and Attachment A (including complete chain of custody related to the CDS recovered from the scene on July 18, 2013, stating that the CDS is physically located in the Evidence Control Unit of BPD); *see also* ECF 115-3, Affidavit of Steven O'Dell, BPD's Chief of Forensic Science and Evidence Management Division, ¶¶3-6, and Attachment A (containing the chemical analysis of the drugs found at the scene, which revealed that the evidence tested positive for cocaine).

At that point they approached Mr. West as to take out the handcuffs to try to arrest him. That was-- I don't want to say a confrontation, because they got him and they rolled him over on his back side because he was trying to stand up, and that's when they got him over on his stomach. The white cop put his knee, his left knee in the back of Mr. West.

According to Ms. Servance, while Mr. West had his hands behind his back, *id.* at 83:10, and Chapman had his knee on Mr. West's back, *id.* at 101:3-5, Chapman sprayed Mr. West in his face and neck with "mace[]."  ECF 106-6 at 109:16; *see id.* at 83:11-17; 101:11; 102:10-11; 102:15-16.[20]  Officers Chapman and Bernardez-Ruiz used the term "pepper spray." *See, e.g.*, ECF 106-5 at 28:2; ECF 106-7 at 23:7. The substance was actually Oleoresin Capsicum ("OC"). ECF 97-3 at 6.[21]

The Fourth Circuit has said:  "The effects of OC spray include (1) dilation of the capillaries and instant closing of the eyes through swelling of the eyelids, (2) immediate respiratory inflammation, including uncontrollable coughing, retching, shortness of breath and gasping for air with a gagging sensation in the throat, and (3) immediate burning sensations to the mucous membranes, skin and inside the nose and mouth." *Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001).

Ms. Servance recounted that in "reaction" to the spray Mr. West "screamed" and stood up.  Servance Dep., ECF 106-6 at 83:17-19; *id.* at 107:6-8; *id.* at 109:16-17. As a result, Officer Chapman was thrown off of Mr. West.  *Id.* at 103:15-20. And, Officer Bernardez-Ruiz was "slam[med]" into the police car because he had been standing directly behind Mr. West and,

---

[20] Ms. Servance was initially uncertain whether Mr. West was "tased or maced". ECF 106-6 at 101:19-21. However, she subsequently assumed that Mr. West was sprayed with mace because the object used was a "little black canister" rather than something that looked like a gun. *Id.* at 101:20-102:11.

[21] Officers Chapman and Bernardez-Ruiz agree that spray was deployed but dispute the context in which it was used and exactly when it was deployed.  And, it appears that Officers Chapman and Bernardez-Ruiz were inadvertently sprayed as well.  Chapman Dep., ECF 106-7 at 23:3–13; Bernardez-Ruiz Dep., ECF 106-5 at 28:1–14.

when Mr. West stood up, his back hit the front of Officer Bernardez-Ruiz. *Id.* at 103:8-104:18; *id.* at 107:6-108:2.

An "altercation" ensued between Officer Bernardez-Ruiz and Mr. West, with both of them hitting each other in the face. *Id.* at 108:3-11. However, Ms. Servance claimed that Mr. West punched the officer only after he was punched, in order to "defend[] himself." *Id.* at 111:15-20. Officer Chapman sent a radio request for backup, *i.e.*, a Signal 13. *Id.* at 108:14-16; ECF 97-9, Chapman Answer to Pl's Interrog. No. 18.[22] Officer Chapman then joined the fray and hit Mr. West in the face and body. Servance Dep., ECF 106-6 at 108:18-109:2. Ms. Servance described the altercation as a "street fight" and said: "Whoever [was] hitting [Mr. West], he's hitting him back." *Id.* at 109:1-6.

Mr. West backed up. Nevertheless, the officers followed and began to hit Mr. West with their batons as well as their fists. *Id.* at 113:7-114:14. Mr. West was "scuffling" with the officers at this point in order to "defend[] himself." *Id.* at 114:7-14. Mr. West then ran down Kitmore, with his hands up in the air, repeatedly screaming, "'Travon Martin, Travon Martin.'" *Id.* at 115:1-116:20. People in the neighborhood began to come outside; Ms. Servance screamed for someone to call the police and for Mr. West to lay down. *Id.* at 116:20-117:16. Bernardez-Ruiz and Chapman approached Mr. West, swinging their batons, and Mr. West tried to defend himself, by making a windmill motion with his arms. *Id.* at 117:19-118:1; *id.* at 120:10-13. The batons did not make contact with Mr. West at this point. *Id.* at 120:11-13; 122:7-8. Ms. Servance claimed that she and the neighbors continued to scream that Mr. West should lay down;

---

[22] A "Signal 13" is a call for immediate assistance over the departmental radio. *See* ECF 97-18, Expert Report of Charles J. Key, at 11, n. 3.

he heeded their instruction and got on the ground on his stomach, "with his arms spread out." *Id.* at 120:15-18.

After Mr. West was allegedly on the ground with "his arms completely out" (*id.* at 122:14-15; 124:8), Officers Bernardez-Ruiz and Chapman nonetheless continued to beat him "with the batons like they were playing the drums." Servance Dep., ECF 106-6 at 123:17-19. Ms. Servance maintained that the two officers were "hitting him everywhere. Head, body, back, everywhere. They are just hitting him." *Id.* at 124:4-6. At the time, Mr. West was still "laying on his stomach." *Id.* at 124:8.

According to Ms. Servance, Mr. West "had one cuff on his right wrist, but the other one was dangling free." *Id.* at 126:20-127:1. The officers did not attempt to link the handcuffs while Mr. West was on the ground. *Id.* at 127:21-128:2. As the officers continued to hit Mr. West with their batons (*id.* at 127: 14-15), he stood up and proceeded to swing his arms in a defensive manner. *Id.* at 126:11-127:12. As Mr. West backed up, Officers Bernardez-Ruiz and Chapman continued to swing their batons, and Mr. West continued to make a windmill motion with his arms with a handcuff on his right wrist. *Id.* at 129:9-15.

Additional officers began arriving at the scene in three different vehicles. *See, e.g.*, ECF 97-15, Hinton Answer to Pl's Interrog. No. 18. They included MSU Officer David Lewis and BPD Officers Matthew Cioffi; Eric Hinton; Alex Hashagen; Danielle Lewis; Derrick Beasley; and Latreese Lee (collectively, "Assisting Officers"). *See, e.g.*, *id.* [23]

Two officers, one of whom identified himself as a captain and one of whom was a female, moved Ms. Servance across the street. Servance Dep., ECF 106-6 at 131:13-132:1. Ms.

---

[23] MSU Officer David Lewis came to the scene because Officer Beasley had been on a special detail riding with Lewis since January 2013. *See* ECF 97-14, Beasley Answer to Pl's Interrog. No. 18. I use the first name to distinguish defendant David Lewis from defendant Danielle Lewis.

Servance saw approximately seven officers, including "the Morgan State cop" and the two original officers, kick and hit Mr. West with fists and batons "everywhere", including on his head, as he stood with his back against a "black SUV" for a minute to a minute and a half. *Id.* at 132:3-18; 134:3-21; 136:3-4; 137:14-16.[24] According to Ms. Servance, Mr. West "was limp taking blows. He wasn't defending himself at all." *Id.* at 143:4-5. She added: "I could see, as they were hitting him, I could see his body jerking towards the movement of the blows. As I went past the vehicle, it was on the other side, I could just see his body still limply jerking from the blows that they were giving him." *Id.* at 143:8-13.

Mr. West then collapsed on the sidewalk. *Id.* at 134:5-12. According to Ms. Servance, MSU Officer David Lewis and two or three other officers (not Bernardez-Ruiz and Chapman) began stomping on Mr. West's upper body while he was on his back. *Id.* at 141:4-142:7.

Officer Hinton was able to handcuff Mr. West. ECF 106-10, Hinton Statement to IAD at 4. While Mr. West was on his stomach, MSU Officer David Lewis placed his knee on Mr. West's back for about a minute. ECF 106-11, Hashagen Statement to IAD at 5; ECF 97-12, Cioffi Answer to Pl's Interrog. No. 18; ECF 97-15, Hinton Answer to Pl's Interrog. No. 18; ECF 97-7, Deposition of David Lewis ("Lewis Dep.") at 38:1-39:12. According to Officer Corey Jennings, who is not a defendant, Officer David Lewis had his "knees" on Mr. West's back. ECF 106-15, Jennings Statement to IAD, at 5. Ms. Servance described Officer David Lewis as a "huge" guy. Servance Dep. at 126:2. He is 6'8'' and weighs 315 lbs. Lewis Dep., ECF 97-7 at 10:12-118.

---

[24] There is some evidence that Officers Bernardez-Ruiz and Chapman stopped engaging with Mr. West after the Assisting Officers arrived, either due to OC exposure (*see, e.g.*, ECF 97-15, Hinton Answer to Pl's Interrog. No. 18) or, in the case of Officer Chapman, an eye injury allegedly caused by Mr. West that obscured his vision for some fifteen minutes. Chapman Dep., ECF 10-67 at 31:9-18.

Officer Hinton was standing near Mr. West's head. He thought Mr. West had stopped breathing, and so he asked an unidentified officer to help turn over Mr. West. *See* ECF 97-15, Hinton Answer to Interrog. No. 18; Lewis Dep., ECF 97-7 at 39:16–40:1. At about the same time, Officer Taras Hnatyshyn, who is not a defendant, arrived and made efforts to resuscitate Mr. West, who was not breathing and did not have a discernible pulse. He performed CPR and chest compressions.[25] ECF 97-15, Hinton Answer to Interrog. No. 18; ECF 97-12, Cioffi Answer to Interrog. No. 18; ECF 97-14, Beasley Answer to Pl's Interrog. 18. Officer Jennings assisted by moving Mr. West to the grass, removing the handcuffs from Mr. West, and trying to ensure that Mr. West's tongue was not blocking his airway. ECF 106-15, Jennings Statement to IAD, at 2-3. According to Officer Jennings, while Officer Hnatyshyn performed CPR, Mr. West's pulse came back twice, but he did not resume breathing. *Id.* at 3, 7.

As Officer Hnatyshyn was performing CPR, Sergeant Daraine Harris, also not a defendant, arrived and called for paramedics. ECF 97-15, Hinton Answer to Interrog. No. 18; ECF 97-12 at 3; ECF 97-12, Cioffi Answer to Interrog. No. 18.[26] Officer Hnatyshyn also used a defibrillator on Mr. West before the medics arrived. ECF 106-16, Officer Hnatyshyn Statement to IAD, at 3.

Emergency Medical Technicians ("EMTs") from the Baltimore City Fire Department arrived at the scene and were directed to Mr. West. ECF 106-23, Certified EMT Report, Summary of Events. After the EMTs arrived, one shock from the defibrillator was delivered to

---

[25] Officer Hnatyshyn stated that he also asked someone to roll over Mr. West. ECF 106-16, Officer Hnatyshyn Statement to IAD, at 2. Officer Hnatyshyn believes that it was a "Morgan State Officer" who did so. *Id.*

[26] Officer Chapman claims to have already called for a medic for himself because Mr. West allegedly poked him in the eye. ECF 106-7 at 28:13-15; 30:21-31:6. When the "medic" arrived, he began to assist Mr. West instead of Officer Chapman. *Id.* at 34:11-14.

Mr. West and one of the police officers (presumably, Officer Hnatyshyn) continued to perform CPR until Mr. West was inside of the medic unit. *Id.* at 2. Once inside the medic unit, one of the medics began to perform CPR and they administered two rounds of epinephrine and 2 mg of narcan. *Id.*

Ms. Servance saw the medic unit arrive. ECF 106-6 at 143:19-20. According to Ms. Servance, a "few minutes, a couple minutes. Maybe three minutes, four minutes" elapsed between the time that Mr. West collapsed and when he was placed on a stretcher by a medic. *Id.* at 143:13-18; *id*. at 145:15-20. Mr. West was transported to Good Samaritan Hospital, where he was pronounced dead at 8:11 p.m. *See* ECF 98 at 1.

Pamela E. Southall, M.D., an Assistant State Medical Examiner, performed the autopsy of Mr. West. She opined that the cause of death was "Cardiac Arrhythmia due to Cardiac Conduction System Abnormality complicated by Dehydration during Police Restraint." ECF 98, Autopsy Report at 9; *id.* at 1. The autopsy also "revealed a superficial abrasion on [Mr. West's] face and abrasions and contusions on his back and upper and lower extremities…" *Id.*; *see also id.* at 3. More specifically, these included a superficial abrasion on the forehead; multiple superficial abrasions on the back; multiple superficial abrasions on the hands and arms; and multiple contusions on the legs. *Id.* at 3.

Dr. Southall also wrote, *id.* at 9: "[A]bnormalities found in Mr. West's heart and signs of dehydration are certainly causes for sudden cardiac death. Another factor that may have contributed to his death was the extreme environmental temperature. Temperatures on the day of his death …were reportedly in the high 90s with a heat index in the low 100s (degrees Fahrenheit)." She also said: "The cardiac conduction system abnormality is a predisposing factor for cardiac arrhythmia" *Id.* The manner of death could not be determined. *Id.*

Dr. Southall's "Opinion" includes facts obtained solely from police reports. The version of facts in those reports is at odds with Ms. Servance's account. For example, the factual summary in the autopsy paints the Decedent as the aggressor. There is no reference to Ms. Servance's claim that while the Decedent was on the ground, an officer put one or two knees on the Decedent's back.

At her deposition, Dr. Southall clarified that there were "no signs of asphyxia, no signs of significant injury that could have changed my opinion to something more definite, such as homicide. I just didn't have enough findings to support that, but I can't rule out that that encounter [with the police officers] may have played some role." ECF 97-8 and ECF 152-1, Deposition of Pamela Southall, M.D. ("Southall Dep.") at 21:1-7.

In contrast, William Manion, M.D., Ph.D., plaintiffs' expert witness, determined that the manner of death was homicide and that the cause of death was positional asphyxia as a result of the Decedent being "hog tied" *and* because an adult male sat on Mr. West's back while he was restrained. *See* ECF 106-20.

Additional facts will be included in the Discussion.

## II. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The non-moving

party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied,* 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322–24. However, and of import here, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits or deposition testimony, summary judgment ordinarily is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

To defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *Anderson*, 477 U.S. at 247–48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016). Conversely, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*[27]

---

[27] At trial, a jury is generally instructed that what matters is "'the quality and persuasiveness of the evidence, not…the number of witnesses….'" *Dash v. Selective Ins. Co. of S.C.*, No. 5:12-CV-02732-JMC, 2015 WL 4660694, at *2 (D.S.C. Aug. 5, 2015) (quoting *In the Matter of: Bitstreams, Inc.,* SBA No. BDP–122 (July 2, 1999) (citing 4 L. Sand, et al., Modern Federal Jury Instructions ¶ 73.01 (1998) (Form Instruction 732))). Thus, the jury could credit Ms. Servance's account, even if it is contradicted by multiple officers who were at the scene.

**III. Discussion**

A.  BPD Officers' Motion for Summary Judgment

The BPD Officers argue that they did not violate Mr. West's rights and, in any event, that they are entitled to qualified immunity as to plaintiffs' § 1983 claims. *See* ECF 97-3.

1.   The Traffic Stop

Plaintiffs contend that the initial traffic stop was unlawful.  ECF 106-1 at 14.  They maintain that the officers did not possess reasonable, articulable suspicion to stop Mr. West, because "unsafe backing" is not a traffic violation.  *Id.* at 16-17.  Further, they argue that "Mr. West simply moving while inside of his vehicle as he talked with his front seat passenger is not probable cause to stop Mr. West's vehicle." *Id.* at 18.[28]  Plaintiffs also argue that the stop was unlawfully prolonged because the officers "repeatedly" questioned Ms. Servance "about drugs and guns." *Id.* at 7.  In addition, plaintiffs contend that "ordering Mr. West and his passenger to exit the vehicle where no actual traffic violations were observed is not justified under Maryland Law." *Id.* at 22.  Further, plaintiffs contest the "non-consensual opening of the trunk of Mr. West's vehicle in the absence of probable cause." *Id.* at 18.

Plaintiffs' claims are predicated on the Fourth and Fourteenth Amendments to the United States Constitution and Articles 24 and 26 of the Maryland Declaration of Rights, which are the

---

[28] As discussed, *infra*, it is well settled that the police do not need probable cause to effect a traffic stop.  Curiously, in their Opposition, plaintiffs primarily cite to Maryland State cases concerning the Fourth Amendment, at least one of which has been overruled.  *See, e.g.*, ECF 106-1 at 14 (citing *Gilmore v. State*, 204 Md. App. 556, 571-72, 577, 42 A.3d 123, 131-32, 135 (2012)).  *See also Adams v. State*, No. 2256, Sept. Term 2015, 2017 WL 677799 (Md. Ct. Spec. App. Feb. 21, 2017) (recognizing that *Gilmore* was overruled in part by *Heien v. N.C.,* 574 U.S.__, 135 S. Ct. 530, 536 (2014)).

Plaintiffs cite *Gilmore* for the principle that a stop is objectively unreasonable when it is based on a reasonable belief that a law had been violated, if no violation of the law actually occurred. However, in *Heien*, the Supreme Court determined that the Fourth Amendment is not violated when a police officer makes a mistake of law in regard to a traffic stop, so long as such an error is objectively reasonable.

23

Maryland counterparts to the Fourteenth and Fourth Amendments, respectively.[29]  Section 1983 is not an independent source of substantive rights, "but simply a vehicle for vindicating preexisting constitutional and statutory rights." *Safar v. Tingle*, __F.3d__, 2017 WL 2453257, at *2 (4th Cir. June 7, 2017) (citing *Graham v. Connor*, 490 U.S. 386, 393–94 (1989)); *see also Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979).  Therefore, "[t]he first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 2017 WL 2453257, at *2  (citing *Baker*, 443 U.S. at 140).

The BPD Officers contend that Officers Bernardez-Ruiz and Chapman had reasonable, articulable suspicion to justify the traffic stop of Mr. West, because Mr. West committed traffic violations in the presence of Bernardez-Ruiz and Chapman.  ECF 97-3 at 10-12.  Alternatively, they argue that, even if the officers were incorrect in the belief that Mr. West violated the traffic laws, the officers were justified in making the stop because they reasonably believed that Mr. West had violated traffic laws.  *Id.* at 12-14.

The BPD Officers point to multiple provisions of the Transportation Article ("Trans.") of the Md. Code (2012 Repl. Vol.):  Trans. §§ 21-309(b), 21-604, 21-804 and 21-1102.  *See* ECF 97-3 at 10-11; *see also* ECF 99-1 at 23-24 (citing Trans. §§ 21-1003(d), 21-603(a), 21-603(b), 21-601(a), 21-603(a), and 21-604(e)).  Trans. § 21-1102 is particularly noteworthy.  It provides,

---

[29] Articles 24 and 26 are construed *in pari materia* with their federal analogs. *See, e.g., Littleton v. Swonger,* 502 Fed. Appx. 271, 274 (4th Cir. 2012) ("Articles 24 and 26 are construed *in pari materia* with the Fourth and Fourteenth Amendments of the U.S. Constitution"); *McDaniel v. Arnold,* 898 F. Supp. 2d 809, 847–48 (D. Md. 2012); *Dent v. Montgomery Cnty. Police Dep't,* 745 F. Supp. 2d 648, 661 (D. Md. 2010) (Articles 24 and 26 "are construed *in pari materia* with the Fourteenth and Fourth Amendments of the United States Constitution, respectively"); *Doe v. Dep't of Pub. Safety and Corr. Servs.,* 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009) (Article 24 is construed "*in pari materia* with the Due Process Clause of the Fourteenth Amendment"); *Padilla v. State,* 180 Md. App. 210, 226, 949 A.2d 68, 78 (stating that "the cases are legion in which Maryland Courts have construed Article 26 *in pari materia* with the Fourth Amendment to the United States Constitution"), *cert. denied,* 405 Md. 507, 954 A.2d 468 (2008).

*id.*: "The driver of a vehicle may not back it unless the movement can be made safely and without interfering with other traffic." Trans. § 21-1003(d) is also relevant. It provides: "A person may not stop, stand, or park a vehicle in an intersection."

In addition, the BPD Officers claim that, under the law, they had the right to require the occupants to exit the vehicle during the traffic stop. ECF 97-3 at 10. They also claim removal was justified based on the following observations made by Chapman and Bernardez-Ruiz, ECF 97-3 at 16:

> (1) Mr. West was observed committing several traffic violations; (2) Mr. West and Ms. Servance continued to drive a short distance at a low rate of speed turning around and looking at the officers; and (3) Mr. West and Ms. Servance were observed dipping their heads and arms down below the view of the officers as if to conceal a weapon or contraband.

### a.    The Fourth Amendment and *Terry*

The Fourth Amendment prohibits unreasonable searches and seizures. *See Birchfield v. North Dakota*, 579 U.S. ____, 136 S. Ct. 2160, 2173 (2016); *Utah v. Strieff*, 579 U.S. ____, 136 S. Ct. 2056, 2060 (2016); *United States v. Mendenhall*, 446 U.S. 544, 551 (1980). When a police officer stops a motor vehicle and detains the occupant, the stop constitutes a seizure that implicates the Fourth Amendment. *See, e.g., Brendlin v. California*, 551 U.S. 249, 255 (2007); *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015); *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011); *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011), *abrogated in part on other grounds by Rodriguez v. United States*, 575 U.S. ____, 135 S. Ct. 1609 (2015). Therefore, the vehicular stop must be reasonable under the circumstances. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016). Indeed, "'the ultimate touchstone of the Fourth Amendment is reasonableness.'"

*Riley v. California*, 573 U.S. \_\_\_\_, 134 S. Ct. 2473, 2482 (2014) (citation and some quotation marks omitted); *see Maryland v. Wilson,* 519 U.S. 408, 411 (1997); *Ohio v. Robinette*, 519 U.S. 33, 38 (1996); *United States v. Bumpers*, 705 F.3d 168, 171 (4th Cir. 2013).

The "test of reasonableness under the Fourth Amendment is an objective one." *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham*, 490 U.S. at 397). The Supreme Court explained in *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam): "Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" (Quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)); *see also United States v. Sokolow*, 490 U.S. 1, 9 (1989).

Warrantless searches and seizures are *per se* unreasonable, subject only to a few well established exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967); *Kentucky v. King*, 563 U.S. 452, 459-60 (2011). What has become known as the "*Terry* stop and frisk" is one of the limited exceptions to the warrant requirement. *Terry v. Ohio*, 392 U.S. 1 (1968). The seminal case of *Terry v. Ohio* and its progeny permit a police officer to stop and detain an individual, without probable cause, and without violation of the Fourth Amendment's prohibition against unreasonable searches and seizures, so long as the police officer has "specific and articulable facts which, taken together with rational inferences from those facts," create reasonable suspicion that the person has been or is about to engage in criminal activity. *Terry*, 392 U.S. at 21; *see also id.* at 30; *Sokolow*, 490 U.S. at 7 ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause") (citation omitted).

The purpose of a *Terry* stop is investigative—to verify or to dispel the officer's suspicion surrounding the suspect. *Terry*, 392 U.S. at 22-23, 30. But, the stop must be brief, and it must be "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see Sokolow*, 490 U.S at 7; *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011).

The question of reasonable, articulable suspicion is sometimes elusive. Indeed, the Supreme Court has acknowledged the difficulty in pinpointing exactly what is meant by the phrase "reasonable, articulable suspicion." *Ornelas v. United States*, 517 U.S. 690, 699-700 (1996). In sum, reasonable, articulable suspicion is a "commonsense, nontechnical" standard that relies on the judgment of experienced law enforcement officers, "not legal technicians." *Id.* at 695 (internal quotation marks omitted); *see Williams*, *supra*, 808 F.3d at 246.

In *United States v. Mason*, 628 F.3d 123, 128 (4th Cir. 2010), *cert. denied*, 565 U.S. 914 (2011), the Fourth Circuit reiterated that the concept of reasonable, articulable suspicion "'is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails commonsense, nontechnical conceptions that deal with factual and practical considerations of everyday life.'" (Citation omitted). *See also United States v. Lawing,* 703 F. 3d 229, 236 (4th Cir. 2012), *cert. denied*, 133 St. Ct. 1851 (2013); *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011); *United States v. Christmas*, 222 F.3d 141, 143 (4th Cir. 2000). Therefore, an officer conducting a *Terry* stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Terry*, 392 U.S. at 27; *see Alabama v. White*, 496 U.S. 325, 329-30 (1990); *Bumpers*, 705 F.3d at 171. Put another way, the police must have "a particularized and objective basis for suspecting the person stopped of criminal activity...." *Ornelas*, 517 U.S. at 696; *see Navarette v. California*, 572 U.S. ____, 134 S. Ct. 1683, 1687

(2014); *United States v. Gardner*, 823 F.3d 793, 799 (4th Cir. 2016); *United States v. Black,* 707 F.3d 531, 539 (4th Cir. 2013); *Massenburg*, 654 F.3d at 486; *United States v. Griffin,* 589 F.3d 148, 152 (4th Cir. 2009), *cert. denied*, 562 U.S. 1273 (2011).

The reasonable suspicion standard is not onerous, however. *See*, *e.g.*, *United States v. Glover*, 662 F.3d 694, 698-700 (4th Cir. 2011). Of import here, it "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

Reasonable suspicion is determined by examining the totality of the circumstances. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Wardlow*, 528 U.S. at 123; *Sokolow*, 490 U.S. at 7-8; *United States v. Brooks*, ____ Fed. App'x ____, 2017 WL 1400481, at * 2 (4th Cir. April 19, 2017). "A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect." *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013); *see Maney v. Garrison*, ____ Fed. App'x ____, 2017 WL 937460, at *6 (4th Cir. March 9, 2017) (per curiam); *United States v. Mayo*, 361 F.3d 802, 805-06 (4th Cir. 2004). And, in assessing reasonable suspicion, courts must "give due weight to commonsense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see also United States v. Sowards*, 690 F.3d 585, 587-88 (4th Cir. 2012); *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010); *United States v. Branch*, 537 F.3d 328, 336-337 (4th Cir. 2008), *cert. denied*, 555 U.S. 1118 (2009). Although a particular act of a suspect may, by itself, be innocent, a series of such acts, taken together, can give rise to reasonable suspicion. *Arvizu*, 534 U.S. at 274; *see also Palmer*, 820 F.3d 652; *Williams*, 808 F.3d at 246; *United States v. McCoy*, 513 F.3d 405, 413-14 (4th Cir. 2008). In other words, the court may evaluate "cumulative

information" available to the police officer. *United States v. McBride*, 676 F.3d 385, 392 (4th Cir. 2012). Because the reasonable suspicion standard is an objective one, however, the officer's subjective state of mind is not considered. *George*, 732 F.3d at 299; *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011).

A traffic stop is "analogous to a so-called '*Terry* stop'...." *Berkemer v. McCarthy*, 468 U.S. 420, 439 (1984); *see Rodriguez*, 135 S. Ct. 1609; *Knowles v. Iowa*, 525 U.S. 113, 117 (1998); *Williams*, 808 F.3d at 245. It is a "seizure" under the Fourth Amendment and "subject to review for reasonableness." *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017). Thus, the court assesses the constitutionality of a traffic stop under the two-prong standard articulated in *Terry v. Ohio, supra; see Arizona v. Johnson,* 555 U.S. 323, 330-31 (2009); *Palmer*, 820 F.3d at 648; *Williams*, 808 F.3d at 245;*United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011).

In particular, under the so called dual inquiry, the court first examines "whether the officer's action was justified at its inception and [second] whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Sharpe*, 470 U.S. at 682; *see Hill*, 852 F.3d at 381; *Palmer*, 820 F.3d at 648; *Williams*, 808 F.3d at 245; *Guijon-Ortiz*, 660 F.3d at 764; *Digiovanni*, 650 F.3d at 506. Notably, the investigative seizure or stop must be limited both in scope and duration. *Digiovanni*, 650 F.3d at 507; *see also Florida v. Royer,* 460 U.S. 491, 500 (1983) (plurality opinion); *Hill*, 852 F.3d at 381; *Williams*, 808 F.3d at 245; *Guijon-Ortiz*, 660 F.3d at 764; *Branch*, 537 F.3d at 337. "Generally...an officer's focus must remain on the bases for the traffic stop...." *Palmer*, 820 F.3d at 649.

Of relevance here, when a vehicle is being driven contrary to the laws governing the operation of motor vehicles, that generally gives rise to reasonable, articulable suspicion to effectuate a stop. *Prouse*, 440 U.S. at 650; *Whren,* 517 U.S. at 817-18; *United States v. Hassan*

*El*, 5 F.3d 726, 730 (4th Cir. 1993). As the Fourth Circuit said in *United States v. Davis*, 460 Fed. App'x 226, 230 (4th Cir. 2011) (per curiam): "Traffic stops are justified at their inception when officers observe a violation of the applicable traffic laws." Indeed, in making a stop, a police officer is "entitled to rely on [a traffic] statute unless it was 'clearly unconstitutional.'" *United States v. Gibbs*, ____ Fed. App'x ____, 2017 WL 729721, at *1 (4th Cir. Feb. 24, 2017) (per curiam). And, a traffic stop is justified even when an officer observes only minor violations. *See, e.g.*, *United States v. Cleveland*, 597 Fed. App'x 172 (4th Cir. 2015) (per curiam) (affirming denial of motion to suppress where defendant claimed his consent to search was coerced after he was stopped for driving without a seatbelt); *United States v. Adams*, 462 Fed. App'x 369, 375 (4th Cir. 2012) (upholding stop for seatbelt violation); *United States v. Beckham*, 420 Fed. App'x 261, 263-64 (4th Cir. 2011) (per curiam) (same); *see also Hassan El*, 5 F.3d at 730 (holding that failure to stop at a stop sign was sufficient basis for defendant's detention).

Based on the factual summary previously set forth, the record amply demonstrates that the BPD Officers had reasonable, articulable suspicion to believe that Mr. West committed a traffic violation. All witnesses, including the Decedent's passenger, agree that after Mr. West missed the right turn onto Kitmore Road, he stopped in the intersection of Northwood Drive and then backed down the street on Northwood Drive. All of the witnesses described a driving maneuver that the officers reasonably regarded as unsafe.

In particular, Ms. Servance testified that Ms. West stopped his vehicle with the rear of the vehicle in the intersection of Kitmore Road for one or two minutes before backing further into the intersection onto Northwood Drive, so that he could make a right turn onto Kitmore. *See, e.g.*, ECF 106-6 at 30:3-8; 30:16-20; 24:19-20; 31:7-9; 31:11-21; 32:2-4; 157:18-158:14. Officer Bernardez-Ruiz claims he had to drive around Mr. West's vehicle because Mr. West had stopped

in the road.  ECF 106-5 at 16:2-12.  Then, he saw Mr. West back up his car, "like almost an entire city block," before making the right turn.  *Id.* at 16:18-20.  Officer Chapman also observed Mr. West stop his car in the travel lane, but he said that Officer Bernardez-Ruiz had to go around Mr. West, using the opposing lane, because Mr. West was backing his car into the same lane in which Bernardez-Ruiz was driving.  ECF 106-7 at 12:14-19; *id.* at 14:1-8.  Ms. Servance also admitted that a car passed Mr. West's vehicle at or around the same time that Mr. West missed the right turn onto Kitmore.  ECF 106-6 at 28:18-29:1.

Therefore, the officers possessed reasonable, articulable suspicion to believe that plaintiff violated at least two Maryland traffic laws, *i.e.*, Trans. § 21-1102 and § 21-1003(d).  That is all that was required to justify the initial stop.  *See, e.g., United States v. Mubdi,* 691 F.3d 334, 342 (4th Cir. 2012) ("'[I]f an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable.'") (citation omitted); *see also Heien v. N.C., supra*, 135 S. Ct. 530, 536 (recognizing that the Fourth Amendment is not violated when a police officer makes a mistake of law in regard to a traffic stop, so long as such an error is objectively reasonable).

### b.  The Duration of the Stop

Plaintiffs complain that the stop was unlawfully prolonged.  The claim is unfounded.

As indicated, traffic stops must be limited in both scope and duration. *Digiovanni*, 650 F.3d at 507.  "[A] traffic violation provides sufficient justification for a police officer to detain the offending vehicle [only] for as long as it takes to perform the traditional incidents of a routine traffic stop." *Branch*, 537 F.3d at 335; *see United States v. Edwards*, 666 F. App'x 253, 255 (4th Cir. 2016) (per curiam); *United States v. Finch*, 592 F. App'x 218, 219 (4th Cir. 2015) (per curiam); *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014); *see also Williams*, 808

F.3d at 246 (recognizing that *Rodriguez*, 135 S. Ct. 1609, forecloses even a *de minimis* extension of a routine traffic stop, in the absence of reasonable suspicion of criminal activity). The "law has become well established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Foreman,* 369 F.3d 776, 781 (4th Cir. 2004).

In *Rodriguez*, the Supreme Court said, 135 S. Ct. at 1612:

> We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation. [*Illinois v. Caballes*, 543 U.S. 405] at 407, 125 S. Ct. 834 (2005)] The Court so recognized in *Caballes*, and we adhere to the line drawn in that decision.

A police officer may prolong a traffic stop, "beyond the scope of a routine traffic stop....," if there is "justification" to do so. *Branch*, 537 F.3d at 336; *see Palmer*, 820 F.3d at 650. "This requires 'either the driver's consent or a 'reasonable suspicion that [other] illegal activity is afoot.'" *Guijon-Ortiz*, 660 F.3d at 764 (citations omitted); *see Hill*, 852 F.3d at 381; *Williams*, 808 F.3d at 245-46; *Ortiz*, 669 F.3d at 444 ("Any detention longer than reasonably necessary to accomplish the purposes of the stop must be justified by at least a reasonable suspicion of other criminal activity."). Although the officer must employ "'the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time,'" *Digiovanni*, 650 F.3d at 507 (citation omitted), this does not mean "the least intrusive means conceivable." *Palmer*, 820 F.3d at 649.

Notably, lawful duration is not subject to mathematical precision. *Digiovanni*, 650 F.3d at 511; *Branch*, 537 F.3d at 336. Analyzing scope and duration requires "highly fact-specific inquiries...." *Guijon-Ortiz,* 660 F.3d at 764. *See*, *e.g.*, *United States v. Harvey*, 901 F. Supp. 2d 681, 686 (N.D. W. Va. 2012). The court must evaluate "whether the police diligently pursued a

means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it is necessary to detain the defendant." *Sharpe*, 470 U.S. at 686; *see also Digiovanni*, 650 F.3d at 509; *Guijon-Ortiz*, 660 F.3d at 764, 766.

There is no evidence that the two officers who effected the traffic stop unduly prolonged it. They asked Mr. West and Ms. Servance if there were guns or drugs in the vehicle. Ms. Servance did not specifically testify as to how long she and Mr. West were questioned, but there is no indication from her testimony that this period of questioning was "extensive and time-consuming." *Digiovanni*, 650 F.3d at 510; *see* Servance Dep. at 67:14-68:7. Rather, it appears that the questioning was quite brief. *Id.*

The Supreme Court "has made plain" that an "officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson,* 555 U.S. at 333 (citing *Muehler v. Mena,* 544 U.S. 93, 100–01 (2005)); *see also Guijon–Ortiz,* 660 F.3d at 765 (stating that an officer may, "'in the interest of personal safety,' request that the passengers in the vehicle provide identification, at least so long as the request does not prolong the seizure"); *Mason,* 628 F.3d at 131 ("There is no support in Fourth Amendment jurisprudence for the notion that questioning unrelated to the purpose of a traffic stop requires reasonable suspicion, provided that the questioning occurs within the timeframe reasonably necessary to effectuate the traffic stop."); *id.* at 131-32 (holding that unrelated questioning that took "one to one and one-half minutes" was not unreasonable, because the stop was conducted "promptly and with efficiency.")

### c. Removal of the Occupants

Plaintiffs also challenge the removal of Mr. West and Ms. Servance from the vehicle. This challenge lacks merit.

In *Mimms, supra*, 434 U.S. 106, the Supreme Court ruled that a police officer may, as a matter of course, order the driver of a lawfully stopped vehicle to exit the vehicle. The Court determined that ordering a driver to exit the vehicle after a stop is a *de minimis* intrusion that hardly rises to the level of a "petty indignity," and that "[w]hat is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.[1]" *Id.* at 111. In addition, an officer conducting a lawful traffic stop may, as a safety measure, order a passenger to exit the vehicle. *Wilson*, *supra*, 519 U.S. at 414-15; *see United States v. Rumley*, 588 F.3d 202, 206 (4th Cir. 2009). The Supreme Court reasoned in *Wilson* that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car," 519 U.S. at 414, and "the additional intrusion on the passenger is minimal." *Id.* at 415; *see also United States v. Robinson*, 846 F.3d 694, 698–99 (4th Cir. 2017) (recognizing the increased risk to officers when a traffic stop involves one or more passengers).

### d. Vehicle Search

Plaintiffs challenge "Defendants' illegal search of Mr. West's vehicle," including the alleged "non-consensual opening" of Mr. West's trunk, asserting that the searches were "not supported by probable cause and was clearly not done for officer safety." ECF 106-1 at 22 and 18. There is no suggestion from any of the witnesses that drugs or other evidence of criminal activity were found during the search of the vehicle.

As noted earlier, Officers Bernardez-Ruiz and Chapman activated their lights and followed Mr. West and Ms. Servance on Kitmore Road. The officers allegedly saw the pair

make furtive movements that, in the officers' view, suggested that Mr. West and Ms. Servance were trying to conceal either a weapon or contraband in the vehicle. Officer Chapman specifically testified that he believed the passengers could have been "trying to hide a gun or arm themselves with a gun." ECF 106-7 at 16:1-2.

Ms. Servance did not refute that she and Mr. West were moving around in the vehicle at or around the time that they noticed the police car. However, she claimed that both she and Mr. West were eating chicken, which was located in the center console of the car, and that she and Mr. West were both wiping their hands off as the officers followed them on Kitmore. ECF 106-6 at 39:1-9; *see also* ECF 99-4, Servance Police Interview at 5:6-8, 5:14-17, 6:1-14.

The facts suggest that the search of the passenger compartment of the vehicle took place either just before Officer Bernardez-Ruiz saw the bulge in Mr. West's sock or contemporaneously with that observation. Officer Chapman stated that he did not seek Mr. West's consent to search the vehicle but that he did ask for permission to search the trunk. ECF 106-7 at 18:19-19:17. In contrast, Ms. Servance testified that Officer Chapman asked for consent to search the vehicle and that Mr. West gave his consent to that search. ECF 106-6 at 68:5-11. And, both Chapman and Servance agree that Chapman sought consent to search the trunk, and Mr. West consented. ECF 106-6 at 74:5-6; ECF 106-7 at 18:19-19:17.

Assuming, *arguendo*, that Mr. West did not consent to the search of the vehicle compartment, the question is whether the search of the interior was lawful.

As an extension of the *Terry* doctrine, the Supreme Court held in *Michigan v. Long,* 463 U.S. 1032, 1049 (1983) that, in the context of a traffic stop, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and

articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.[1]" (Quoting *Terry*, 393 U.S. at 21).

On the other hand, when an "arrestee has been secured and cannot access the interior of the vehicle," the police may not search a vehicle incident to the arrest. *Arizona v. Gant*, 556 U.S. 332, 335 (2009). *See also United States v. Griffin,* 589 F.3d 148, 154 n.8 (4th Cir. 2009) (noting that a protective search of a vehicle is permitted during a *Terry* stop because "'the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed'" (quoting *Arizona v. Gant,* 556 U.S. at 352 (Scalia., J., concurring)).

In *United States v. Holmes*, 376 F.3d 270, 280 (4th Cir. 2004), which preceded *Arizona v. Gant*, the Fourth Circuit said (emphasis added):

> [W]here a suspect is an occupant or recent occupant of a vehicle at the initiation of a *Terry* stop, and where the police reasonably believe the suspect may be dangerous and that there may be readily-accessible weapons in his vehicle, [*Michigan v. Long*, 463 U.S. 1032 (1983)] authorizes a protective search of the vehicle for weapons, provided the police harbor a reasonable belief that the suspect may gain access to the vehicle at a time when that access would endanger the safety of the officers conducting the stop or of others nearby—including the reasonable belief that the suspect *will return to the vehicle* following the conclusion of the *Terry* stop.

From the facts presented here, it does not appear that the principles of *Arizona v. Gant* apply. When Officer Chapman began the search of the vehicle, Mr. West was not under arrest or secured, so as to foreclose his access to the vehicle. Nevertheless, the officer still required reasonable suspicion to justify a protective search of the vehicle. *See Michigan v. Long,* 463 U.S. at 1049. The question is whether the movements that Officers Chapman and Bernardez-Ruiz observed and regarded as suspicious justified the warrantless vehicle search.

The Fourth Circuit has recognized that furtive or abrupt movement as officers approach is a relevant factor giving rise to reasonable suspicion. *See United States v. Spearman*, 254 F. App'x 178, 182 (4th Cir. 2007) (per curiam) (finding reasonable suspicion to justify a *Terry* stop and search of a suspect where, among other things, defendant made furtive movements when he saw the detectives approach his vehicle); *United States v. Barnes*, 153 F. App'x 232, 235 (4th Cir. 2005) (per curiam) (concluding that *Terry* stop of the suspect was justified when, among other factors, defendant exhibited "suspicious motions" as if he were reaching under the car seat). However, in both *Spearman* and *Barnes* there were other factors, in addition to the furtive or suspicious movements, that collectively were sufficient to establish reasonable suspicion of criminal activity.

For example, in *Barnes*, 153 F. App'x at 234, the officers based their stop upon the following factors: "(1) the report of a gun assault; (2) an anonymous tipster stating that the officers had just passed the individual with the gun and that he was getting into a green Toyota Camry; (3) Barnes' failure to comply with Officer Hyatt's directive to get out of the vehicle; and (4) Barnes' motion that suggested he was reaching under the front seat of the car." The Fourth Circuit concluded: "These actions, taken together, provided the officers with a reasonable and articulable suspicion that Barnes was engaged in criminal activity, thus justifying his detention and removal from the vehicle." *Id.*

The BPD Officers have not identified any case, nor have I found one, where suspicious movements, along with a minor traffic violation, were deemed sufficient to establish reasonable suspicion to justify the warrantless protective search of a vehicle. In a case involving "furtive" movements, similar to those at issue here, Judge William D. Quarles, Jr. said: "Pollins and Mikles were leaning over, reaching under their seats, and appeared nervous when Officer

Johnson neared. Based on the prior cases, it is clear that these actions alone would be insufficient to justify the subsequent *Terry* stop. However, although the anonymous tip *alone* and the furtive behavior *alone* would not be sufficient to establish reasonable suspicion, *together* they do so." *United States v. Pollins*, 145 F. Supp. 3d 525, 536 (D. Md. 2015) (emphasis in original). Moreover, in *United States v. Slocomb*, 804 F.3d 677, 682–83 (4th Cir. 2015), the Fourth Circuit stressed that when furtive behavior provides "the only substantial basis for *particularized* suspicion," there must be a showing of "extreme or unusual nervousness or acts of evasion", such as "physical signs of extreme nervousness." (Emphasis in *Slocomb*; citation and internal quotation marks omitted).

Considering the facts in the light most favorable to plaintiffs, the suspicious movements of Mr. West and Ms. Servance were insufficient to provide reasonable, articulable suspicion that Mr. West and/or Ms. Servance were trying to hide a weapon or contraband in the vehicle, so as to justify a warrantless search of the interior of the vehicle. The facts are in dispute as to whether Mr. West consented to the search of the interior of the vehicle.[30] And, without consent from Mr.

---

[30] In a criminal case, the government has "the burden of establishing, by a preponderance of the evidence, that it obtained valid consent to search." *United States v. Toyer*, 414 Fed. Appx. 584, 588 (4th Cir. 2011) (citing *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007); *United States v. Block*, 590 F.2d 535, 539 (4th Cir. 1978)); *see also United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013). "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. N. Carolina*, 391 U.S. 543, 548-49 (1968). Moreover, "the Government's 'burden is heavier where consent is not explicit, since consent is not lightly to be inferred.'" *Neely*, 564 F.3d at 350 (citation omitted). And, "once voluntary consent is given, it remains valid until it is withdrawn *by the defendant.*" *Ortiz*, 669 F.3d at 447 (emphasis in *Ortiz*).

However, the Fourth Circuit has noted that "[t]he circuit courts are not in agreement about which party bears the burden of proof in a civil suit that alleges a constitutional violation based on involuntary consent." *Trulock v. Freh*, 275 F.3d 391, 401 n. 4 (4th Cir. 2001) (*Comparing Valance v. Wisel*, 110 F.3d 1269, 1278–79 (7th Cir.1997) (burden on plaintiff to prove that consent is involuntary), *and Larez v. Holcomb*, 16 F.3d 1513, 1517–18 (9th Cir.1994) (burden on plaintiff), *and Ruggiero v. Krzeminski,* 928 F.2d 558, 562–63 (2nd Cir.1991) (burden

West, Officer Chapman was not justified in conducting a protective search of the passenger compartment of the vehicle.

As to the search of the trunk, the case of *Michigan v. Long*, 463 U.S. 1032, *supra*, provides that the permissible scope of a protective search does not extend to the search of a vehicle's trunk. Officer Chapman claims that he never actually searched the trunk because his attention was drawn away when Officer Bernardez-Ruiz asked Mr. West to see his sock. *Id.* at 19:17-20:5. In any event, Ms. Servance indicated that one of the officers explicitly asked Mr. West for permission to search his trunk and Mr. West responded, "'go ahead.'" ECF 106-6 at 74:5-6; *see also* Chapman Dep., ECF 106-7 at 18:19-19:17 (stating that he did not ask to search the vehicle but did ask for permission to search the trunk).

Ms. Servance testified that Mr. West expressly consented to the search of his trunk. ECF 106-6 at 73:20-74:9. Plaintiffs have not offered any facts to refute Ms. Servance's testimony. It follows that the search of the trunk, if any, was not illegal.[31]

---

on plaintiff), *and Crowder v. Sinyard*, 884 F.2d 804, 824–26 (5th Cir.1989) (burden on plaintiff), *with Tarter v. Raybuck*, 742 F.2d 977, 980–81 (6th Cir. 1984) (burden on defendant)).

[31] No facts have been proffered by plaintiffs to that suggest that Mr. West's consent to search the trunk was involuntary. Nor do I glean from the record any facts indicating that consent was involuntary.

Consent and the voluntariness of consent are "related, but analytically distinct." *United States v. Carter*, 300 F.3d 415, 423 (4th Cir. 2002) (per curiam). Whether a defendant voluntarily consented to a search is a question of fact, which is determined by the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). The totality of the circumstances includes "the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which that consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *Lattimore*, 87 F.3d at 650; *see v. DiGiovanni*, 650 F.3d at 514; *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001). In *Lattimore*, the Court said, 87 F.3d at 650: "Whether the accused knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of consent...."; *see Schneckloth*, 412 U.S. at 248-49.

### e. The Sock

Plaintiffs do not challenge the search of Mr. West's sock. Indeed, plaintiffs characterize the cocaine as "phantom drugs" (ECF 106-1 at 26) and maintain that Mr. West did not possess the drugs. *Id.* at 24-27. They also deny that Officer Bernardez-Ruiz "actually went into Mr. West's sock." *Id.* at 8. Rather, according to plaintiffs, "[a]ll of a sudden Bernardez-Ruiz had a sandwich baggy allegedly visible in his hand." *Id.*

### f. Summary

The BPD Officers are entitled to summary judgment as to any claim challenging the legality of the traffic stop, the duration of the stop, the directive to the occupants to exit the vehicle, and the search of the trunk of Mr. West's car, if any. However, as to the search of the passenger compartment of the vehicle, the facts are in dispute as to whether Mr. West gave consent. In the absence of consent, I discern no basis for a protective search of the interior of the vehicle.

## 2. The Arrest of Mr. West

Plaintiffs claim that Mr. West was unlawfully arrested. The claim is founded on the Fourth and Fourteenth Amendments and Articles 24 and 26 of Maryland Declaration of Rights. Plaintiffs also assert common law claims of false imprisonment and false arrest.

The BPD Officers argue that they were justified in arresting Mr. West because he assaulted Officer Bernardez-Ruiz by pushing him when the officer reached for the bulge in Mr. West's sock. ECF 97-3 at 17-18. In addition, they claim that they had probable cause to arrest Mr. West for possession of drugs. *Id.* at 18-19.

Plaintiffs deny that Mr. West assaulted Officer Bernardez-Ruiz. ECF 106-1 at 23-24. According to plaintiffs, Mr. West merely gestured to the officer without making any physical

contact. *Id.* at 24. They also deny that Mr. West possessed cocaine. *Id.* at 24-27. Plaintiffs seem to suggest that the cocaine was either planted or never existed. *See id.* at 26-27. Further, plaintiffs argue that "there exists no chain of custody to account for the alleged CDS." *Id.* at 26-27.[32]

As discussed below, Officers Bernardez-Ruiz and Chapman were legally justified in arresting Mr. West.

"If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001); *see Virginia v. Moore,* 553 U.S. 164, 176 (2008) ("[W]arrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution…."); *Pegg v. Herrnberger*, 845 F.3d 112, 118 (4th Cir. 2017) (same).

Maryland Code (2008 Repl. Vol.), § 2–202 of the Criminal Procedure Article ("C.P.") is also relevant. It is titled "Warrantless arrests – In general." It states, in part:

> (a) *Crimes committed in presence of police officer.* — A police officer may arrest without a warrant a person who commits or attempts to commit a felony or misdemeanor in the presence or within the view of the police officer.

> (b) *Probable cause to believe crime committed in presence of officer.* — A police officer who has probable cause to believe that a felony or misdemeanor is being committed in the presence or within the view of the police officer may arrest without a warrant any person whom the police officer reasonably believes to have committed the crime.

---

[32] Plaintiffs contend that on September 5, 2016, they issued a "subpoena duces tecum to the Baltimore Police Department, to produce for inspection and photographing, the alleged [Controlled Dangerous Substance, 'CDS']." ECF 106-1 at 26. According to plaintiffs, "[c]ounsel for Defendant Baltimore Police Department advised that they were unable to produce the alleged CDS and had no explaining [sic] as to where it was." *Id.* Thus, plaintiffs object to "any such mention of CDS . . . ." *Id.* at 27. Notably, plaintiffs' contention is not supported by affidavit, and it is contradicted by the BPD Defendants, who have provided ample chain of custody information. *See* ECF 115-2; ECF 115-3; *see also* ECF 97-19.

The concept of probable cause is not subject to precise definition. *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010). As the Supreme Court said in *Ornelas*, 517 U.S. at 696, probable cause "exist[s] where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." The assessment of probable cause is based on the totality of the circumstances, "rather than on the technical or rigid demands of a formulaic legal test." *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011).

In *Maryland v. Pringle*, 540 U.S. 366 (2003), the Supreme Court reiterated, *id.* at 370-71 (citations and quotations marks omitted):

> [T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.
>
> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that [t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized[.]

*See also Illinois v. Gates*, 462 U.S. 213 (1983); *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).

It is not enough that plaintiffs "simply plead an absence of probable cause for [their] claim[s] to survive summary judgment." *Pegg*, 845 F.3d at 119 (citation and internal quotation marks omitted). Although the Fourth Circuit has recognized that "'probable cause or its absence will be at least an evidentiary issue in practically all [§ 1983 wrongful arrest] cases,'" it has also "noted that there is a significant difference between the context of a motion to dismiss and a

motion for summary judgment in which the sufficiency of the evidence (as distinct from allegations) can be tested." *Nero v. Mosby*, MJG-16-1288, __F. Supp. 3d__, 2017 WL 386537, at *17 (D. Md. Jan. 27, 2017) (quoting *Pegg*, 845 F.3d at 119), *stayed pending appeal by* App. Case Nos. 17-1166, ECF 26; 17-1168, ECF 22; and 17-1169, ECF 21 (4th Cir. May 4, 2017).

In Maryland, the tort of false imprisonment is largely identical to the tort of false arrest. *See, e.g., Okwa v. Harper,* 360 Md. 161, 189-190, 757 A.2d 118, 133 (2000) ("Although the intentional torts of false arrest and false imprisonment are separate causes of action, they share the same elements."). "An action for false imprisonment arises when one unlawfully causes a deprivation of another's liberty against his will." *Allen v. Bethlehem Steel Corp.*, 76 Md. App. 642, 649, 547 A.2d 1105, 1109 (1988).

The elements of the tort of false imprisonment are as follows: "'1) the deprivation of the liberty of another; 2) without consent; and 3) without legal justification.'" *Jones v. NMS Health Care of Hyattsville, LLC*, 903 F. Supp. 2d 323, 330-31 (D. Md. 2012) (quoting *Heron v. Strader*, 361 Md. 258, 264, 761 A.2d 56, 59 (2000)) (citing *Manikhi v. MTA*, 360 Md. 333, 364, 758 A.2d 95 (2000)). "'Any exercise of force, or threat of force, by which in fact the [plaintiff] is deprived of [his] liberty...is an imprisonment.'" *Jones*, 903 F. Supp. 2d at 331 (quoting *Mason v. Wrightson*, 205 Md. 481, 487, 109 A.2d 128, 131 (1954)).

The tort of false imprisonment in Maryland turns on the concept of "legal justification" for a police officer's deprivation of the plaintiff's liberty. The Maryland Court of Appeals said in *Ashton v. Brown,* 339 Md. 70, 120, 660 A.2d 447, 472 (1995):

> [W]hile the presence or absence of probable cause to believe that a crime was committed may be pertinent in some cases with regard to the lawfulness of the arrest, the actual element of the tort of false imprisonment is legal justification rather than probable cause. To the extent that the lawfulness of an arrest does not turn upon probable cause under Maryland law, probable cause will not be

determinative of the legal justification issue in a false imprisonment action based on that arrest.

Further, the *Ashton* Court said: "When the cases speak of legal justification we read this as equivalent to legal authority....Whatever technical distinction there may be between an 'arrest' and a 'detention' the test whether legal justification existed in a particular case has been judged by the principles applicable to the law of arrest." *Ashton*, 339 Md. at 120, 660 A.2d at 472 (citation omitted); *see also Beasley v. Kelly*, DKC 10-0049, 2011 WL 4711910, at *4 (D. Md. Oct. 4, 2011).

A detention for purposes of conducting a search can constitute a deprivation of liberty for purposes of the tort of false imprisonment. *See, e.g., Ashton,* 339 Md. at 117, 660 A.2d at 470 (stating that where "a police officer performed a warrantless search of the plaintiff, over the plaintiff's objection," plaintiff stated a claim for false imprisonment) (citing *Mason v. Wrightson,* 205 Md. 481, 487, 109 A.2d 128, 130 (1954)). And, it is well established that an arrest constitutes a deprivation of liberty for purposes of evaluating a false arrest/imprisonment claim. *State v. Dett,* 391 Md. 81, 94, 891 A.2d 1113 (2006).

Md. Code (2012 Repl. Vol.), § 3-203(a) of the Criminal Law Article ("C.L.") pertains to second-degree assault. It provides: "A person may not commit an assault." C.L. § 3-201(b) defines assault as "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings." Although the offense of second-degree assault is a misdemeanor, it is punishable by up to ten years in prison. C.L. § 3-203(b).[33] The "statute…broadly defines misdemeanor assault, based on common law, to encompass even minor touching.[1]" *Karimi v. Holder*, 715 F.3d 561, 564 (4th Cir. 2013).

---

[33] Assault in the first degree is defined in C.L. § 3-502 and involves, *inter alia*, the use of various firearms. *Id.* § 3-202(a)(2). It is a felony offense, punishable by up to 25 years of imprisonment. C.L. § 3-202(b).

Under Maryland common law "there is no single crime . . . called 'assault and battery.'" *State v. Duckett*, 306 Md. 503, 510, 510 A.2d 253, 256 (1986), *superseded by statute as stated in Robinson v. State*, 353 Md. 683, 728 A.2d 698 (1999). "Assault and battery, although closely related, are nonetheless distinct crimes." *Claggett v. State*, 108 Md. App. 32, 47, 670 A.2d 1002, 1009 (1996); *see Ford*, 330 Md. at 699, 625 A.2d at 992. However, the term "assault" is often used interchangeably with battery to embrace conduct that constitutes battery. *Lamb v. State*, 93 Md. App. 442, 428-433, 613 A.2d 402, 404-407 (1992).

"A battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll,* 355 Md. 593, 601, 735 A.2d 1096 (1999); *accord Ford v. State*, 330 Md. 682, 699, 625 A.2d 984, 992 (1993) (*disapproved on other grounds by Henry v. State*, 419 Md. 588, 19 A.3d 944 (2011)); *Johnson v. Valu Food, Inc.,* 132 Md. App. 118, 123, 751 A.2d 19 (2000); *Janelsins v. Button*, 102 Md. App. 30, 35, 648 A.2d 1039, 1042 (1994). An assault is a consummated battery, an attempted battery, or placing a victim in reasonable fear of an imminent battery. *Snyder v. State*, 210 Md. App. 370, 381-82, 63 A.3d 128, 135 (2013); *Lamb*, 93 Md. App. at 427, 613 A.2d at 405; *see Lee v. Pfeifer,* 916 F. Supp. 501, 505–06 (D. Md. 1996).

Notably, "the unlawful application of force to another, however slight, constitutes a battery" in Maryland. *Claggett*, 108 Md. App. at 47, 670 A.2d at 1009. Thus, "[b]attery includes 'kissing another without consent, touching or tapping another, jostling another out of the way, throwing water upon another, rudely seizing a person's clothes, cutting off a person's hair, throwing food at another, or participating in an unlawful fight.'" *Marquardt v. State*, 164 Md. App. 95, 129, 882 A.2d 900, 920 (2005) (quoting *Duckett,* 306 Md. at 510–11, 510 A.2d at

257 (1986)).  Moreover, "[t]he crime is committed no matter how slight the injury to the victim." *Marquardt*, 164 Md. App. at 129, 882 A.2d at 920.

"To convict a defendant of an assault of the battery variety under Maryland law, 'the State must prove that: (1) the defendant caused offensive physical contact with, or harm to, the victim; (2) the contact was the result of an intentional or reckless act of the defendant and was not accidental; and (3) the contact was not consented to by the victim or was not legally justified.'" *United States v. Royal*, 731 F.3d 333, 341 (4th Cir. 2013) (citation omitted).

As indicated, while Mr. West sat on the curb with his legs extended and crossed, Officer Bernardez-Ruiz observed a "bulge" in the sock of Mr. West.  ECF 106-5 at 23:12-16; *id.* at 24:5-12.  Believing that Mr. West had "an illegal substance" in his sock, Bernardez-Ruiz reached towards the sock.  *Id.* at 24:15-20.  Ms. Servance testified that Mr. West moved Officer Bernardez-Ruiz's hand away from the sock.  ECF 106-6 at 81:10-12.  She testified, *id.* at 84:11-15: "[Mr. West] must have pushed his hand back or something like that. He didn't like push him physically, he must have just moved him away from whatever he was reaching to because he had already padded [sic] him down."  Even if the contact was relatively minor, a jury could conclude that the officers were justified in arresting Mr. West for second-degree assault.  *See Marquardt*, 164 Md. App. at 129, 882 A.2d at 920.

Regardless of whether the officers were justified in arresting Mr. West for assault, they were clearly justified in arresting Mr. West for possession of suspected cocaine.  According to plaintiffs, "Defendant Bernardez-Ruiz…reached towards Mr. West's foot area, but never actually went into Mr. West's sock." ECF 106-1 at 8.  Ms. Servance does not claim the officer did not look in the sock.  Rather, she said, ECF 106-6 at 77:4-7: "I didn't see [the officer] go to his sock, but he said you have drugs on you. I turned around trying to figure out what was going

on at that point." Ms. Servance then saw Officer Bernardez-Ruiz holding a plastic bag containing a green substance. ECF 106-6 at 78:11-79:7. Bernardez-Ruiz opened the bag and commented that there was cocaine inside. Plaintiffs' attempt to suggest that Mr. West never admitted to the possession of cocaine is flatly contradicted by Ms. Servance. According to Ms. Servance, Mr. West stated: "'[Y]ou got a measly four bags.'" *Id.* at 79:19-20; *id.* at 79:17-80:8. And, Ms. Servance acknowledged that when the bag was "opened up... you could see it was crack cocaine." *Id.* at 80:9-13.

The BPD submitted evidence pertinent to the chain of custody for the CDS. *See* ECF 115-2, Affidavit of Lt. Scott Dressler, ¶¶4, 8 and Attachment A (including complete chain of custody related to the CDS recovered from the scene on July 18, 2013, stating that the CDS is physically located in the Evidence Control Unit of BPD); *see also* ECF 115-3, Affidavit of Steven O'Dell, BPD's Chief of Forensic Science and Evidence Management Division, ¶¶3-6, and Attachment A (containing the chemical analysis of the drugs found at the scene, which revealed that the evidence tested positive for cocaine). It reveals that the plastic bag contained thirteen green zip-lock baggies with a white rock substance, which was subsequently identified as cocaine. *See* ECF 97-19, BPD Lab Section Drug Analysis report. Plaintiffs have not presented any evidence refuting the validity of the chain of custody.

Thus, Officer Bernardez-Ruiz possessed probable cause to believe that Mr. West was in possession of cocaine in his presence. Accordingly, the officers were justified in arresting Mr. West for possession of cocaine.

The BPD Defendants (not the BPD Officer Defendants) also argue that the Fourth Amendment permitted Officers Chapman and Bernardez-Ruiz to arrest Mr. West for the commission of the traffic violations. *See* ECF 99-1 at 18-19.

In general, Maryland law does not authorize a police officer to arrest a motorist for a minor traffic offense, such as unsafe backing up of a vehicle or stopping a vehicle in an intersection, unless additional circumstances are present. *See generally* Transp. § 26–202 (delineating power of arrest for violations of the Maryland Vehicle Law). Rather, such offenses are ordinarily resolved by the issuance of a citation. *See* Transp. § 26–201.

Nevertheless, an arrest for the offense of unsafe backing of a vehicle or stopping a vehicle would not offend the Fourth Amendment. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater,* 532 U.S. at 354 (concluding that Fourth Amendment was not violated by arrest of motorist for seatbelt violation, a misdemeanor punishable only by a fine); *see also Virginia,* 553 U.S. at 176 ("[W]arrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and ... while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections."); *Pegg*, 845 F.3d at 118 (same).

For all these reasons, it follows that the BPD Officers are entitled to summary judgment as to any claim regarding the validity of Mr. West's arrest.

### 3. Excessive Force[34]

The heart of the case rests with plaintiffs' claim regarding use of excessive force by the various police officer defendants. The claim is brought under 42 U.S.C. § 1983, Articles 24 and 26 of Maryland Declaration of Rights, and Maryland tort law. The BPD Officers claim that they used only reasonable force in response to Mr. West's continuing attempts to resist arrest.

---

[34] The BPD Defendants have not moved for summary judgment on the excessive force claim. *See* ECF 99-1 at 22, n. 7.

Alternatively, they claim that they are entitled to qualified immunity under federal law. *See* ECF 97-3.[35]

Claims brought under 42 U.S.C. § 1983, alleging the use of excessive force in effectuating an arrest or other seizure, are governed by the Fourth Amendment's prohibition against "unreasonable" seizures. *Graham, supra*, 490 U.S. at 395. Reasonableness is analyzed by weighing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner,* 471 U.S. 1, 8 (1985) (internal quotation marks omitted); *see also Graham*, 490 U.S. at 396 ("Determining whether the force used to effect a particular seizure is 'reasonable'" involves a balance of the individual's Fourth Amendment interests against the government's interests).

"The operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" *County of Los Angeles v. Mendez*, ____ U.S. ____, 2017 WL 2322832, at *6 (May 30, 2017) (citation omitted) (bracket in *Mendez*). Of relevance here, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Moreover, such claims are "evaluated . . . based upon the information the officers had when the conduct occurred." *Saucier v. Katz,* 533 U.S. 194, 207 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009).

To determine whether excessive force was used, the Fourth Circuit has said: "We determine whether an officer has used excessive force to effect an arrest based on a standard of

---

[35] The use of reasonable force to effectuate an arrest does not give rise to a claim for assault or battery. *See*, *e.g.*, *French v. Hines*, 182 Md. App. 201, 265-66, 957 A.2d 1000, 1037 (2008).

'objective reasonableness,' taking into account 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Meyers v. Baltimore Cnty., Md.,* 713 F.3d 723, 732-33 (4th Cir. 2013) (quoting *Graham,* 490 U.S. at 396). Courts have also considered the extent of the injury caused by the use of force in determining whether the use of that force was reasonable. *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).

When analyzing the objective reasonableness of the amount of force used by a law enforcement officer, the Fourth Circuit has cautioned courts not to adopt a "segmented view of [a] sequence of events." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). This is because such an approach "miss[es] the forest for the trees." *Id.* Instead, the Fourth Circuit has instructed, *id.*: "The better way to assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness."

In the context of this case, plaintiffs' claim of use of excessive force is quintessentially one for the jury. It will be the jury's responsibility to determine the sequence of events, the conduct of Mr. West, and the conduct of each of the police officers. Put another way, it will be up to the jury to determine the who, what, and when that permeates this case. I reach this conclusion based on the discussion that follows.

a. Constitutional Violation

Officers Bernardez-Ruiz and Chapman contend that the amount of force they directed against Mr. West was reasonable, *i.e.*, that they did not commit a constitutional violation. According to defendants, Mr. West posed a significant threat to Officers Bernardez-Ruiz and

Chapman. Further, the BPD Officers argue that Mr. West assaulted Officer Bernardez-Ruiz by pushing him. And, the defendants claim that Mr. West violently resisted arrest the "entire time" that the officers tried to subdue him. The BPD Officers state, ECF 97-3 at 20:

> Mr. West posed an immediate threat to the officers because after Officer Bernardez-Ruiz initially noticed the bulge in Mr. West's sock and reached for it, Mr. West immediately became assaultive and was willing to resist Officers Chapman and Bernardez Ruiz's attempts to subdue him with the use of pushes, kicks, punches and wrestling….Furthermore, Mr. West not only resisted, but posed an immediate danger to the officers because of his willingness to engage into [sic] a fight….Furthermore, Mr. West's size, strength and ability to hold off both Officers Chapman and Bernardez-Ruiz even after being directly sprayed in the face with OC spray demonstrate the immediate threat Mr. West posed to the officers. Mr. West was 6'0 tall, weighed 237 pounds and regularly worked out.

As to the first *Graham* factor, concerning the severity of the crime at issue, the underlying traffic violation was a minor offense. And, viewing the facts in the light most favorable to the plaintiffs as the non-moving parties, Mr. West did not forcefully push Officer Bernardez-Ruiz when the officer reached for Mr. West's sock. Rather, Ms. Servance stated that Mr. West pushed the officer's hand away. Even if this behavior qualified as second-degree assault under Maryland law, the conduct at issue, according to plaintiffs, did not involve the use of significant force by Mr. West. Nevertheless, this factor weighs in favor of the police. *See Valladares v. Cordero,* 552 F.3d 384, 390 (4th Cir. 2009) (agreeing with analysis of district court "that the first *Graham* factor (severity of the underlying offense) weighed *against* Ms. Valladares because James [Ms. Valladares's 15-year-old son] should never have shoved Officer Cordero.").

The next two *Graham* factors, which I consider simultaneously, are whether Mr. West posed an immediate threat to the defendants and whether he was actively resisting arrest.

According to defendants, Mr. West posed a significant threat to the officers because of his behavior in kicking and punching in his continuous attempt to resist. However, plaintiffs vigorously dispute the officers' account. Viewing the facts in the light most favorable to

plaintiffs, Mr. West consented to being placed in handcuffs.  Yet, Officer Chapman sprayed Mr. West with OC spray *after* he consented to being cuffed.  Only then did Mr. West stand up and engage in a fistfight with Officers Bernardez-Ruiz and Chapman.

It is significant that, even if the officers' use of force was initially justified, that does not necessarily warrant the continued use of force.  The "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005).  As the Second Circuit said in *Sullivan v. Gagnier*, 225 F.3d 161, 165–66 (2d Cir. 2000):  "The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit."  (Emphasis in original).

Notably, the unnecessary use of OC spray may constitute the use of excessive force.  *See, e.g., Park v. Shiflett,* 250 F.3d 843, 853 (4th Cir. 2001) (finding use of pepper spray excessive when used to restrain unarmed individual who posed no threat); *see also Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 774 (6th Cir. 2004) (noting that the court has "held that police who repeatedly sprayed mace in the face of an unarmed plaintiff who was not resisting and was not subject to lawful arrest would be liable for excessive force as a matter of law.").  In the Eighth Amendment context, "'[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas *or other chemical agents in quantities greater than necessary* or for the sole purpose of infliction of pain.'" *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin,* 77 F.3d 756, 763 (4th Cir.1996)) (emphasis and alteration in *Iko*).  And, "an officer's 'provocative conduct' can trigger an individual's 'limited right to offer reasonable resistance.'" *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1164 (9th

Cir. 2011) (citation omitted) (recognizing that plaintiff's startled response of rising to his feet and "moving and circling" an officer was reasonable after an officer unexpectedly pepper sprayed a suspect as he sat on a curb).[36]

In addition, according to Ms. Servance, even after Mr. West put his hands in the air, Officers Bernardez-Ruiz and Chapman struck Mr. West with their batons and beat him "like they were playing drums", including striking Mr. West's head after he got down on the ground with his arms spread out. ECF 106-6 at 123:17-19. Ms. Servance stated that Mr. West then stood up and proceeded to swing his arms (*id.* at 126:11-127:12), but only as a defensive measure to fend off further baton strikes.

"Baton blows to the head…are recognized as deadly force." *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1147 (E.D. Cal. 2016). Defendants have not suggested that the use of deadly force was justified. *See Garner,* 471 U.S. at 11 ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."); *id.* ("Where the suspect poses no immediate threat to the officer and no threat to others," officers may not use deadly force to apprehend the suspect.); *see also Thomas v. Holly*, 533 F. App'x 208, 219 (4th Cir. 2013) (per curiam) (citing *Garner* for the proposition that defendants were objectively unreasonable in punching the plaintiff four or five times in the back of the head with a closed fist and with great force in an effort to arrest him when he was effectively pinned to the ground and not incapable of resisting arrest).

---

[36] This limited right should not be confused with the Ninth Circuit's provocation rule, which the Supreme Court recently rejected as "incompatible with [its] excessive force jurisprudence." *Mendez*, 2017 WL 2322832, at *6. In *Mendez,* the Ninth Circuit determined that a police shooting was reasonable under *Graham,* but it "applied the provocation rule and held the deputies liable for the use of force on the theory that they had intentionally and recklessly brought about the shooting by entering [a] shack without a warrant in violation of clearly established law." *Id.* at *5.

Accordingly, even if Officers Bernardez-Ruiz and Chapman were justified in using some level of force against Mr. West in order to effectuate his arrest, accepting plaintiffs' version of events as true, as I must, any use of force by Officers Bernardez-Ruiz and Chapman after Mr. West ceased resisting arrest would not have been objectively reasonable.

As to the additional BPD Officers and MSU Officer David Lewis, *i.e.,* the Assisting Officers, the BPD Officers assert: "After realizing that two officers could not subdue Mr. West, the assisting officers collectively attempted to arrest Mr. West." ECF 97-3 at 24. They argue: "Looking at the totality of the circumstances and the *Graham* factors, the assisting officers observed Mr. West resist arrest, successfully fend off two officers and do so after being OC sprayed. Noteably [sic], once Mr. West was finally handcuffed, no additional force was used." *Id.*[37]

With respect to the Assisting Officers, Ms. Servance testified that at or around the time of their arrival, Mr. West had stood back up and was making a windmill motion with his arms to fend off further baton blows from Bernardez-Ruiz and Chapman. ECF 106-6 at 126:11-127:12; *id.* at 129:9-15. Ms. Servance observed around seven officers, including MSU Officer David Lewis and Bernardez-Ruiz and Chapman, kick and strike Mr. West with fists and batons, including on his head, as he stood with his back against a vehicle for a minute to a minute and a half. Significantly, according to Ms. Servance, Mr. West was not offering any resistance. As indicated, she testified, ECF 106-6 at 143:4-5, 8-10: "He was limp taking blows. He wasn't defending himself…. I could see, as they were hitting him, I could see his body jerking towards the movement of the blows." Mr. West then collapsed on the sidewalk. *Id.* at 134: 5-12. Ms.

---

[37] MSU Officer David Lewis did not set forth any specific arguments as to why his use of force was not excessive. Rather, he filed a two-page motion for summary judgment (ECF 100), in which he joined in the motion for summary judgment filed by the BPD Officers.

Servance claims that, even after Mr. West collapsed, MSU Officer David Lewis and two or three other officers (not Bernardez-Ruiz and Chapman) began stomping on Mr. West. ECF 106-6 at 141:4-142:7.

Assuming the truth of plaintiffs' allegations, no reasonable officer could have thought that such actions were reasonable when Mr. West was limp, not defending himself, and then collapsed. Plaintiffs have proffered sufficient evidence, if credited by the jury, that the force used by the Assisting Officers was excessive and not objectively reasonable.

From my review of the record, I have found no evidence indicating that Officer Danielle Lewis had any contact with Mr. West during the altercation. *See* ECF 106-14, Danielle Lewis Statement to IAD at 8; ECF 106-12, Latrice Lee Statement to IAD, at 5. Moreover, plaintiffs have not cited to any place in the record reflecting that Officer Danielle Lewis had any contact with Mr. West. Inexplicably, in their Motion, the BPD Officers failed to mention this significant omission. Rather, in regard to the use of force claim, both plaintiffs and the BPD Officers generally address the Assisting Officers collectively. *See*, *e.g.*, 97-3 at 23-24; ECF 106-1 at 31, 34 (stating, without citation to the record, that the assisting officers joined the "'dog pile'" to assault Mr. West). Of course, the conduct of each officer must be analyzed separately.

Nevertheless, the BPD Officers did move for summary judgment as to all claims. ECF 97; ECF 97-3. Therefore, given the absence of any evidence implicating Officer Danielle Lewis, she is entitled to summary judgment as to plaintiffs' § 1983 excessive force claim, as well as the related state law claims for assault and battery and the claims for wrongful death and funeral expenses. *See, e.g., Dent v. Montgomery Cty. Police Dep't*, 745 F. Supp. 2d 648, 658 (D. Md. 2010) (explaining that "[b]ecause Plaintiff has not presented evidence that Officer Phoenix used force against her, Officer Phoenix [is] entitled to judgment as a matter of law [in] that he did not

violate Plaintiff's Fourth Amendment rights by using excessive force against her."); *Pethel v. W. Virginia State Police*, 568 F. Supp. 2d 658, 669 (N.D.W. Va. 2008) (concluding that, in the absence of any physical contact by three of the defendants, they were entitled to summary judgment on the plaintiff's § 1983 excessive force claim.), *aff'd*, 359 F. App'x 390 (4th Cir. 2009).

b.   Qualified Immunity

i.   Principles

Defendants claim that they are entitled to the protection of qualified immunity as to any violation of federal law.   With respect to claims under § 1983, courts have recognized qualified immunity as an affirmative defense.   *See Henry v. Purnell*, 501 F.3d 374, 377 n.2 (4th Cir. 2007) (stating that qualified immunity is an affirmative defense that must be pleaded by a defendant), *cert. denied*, 565 U.S. 1062 (2011).

Under federal law, "[t]he doctrine of qualified immunity protects police officers and public officials from claims of constitutional violations 'for reasonable mistakes as to the legality of their actions.'" *Merchant v. Bauer,* 677 F.3d 656, 661 (4th Cir. 2012) (quoting *Saucier,* 533 U.S. at 206), *cert. denied,* 133 S. Ct. 789 (2012). *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Graham v. Gagnon,* 831 F.3d 176, 182 (4th Cir. 2016); *Bland v. Roberts,* 730 F.3d 368, 391 (4th Cir. 2013). "Qualified immunity shields government officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 401 (4th Cir. 2015) (internal quotations omitted); *see also Booker v. S.C. Dep't of Corr.,* 855 F.3d 533, 537-38 (4th Cir. 2017); *Osborne v. Georgiades*,

__Fed. Appx. __, 2017 WL 521570, at *3 (4th Cir. Feb. 8, 2017); *Scinto v. Stansberry,* 841 F.3d 219, 235 (4th Cir. 2016).

Qualified immunity "takes cognizance of human imperfections," *West v. Murphy*, 771 F.3d 209, 213 (4th Cir. 2014), and insulates government officials from liability with respect to "'bad guesses in gray areas.'" *Braun v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (citation omitted). *See Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 395 (4th Cir. 2014) ("Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (citation omitted), *cert. denied sub nom. Baltimore City Police Dep't v. Owens*, 135 S. Ct. 1983 (2015); *see also Saucier*, 533 U.S. at 206; *Martin v. Duffy*, __F.3d.__, 2017 WL 2366997, at *7 (4th Cir. June 1, 2017); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013). Thus, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818.

Qualified immunity is an "'immunity from suit rather than a mere defense to liability' ....'" *Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526).

As the Supreme Court has explained, "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. at 231; *see Safar*, 2017 WL 2453257, at

*3. "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S __, 134 S. Ct. 3, 5 (2013) (per curiam). Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231.

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law," *Harlow*, 457 U.S. at 818, and so an officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Henry v. Purnell,* 652 F.3d 524, 531 (4th Cir. 2011) (en banc)); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). In other words, qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 571 U.S. __, 134 S. Ct. 2369, 2381 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *see Messerschmidt v. Millender*, 132 S. Ct. at 1244.

The Fourth Circuit has explained: "In order for a plaintiff to overcome an official's qualified immunity defense, the plaintiff must demonstrate (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Martin*, 2017 WL 2366997, at *7 (citations and some quotation marks omitted); *see also Scinto,* 841 F.3d at 235. Thus, the qualified immunity analysis involves two

inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right," *Saucier,* 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case— that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant, supra*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Owens, supra*, 767 F.3d at 395-96.

The "two inquiries ... may be assessed in either sequence." *Merchant*, 677 F.3d at 661-62; *accord Pearson*, 555 U.S. at 236 (stating that judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand"). But, the "answer to both…questions must be in the affirmative in order for a plaintiff to defeat a ... motion for summary judgment on qualified immunity grounds." *Batter v. Gomez,* 324 F.3d 288, 293–94 (4th Cir. 2003).

Notably, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'" *Henry*, 501 F.3d at 377 n.2 (citation omitted); *see also, e.g., Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265-66 (11th Cir. 2004). The burden is on the plaintiff to prove that a constitutional violation occurred. However, the defendant must prove that the right was not clearly established at the time in question. *Henry,* 501 F.3d at 377–78; *Bryant v. City Of Cayce*, 332 F. App'x 129, 132 (4th Cir. 2009) (same); *but*

*cf. Harlow,* 457 U.S. at 815 n. 24, 102 S. Ct. 2727 (explaining that the Court had not decided which party bears the burden of proof).

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 132 S. Ct. at 1245 (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

With respect to whether the right is one that is clearly established, "[t]he animating principle… is one of fair notice." *Safar*, 2017 WL 2453257, at *3; *see Hope v. Pelzer*, 536 U.S. 730, 740 (2002). To determine whether the right was clearly established, the court first must define the right at issue. *Scinto,* 841 F.3d at 235; *Occupy Columbia*, 738 F.3d at 118. "When evaluating whether a right was clearly established at the time of a violation, courts do not ask "whether the right allegedly violated was established as a broad general proposition but whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Pegg v. Herrnberger*, 845 F.3d 112, 117 (4th Cir. 2017) (citation and internal quotation marks omitted). "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S.__, 135 S. Ct. 348, 350 (2014) (per curiam) (quoting *Creighton*, 483 U.S. at 640); *see also Martin*, 2017 WL 2366997, at *7; *Bland*, 730 F.3d at 391. "In other words,

'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll*, 135 S. Ct. at 350 (quoting *al-Kidd*, 563 U.S. at 741); *see White v. Pauly*, __U.S.__, 137 S. Ct. 548, 552 (2017) (per curiam); *City & Cnty. of San Francisco, Calif. v. Sheehan*, 572 U.S. __, 135 S. Ct. 1765, 1774 (2015); *Plumhoff v. Rickard*, 570 U.S. __, 134 S. Ct. 2012, 2023 (2014). As the Supreme Court said in *Reichle v. Howards*, 566 U.S.__, 132 S. Ct. 2088, 2093 (2012): "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." (Citation and quotation marks omitted, alteration in *Reichle*).

In determining whether a right was clearly established, courts in this Circuit "'ordinarily need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose'" as of the date of the conduct at issue. *Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir.) (citations omitted), *cert. denied*, 562 U.S. 890 (2010). Notably, "a right may be clearly established by any number of sources, including a criminal case, a statute, or the Constitution itself." *Owens*, 767 F.3d at 399. However, there need not be a case "directly on point...." *al-Kidd*, 563 U.S. at 741; *see also Martin*, 2017 WL 2366997, at *7; *Crouse*, 848 F.3d at 583.

As the Fourth Circuit has explained, for purposes of "clearly established," it is not necessary that the precise conduct at issue has previously been held unlawful. *Meyers*, 713 F.3d at 734. The "nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity [because] 'qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations.'" *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003) (quoting *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (Michael, J. concurring)); *see also Hope v. Pelzer*, 536 U.S.

730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.")

The question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'" *Merchant*, 677 F.3d at 665 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)).

Of import here, qualified immunity is not a defense to an excessive force claim brought under Articles 24 and 26 of the Maryland Declaration of Rights. *Littleton v. Swonger*, 502 Fed. Appx. 271, 274 & n. 2 (4th Cir. 2012) (citing *Okwa v. Harper*, 360 Md. 161, 757 A.2d 118, 140 (2000)); *see also Wallace v. Poulos*, DKC-2008-0251, 2009 WL 3216622, at *15 (D. Md. Sept. 29, 2009) (qualified immunity not a defense to Article 24 claim). Accordingly, a court addressing an excessive force claim brought under Maryland constitutional law, pursuant to Articles 24 and 26, will assess the reasonableness of an officer's actions, applying the same standard used for an analogous federal constitutional claim. *Purnell, supra*, at 652 F.3d at 536; *Okwa*, 360 Md. at 203–05, 757 A.2d at 141 (relying on U.S. Supreme Court precedent). But, unlike a federal constitutional claim, a Maryland constitutional claim under Articles 24 and 26 is not subject to an analysis that considers whether the right in question "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (citation omitted). Instead, a court may consider potentially applicable state law immunities, if these defenses are raised by the defendants. *See, e.g., Henry*, 652 F.3d at 536

(discussing applicability of Maryland Tort Claims Act, Md. Code (2009 Repl. Vol., 2013 Supp.), § 12–101 *et seq.* of the State Government Article).

### ii. Analysis

As discussed, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right," *Saucier,* 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant, supra*, 677 F.3d at 662 (citation omitted); *see Owens,* 767 F.3d at 395-96.

The BPD Officers failed to address the question of whether the right at issue was clearly established at the relevant time. As noted, the Fourth Circuit has explained that although the burden is on the plaintiff to prove that a constitutional violation occurred, the defendant must prove that the right was not clearly established. *Henry,* 501 F.3d at 377–78; *see also Bryant*, 332 F. App'x at 132 (same); *Calhoun*, 2015 WL 641759, at *4 ("The burden is on the Plaintiff to prove that the alleged conduct violated the law, while Defendant must prove that the right was not clearly established.").

Plaintiffs have successfully met their burden of demonstrating that a constitutional violation occurred. But, defendants have not met their burden to show that they are entitled to qualified immunity.

In the Fourth Circuit, it has long been clearly established "that 'officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity.'"

*Meyers*, 713 F.3d at 734 (quoting *Bailey v. Kennedy,* 349 F.3d 731, 744–45 (4th Cir. 2003)); *see also Meyers.*, 713 F.3d at 735 ("The use of any 'unnecessary, gratuitous, and disproportionate force,' whether arising from a gun, a baton, a taser, or other weapon, precludes an officer from receiving qualified immunity if the subject is unarmed and secured."). This principle is true even as to a citizen who initially offered resistance but was subjected to excessive force after he ceased his resistance. *See, e.g., Bailey,* 349 F.3d at 744–45 (denying qualified immunity where suspect initially resisted arrest but officers continued to use force after he was fully secured); *Kane v. Hargis,* 987 F.2d 1005, 1006–07 (4th Cir. 1993) (denying qualified immunity where suspect initially resisted arrest but police officer, after suspect was secured, "repeatedly push[ed] her face into the pavement, cracking three of her teeth, cutting her nose, and bruising her face").

Ms. Servance stated that the BPD Officers continued to beat Mr. West when he was not resisting and even after he collapsed. Such use of gratuitous force, if proven, is unlawful. *See, e.g.*, *Valladares*, 552 F.3d at 390-91 (concluding, on summary judgment, that district court correctly determined that the officer was not entitled to qualified immunity; a reasonable officer would not have used the degree of force that the officer used, *i.e.*, shoving the plaintiff's face into a car after the plaintiff surrendered); *Gulley v. Elizabeth City Police Dep't*, 340 F. App'x 108, 109 (3d Cir. 2009) (concluding that district court did not err in its determination that officers were not entitled to qualified immunity because it is clearly established that "'beating an unarmed suspect, multiple times on the face and head while he is lying down and not resisting arrest constitutes excessive force.'"); *Calhoun v. Schweinsburg*, DKC 12-2014, 2015 WL 641759, at *6 (D. Md. Feb. 12, 2015) (denying summary judgment as to an excessive force claim and finding that defendant was not entitled to qualified immunity because "[a]ny continued beating of Plaintiff by Defendant Schweinsburg after Plaintiff was tased, fell to the ground,

temporarily lost muscle control, and was no longer resisting arrest, would constitute excessive force *despite the fact that Plaintiff had not yet been handcuffed* because Defendant Schweinsburg's force would have been unnecessary") (emphasis added); *Sinclair v. Purnell*, GLR-13-1735, 2014 WL 4052859, at *6 (D. Md. Aug. 13, 2014) (denying summary judgment and determining that qualified immunity "provides no basis to dismiss Plaintiff's allegations" because a reasonable officer could not have believed "that kneeing, kicking, and beating an already subdued arrestee while he was on the ground was reasonable").

It will be for the jury to resolve the material factual disputes as to whether the BPD Officers used excessive force. Under these facts, any officer found to have used excessive force would not be entitled to qualified immunity.

Moreover, Officer Chapman is not entitled to qualified immunity as to the search of the vehicle. At the time in question, it was clearly established that furtive movements alone are generally insufficient to constitute reasonable articulable suspicion to justify a vehicle search. *See, e.g., Spearman*, 254 F. App'x 178; *Barnes*, 153 F. App'x 232; *United States v. Sprinkle,* 106 F.3d 613, 617-18 (4th Cir. 1997) (holding that the officers did not have reasonable suspicion, even where one of the actors, whom the officers knew to be involved in the narcotics trade, "raised his hand to the side of his face as if to conceal his identity.")[38]

### c. Assault and battery

"The parallel state law claim of assault and battery is subsumed within the federal excessive force claim . . . ." *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). Because I have concluded that the evidence, viewed in the light most favorable to plaintiffs, supports an

---

[38] It is not clear what damages would result from a brief search of a car that did not lead to any evidence of illegal activity.

excessive force claim, the BPD Officers are not entitled to summary judgment as to the related claims of assault and battery (except as to Officer Danielle Lewis).

I need not address whether the BPD Officers and/or MSU Officer David Lewis are entitled to common law or statutory immunity under Maryland law because the BPD Officers assert only the defense of qualified immunity under federal law. *See, e.g.,* ECF 97-3 at 31. In fact, in their Reply (ECF 117), the defendants reiterated that they intended to raise federal qualified immunity but not state public official immunity. *Id.* at 18-19.

### 4. Bystander Liability

In their Opposition (ECF 106-1), plaintiffs assert a claim of bystander liability. They allege that "each of the defendant assisting officers observed the brutal actions of their fellow officers and instead of attempting to intercede as required by bystander liability, each officer instead made the conscious decision to participate in the fray." *Id.* at 37.

The Fourth Circuit "has recognized 'bystander liability' as an independent cause of action by which a police officer may violate a plaintiff's constitutional right to be free from excessive force when the officer witnesses 'a fellow officer's illegal act ... possesses the power to prevent it ... and chooses not to act.'" *Beasley v. Kelly*, DKC 10-0049, 2011 WL 4711910, at *8 (D. Md. Oct. 4, 2011) (quoting *Randall v. Prince George's Cnty.,* 302 F.3d 188, 203–04 (4th Cir. 2002)).

As a preliminary matter, if the officers "participate[d] in the fray" (ECF 106-1 at 37), as plaintiffs claim, then they were not acting as bystanders. In the Amended Complaint, plaintiffs assert that all of the individual defendants participated in beating Mr. West.

Moreover, plaintiffs assert a claim for bystander liability for the first time in their Opposition to the BPD Officers' Motion. They did not assert this claim in their Complaint (ECF 2) or in their Amended Complaint (ECF 33).

It is well established that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F. Supp. 2d 399, 436 (D. Md. 2006) (citing *Shanahan v. City of Chi.,* 82 F.3d 776, 781 (7th Cir.1996)); *see also Zachair Ltd. v. Driggs,* 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd,* 141 F.3d 1162 (4th Cir. 1998); *Cf. Howie v. Prince George's Cnty.,* No. DKC 2006–3465, 2009 WL 2426018, at *5–6 (D. Md. Aug. 5, 2009) (evaluating a claim of bystander liability on summary judgment because the plaintiffs had alleged "this theory in their amended complaint" by claiming that certain of the defendant officers did nothing to stop a beating).

Accordingly, to the extent that plaintiffs present a bystander liability claim, I will not consider it.

### 5. Deliberate Indifference to a Serious Medical Need

Claim I-Count IV of the Amended Complaint appears to assert that the BPD Officers and MSU Officer David Lewis were deliberately indifferent to Mr. West's serious medical needs. ECF 33, ¶ 61; *see, e.g.*, ECF 106-1 at 34-35.[39] "Claims of deliberate indifference to a serious medical need during an arrest are covered by the due process clause." *Elder v. Thompson*, No. 4:13-CV-00047, 2014 WL 1607381, at *15 (W.D. Va. Apr. 22, 2014) (citation and quotation marks omitted); *see Bell v. Wolfish,* 441 U.S. 520, 525 n. 16 (1979). "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due

---

[39] Curiously, the BPD Officers did not directly address this claim in their Motion. However, the BPD Defendants moved for summary judgment on this issue (ECF 99-1 at 26). They argue that the BPD Officers did not violate Mr. West's rights under the Fourteenth Amendment because he was promptly provided with medical assistance. And, plaintiffs address this claim in their Opposition to the BPD Motion (ECF 103-1 at 23).

process of law.[[]" *Bell*, 441 U.S. at 535. Notably, the "due process rights of detainees are coextensive with Eighth Amendment rights of convicted prisoners, at least with regard to detainees' claims of deliberate indifference to medical needs." *Thomas v. Kincaid*, No. CIV.A. 03-941-AM, 2004 WL 3321472, at *5 (E.D. Va. June 30, 2004) (citing *Hill v. Nicodemus,* 979 F.2d 987 (4th Cir.1992)). Therefore, I will look for guidance to cases that arise under the Eighth Amendment.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto*, 841 F.3d at 225; *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state a claim for denial of adequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, *supra*, 535 F.3d at 241. The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and, subjectively, the defendants were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *King*, 825 F.3d at 219. A "'serious... medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228.

Proof of an objectively serious medical condition does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225. Put another way, "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the [plaintiff's] serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178.

The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001). As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to…health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter ... becomes essential to proof of deliberate indifference 'because [defendants] who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Of import here, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness…." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir.

1999), resonates here: "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it ... [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences ... To lower this threshold would thrust federal courts into the daily practices of local police departments."

Although the deliberate indifference standard "'entails more than mere negligence ... it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a [defendant's] actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a [defendant] knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015)(quoting *Farmer*, 511 U.S. at 842). Moreover, if a risk is obvious, a defendant "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105.

Even if the requisite subjective knowledge is established, an official may still avoid liability if he "responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844; *see Scinto*, 841 F.3d at 226. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

The BPD Defendants claim that "the evidence before the Court shows that Defendants Chapman and Bernardez-Ruiz had no idea that Mr. West was severely injured and needed immediate medical assistance." ECF 99-1 at 29. In addition, they argue that "the undisputed

evidence of this case demonstrates that medical assistance, in fact, was provided to Mr. West in two forms: (1) one officer (Officer Hatnshyn [sic]) began CPR when he realized the Mr. West was unresponsive; and (2) the medic who was originally called for Defendant Chapman, instead, began to immediately work on Mr. West." *Id.*

Plaintiffs counter that, despite Mr. West's "visible and audible distress," no defendant attempted to provide Mr. West with medical assistance "until he was apparently dead." ECF 103-1 at 24. The record belies this assertion.

Construing the facts in the light most favorable to plaintiffs, there is no basis for a claim of deliberate indifference as to the provision of medical care. *Lightsey*, 775 F.3d at 178. A very brief amount of time elapsed from when Mr. West collapsed to when he began to receive medical treatment. *See Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009) ("[M]ere delay or interference can be sufficient to constitute a violation of the Eighth Amendment."). The undisputed facts reveal that as soon as the officers became aware of Mr. West's serious medical condition, they attended to him. Officer Hinton asked an unidentified officer, likely MSU Officer David Lewis, to turn Mr. West over, and Officer Jennings carried Mr. West over to the grass. *See* ECF 97-15, Hinton Answer to Interrog. No. 18; Lewis Dep., ECF 97-7 at 39:16–40:1; ECF 106-15, Jennings Statement to IAD, at 2-3. Officer Hnatyshyn, assisted by Officer Jennings, began to perform CPR on Mr. West and continued chest compressions until medics arrived. *See, e.g.*, ECF 97-15, Hinton Answer to Interrog. No. 18; *see also* ECF 106-15, Jennings Statement to IAD, at 2-3. According to Officer Jennings, while Officer Hnatyshyn performed CPR, Mr. West's pulse came back twice. ECF 106-15, Jennings Statement to IAD, at 3, 7. These facts have not been refuted by plaintiffs or Ms. Servance.

Moreover, a medic had already been called to assist Officer Chapman, whose eye had allegedly been injured during the fray. In other words, a medic had been called before the officers even realized that Mr. West was in distress. Upon the arrival of the medics[40] at 7:23 p.m., the medics immediately attended to Mr. West. Chapman Dep., ECF 106-7 at 28:13-15; 30:21-31:6; 34:11-14; *see also* ECF 106-23 at 1.

Officer Chapman's testimony is confirmed by the certified EMT report, which states, ECF 106-23 at 2: "Respond to a call for an injured officer to find police officers anxiously directing us to the patient [Mr. West]….Officers were yelling out that they were 'doing CPR.'" Ms. Servance saw the medic arrive. ECF 106-6 *at* 143:19-20. According to Ms. Servance, at the most, three to four minutes elapsed between the time of Mr. West's collapse and when he was placed on a stretcher by the medics. *Id.* at 143:13-18; *id*. at 145:15-20. And, as noted, the officers began to treat Mr. West *before* the medics arrived.

Thus, the BPD Officers and MSU Officer David Lewis are entitled to summary judgment as to the claim of deliberate indifference to a serious medical need. *See, e.g.*, *Thomas*, No. CIV.A. 03-941-AM, 2004 WL 3321472, at *6 (determining that plaintiff did not state a claim of deliberate indifference to a serious medical need when evidence "illustrate[d] that as soon as the high speed chase concluded and Thomas was appropriately restrained, Trooper Kincaid called for medical assistance.").

### 6. Wrongful Death and Funeral Expenses

Plaintiffs have also raised state law claims for wrongful death and for the recovery of funeral expenses.

---

[40] In their depositions, Officer Chapman and Ms. Servance referred only to one medic. But, according to the certified EMT Report, there were two medics. ECF 106-23 at 1.

Maryland's wrongful death statute is found in Md. Code (2013 Repl. Vol.), §§ 3–901 through 3–904 of the Courts & Judicial Proceedings Article ("C.J."). Section 3–902 is titled "Liability for death."  C.J. § 3-902(a) provides that a wrongful death action "may be maintained against a person whose wrongful act causes the death of another." "[A] wrongful death action is brought by the relatives of the decedent, seeking recovery for their loss as a result of the victim's death." *Jones v. Prince George's Cnty.,* 541 F. Supp.2d 761, 764 (D. Md. 2008) (citation omitted). Such an action "'is brought in the name of a person entitled to recover ....'" *Williams v. Work,* 192 Md. App. 438, 452, 995 A.2d 744, 753 (2010) (quoting *Walker v. Essex,* 318 Md. 516, 523, 569 A.2d 645, 648 (1990)), *aff'd sub nom. Ace Am. Ins. Co. v. Williams,* 418 Md. 400, 15 A.3d 761 (2011); *see Eagan v. Calhoun,* 347 Md. 72, 82, 698 A.2d 1097, 1102 (1997) (a wrongful death action "is brought by a spouse, parent, or child, or a secondary beneficiary who was wholly dependent on the decedent, to recover damages for his or her own loss accruing from the decedent's death"); *United States v. Streidel,* 329 Md. 533, 536, 620 A.2d 905, 907 (1993); C.J. § 3–904(d) ("[D]amages awarded...are not limited or restricted by the 'pecuniary loss' or 'pecuniary benefit' rule but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable for the death of ... (1) A spouse ... (3) A parent of a minor child ....").

The Survival Act permits the personal representative of the decedent to bring any claims that the decedent could have brought had he lived, and to recover for any funeral expenses caused by the conduct of the defendants. Md. Code (2011 Repl. Vol.), § 7–401(y)(1) (ii) of the Estate and Trusts Article.

The BPD Officers argue that plaintiffs cannot maintain a wrongful death action because plaintiffs cannot show that any actions of the individual defendants "were wrongful." ECF 97-3 at 30. For the reasons already stated, this argument lacks merit.

In addition, the BPD Officers argue that plaintiffs cannot show that any of the actions of the defendants "caused the death of Mr. West." *Id.* They maintain that Mr. West died from a cardiac conduction abnormality and dehydration, neither of which was caused by the defendants. ECF 97-3 at 25. The BPD Officers rely on the Autopsy Report (ECF 98) and deposition testimony (ECF 97-8 and ECF 152-1) of Doctor Southall, the Assistant State Medical Examiner who performed the autopsy of Mr. West, to argue that they did not cause Mr. West's death. As noted, Dr. Southall opined that the cause of death for Mr. West was "Cardiac Arrhythmia due to Cardiac Conduction System Abnormality complicated by Dehydration during Police Restraint." ECF 98, Autopsy Report, at 9. But, she could not determine the manner of death. *Id.*

The BPD Officers emphasize that a conduction abnormality could by itself cause sudden death, "with or without any other factors involved from the altercation between Mr. West and the officers." ECF 97-3 at 25. They also note that extreme temperatures on the day of the incident may have contributed to Mr. West's death. *Id.* at 26. In addition, the BPD Officer defendants state, *id.*: "Although the officers did employ the use of force in an attempt to apprehend Mr. West, according to Dr. Southall, the cause of death was not caused by any strikes administered to Mr. West in the course of that apprehension but was attributed to a pre-existing heart condition which was exacerbated by the strenuous encounter with the officers at the scene."

The Autopsy Report stated, in part, ECF 98 at 9: [A]utopsy revealed abnormalities within the conduction system of the decedent's heart and an electrolyte imbalance that was consistent with dehydration." The autopsy also "revealed a superficial abrasion on [Mr. West's] face and

abrasions and contusions on his back and upper and lower extremities…" *Id.* But, the autopsy "revealed neither signs of asphyxia, nor significant injury to vital structures or vital areas of the body." Further, Dr. Southall wrote, *id.*: "[A]bnormalities found in Mr. West's heart and signs of dehydration are certainly causes for sudden cardiac death. Another factor that may have contributed to his death was the extreme environmental temperature. Temperatures on the day of his death …were reportedly in the high 90s with a heat index in the low 100s (degrees Fahrenheit)." And, Dr. Southall said: "The cardiac conduction system abnormality is a predisposing factor for cardiac arrhythmia." *Id.*

At her deposition, Dr. Southall explained that the cardiac conduction system abnormality and the "marked dehydration" can, "in and of themselves taken separately . . . cause a sudden death, without any other factors involved. A person can walk along and just die suddenly from either one of those." Southall Dep., ECF 152-1 at 20:5-20:9. But, she acknowledged the Decedent's "exertion" and clarified that she did not know "how much the restraint process or the encounter with the police may have contributed." *Id.* at 20:11-15. She explained: "[T]here was nothing — no signs at autopsy — no signs of asphyxia, no signs of significant injury that could have changed my opinion to something more definite, such as homicide. I just didn't have enough findings to support that, but I can't rule out that that encounter may have played some role." *Id.* at 21:1-7.

Plaintiffs counter that the BPD Officers caused Mr. West's death because they "brutally" beat him "until he was by all descriptions already dead." ECF 106-1 at 35 and 36. Further, plaintiffs dispute that Mr. West had a preexisting heart condition. *Id.* at 37 and 39. As to any potential cardiac conduction abnormality, plaintiffs assert that Dr. Southall "made clear that she is not a cardiologist, and questions of an alleged heart condition causing or contributing to Mr.

West's death are 'venturing outside her area of expertise.'" *Id.* at 37 (quoting Southall Dep., ECF 152-1 at 84:6-13).[41]  Plaintiffs emphasize that "even [Dr. Southall] concluded that she could *not* rule out Homicide." ECF 106 at 37 (emphasis in original).

Plaintiffs rely on the expert report of William Manion, M.D., Ph.D. to assert that the cause of death was positional asphyxia.  ECF 106-1 at 38-39.[42]  In reaching his conclusion, Dr. Manion relied on the Complaint, the Autopsy Report, a toxicology report, hospital records, and Baltimore City Fire Department records.  ECF 106-20 at 1.  In his two-page report, Dr. Manion explained that it is his opinion that the manner of death was homicide and that the cause of death was positional asphyxia as a result of Mr. West being "hog tied" and having an adult male sitting on his back while he was restrained.  ECF 106-20.   Moreover, Dr. Manion opined:  "I do not believe that the cardiac conduction system abnormality made any significant contribution to Mr. West's death. There is no evidence of cardiac disease, fainting or sickness due to any cardiac conduction system abnormality prior to his death."  *Id.* at 2.   Dr. Manion concluded, *id.* (emphasis added):

> The main cause of his death is the fact that he was restrained in such a way that he was unable to breathe. This mechanism of death, called positional asphyxia, can occur if a person is hog tied. *In addition, it can simply occur if the person is held down and people sit upon him in order to restrain him. In this case, Mr. West could not breathe because of being hog tied and because of being restrained*. He was unable to expand his chest in order to inflate his lungs with air. *Thus, the cause of death is positional asphyxia*. There were no drugs present in Mr. West to cause his death. In addition, he suffered no other injuries which could account for his death.

---

[41] Dr. Southall actually said "venturing outside of my realm of expertise."  Southall Dep., ECF 152-1 at 84:10-11.

[42] Dr. Manion's Curriculum Vitae (ECF 106-22) reflects that he currently holds the following positions: President and CEO, Diagnostic Pathology Consultants, PA; Designated Forensic Pathologist, Burlington and Ocean Counties, New Jersey; Chairman, Department of Pathology, Memorial Hospital of Salem County, New Jersey; Laboratory Director, Memorial Hospital of Salem County, New Jersey; and Co-Chairman, Institutional Review Board, Fox Chase Virtua Cancer Program. *Id.* at 1.

In their Reply (ECF 117), the BPD Officers refute the contention that Mr. West died from positional asphyxia. They state, *id.* at 17:

> Plaintiff's citation to Dr. Manion's Expert Report is based upon an unsupported factual contention which is not found anywhere in the record. Dr. Manion opines that Mr. West died because of a hog-tie maneuver which caused Mr. West to suffocate ... but In [sic] plaintiff's analysis, Plaintiff does not cite to anywhere in the record which supports Dr. Manion's preminse [sic] that Mr. West was hog tied. Furthermore, Dr. Southall, the medical examiner, stated that there were no signs of asphyxia or significant injury to vital structures or vital areas of the body.

There is clearly a material factual dispute regarding the cause of Mr. West's death. To be sure, the record does not support Dr. Manion's assertion that Mr. West was hog-tied. But, Dr. Manion also said that positional asphyxia can occur "if the person is held down and people sit upon him . . . ." ECF 106-20 at 2. And, according to Dr. Manion, "[k]neeling or otherwise placing weight on the subject…" increases the risk of positional asphyxia. *Id.* at 2. Notably, it is undisputed that MSU Officer David Lewis, who is a large man, placed at least one knee on Mr. West's back for about one minute, while Mr. West was face down on the ground, on his stomach.

Dr. Southall focused on the cardiac conduction abnormality and dehydration. But, she also recognized that the exertion of Mr. West during the encounter with the BPD Officers could have "played some role." ECF 97-8 and ECF 152-1, Southall Dep. at 21:6-7. Although Dr. Southall's Autopsy Report states that there were no signs of asphyxia, the jury need not credit Dr. Southall's autopsy. It may find Dr. Manion's opinion as to positional asphyxia more credible and more persuasive than Dr. Southall's opinion. Moreover, "there may be more than one proximate cause of an accident." *Karns v. Liquid Carbonic Corp.*, 275 Md. 1, 20, 338 A.2d 251, 262 (1975). The jury might conclude that the Decedent was subjected to excessive force and

that, even if the Decedent had a heart defect, he died because of an unjustified attack, in extreme heat, coupled with dehydration that may have resulted from undue exertion during the fray.

In sum, viewing the evidence in the light most favorable to the plaintiffs, a jury could determine that various BPD Officers utilized excessive force during the course of the encounter with Mr. West, by beating him with batons, including on his head, stomping on him, and using OC spray. At the summary judgment stage, I may not resolve factual disputes; credibility determinations are the sole province of the jury. At this stage of litigation, plaintiffs have sufficiently demonstrated that there is a reasonable connection between the death of Mr. West and the conduct of the BPD Officers and MSU Officer Lewis.

Accordingly, except for Officer Danielle Lewis, the BDP Officers and MSU Officer David Lewis are not entitled to summary judgment as to the wrongful death and survival claims.

## B. BPD Motion for Partial Summary Judgment

As noted, the only claim remaining against former commission Batts (in his individual capacity) and Commissioner Davis (in his official capacity) is "Claim I - Count V," the "survival action for negligent supervision, training and retention and custom or policy of deliberate indifference." ECF 33, Amended Complaint, ¶¶ 64-76. This count asserts § 1983 *Monell* and supervisory claims regarding violations of the Fourth and Fourteenth Amendments. *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).[43] In *Monell*, the Supreme Court determined that, under certain circumstances, a local government may be liable under § 1983.

The BPD Defendants have moved for summary judgment as to the following *Monell* and supervisory liability claims contained in Claim I - Count V: the Fourth Amendment claim regarding Mr. West's arrest; the Fourteenth Amendment claim regarding deliberate indifference

---

[43] MSU Chief Lance Hatcher is also named in this Count, but he did not move for summary judgment. *See* ECF 33 at 19.

to a serious medical need; and claims raised under the Fourth and Fourteenth Amendments, to the extent that plaintiffs complain that Mr. West died from positional asphyxia. *See* ECF 99; ECF 99-1. Notably, the BPD Defendants have not moved for summary judgment as to the excessive force claim. ECF 99-1 at 22, n. 7.

Plaintiffs contend that it is unfair to allow the BPD Defendants to proceed with a dispositive motion at this time. They point out that the Court "granted Defendant BPD's Motion to bifurcate and stayed discovery as to Defendant BPD, which now seeks Summary Judgment on the very matters for which this Court halted the parties from continuing discovery." ECF 103-1.

A municipality is subject to suit under § 1983. *Monell,* 436 U.S. at 690. But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski,* 661 Fed. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, 137 S. Ct. 1342 (2017). Any viable § 1983 *Monell* claim has two elements: (1) the municipality had an unconstitutional "policy or custom" and (2) the unconstitutional "policy or custom" caused a violation of the plaintiff's constitutional rights. *See, e.g., Bd. of Comm'rs of Bryan Cty., v. Brown,* 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City,* 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied,* 547 U.S. 1187 (2006); *Lytle v. Doyle,* 326 F.3d 463, 471 (4th Cir. 2003).

The *Monell* Court determined that local governmental bodies may be liable under § 1983, based on the unconstitutional actions of individual defendants, but only if those defendants were executing an official policy or custom of the local government that resulted in a violation of the plaintiff's rights. *Monell*, 436 U.S. at 690-91; *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). "Section 1983 plaintiffs seeking to impose liability on a municipality must...adequately plead and prove the existence of an official policy or custom that is fairly

attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). Bifurcation is particularly common in § 1983 cases where claims are asserted against individual defendants as well as their supervisors and municipal employers precisely because "a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee." *Young*, 238 F.3d at 579.

In other words, a "Court may not impose vicarious liability" in a § 1983 action. *Dawson v. Prince George's Cnty.*, 896 F. Supp. 537, 540 (D. Md. 1995). Rather, a plaintiff's § 1983 claims against a municipality or a supervisor must "hinge on his ability to show that [individual defendants] violated his constitutional rights." *Id.*; *see also Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 724 (4th Cir. 1991) ("A claim of inadequate training under section 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation on the part of the person being supervised."), *cert. denied*, 502 U.S. 1095 (1992); *Burgess v. Balt. Police Dep't*, RDB-15-0834, 2016 WL 1159200, at *1 (D. Md. Mar. 23, 2016) ("Under 42 U.S.C. § 1983, a municipality or employer cannot be held vicariously liable based solely on an agency relationship."); *Williamson v. Prince George's Cnty.*, DKC-10-1100, 2011 WL 1065780, at *2 (D. Md. Mar. 21, 2011) ("A municipality can only be held liable under § 1983 if the plaintiff first establishes that some county employee violated his constitutional rights."); *Marryshow v. Town of Bladensburg*, 139 F.R.D. 318, 319 (D. Md. 1991) ("Under Section 1983, to hold the [supervisor and municipal] Defendants liable, Plaintiff must first establish that at least one [individual] Defendant violated his constitutional rights.").

The BPD Defendants argue that, without a predicate constitutional violation, plaintiffs' § 1983 *Monell* and supervisory claims must fail (ECF 99-1 at 17-18), because "supervisors and

municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in a suit for damages." *Waybright v. Frederick Cty.*, 528 F.3d 199, 203 (4th Cir. 2008) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam), alteration in *Waybright*), *cert. denied*, 555 U.S. 1069 (2008). In response, plaintiffs argue: "Courts in various jurisdictions have held that municipalities may be found liable for constitutional violations under 42 U.S.C. Section 1983 even though no individual is found to be liable." ECF 103-1 at 7-8 (referencing *Gibson v. City of Chicago*, 910 F.2d 1510 (7th Cir. 1990), *Arnold v. City of New York*, 340 F. Supp. 2d 550 (M.D. Pa. 2004), *Barrett v. Orange Cty. Human Rights Comm'n*, 194 F.3d 341 (2d Cir. 1999), and *Phillips ex rel. Green v. City of New York*, 453 F. Supp. 2d 690 (S.D.N.Y. 2006)).

The case of *Gray v. Kern*, WMN-13-2270, 2016 WL 429914 (D. Md. Feb. 4, 2016), is instructive. That case arose from "the well-publicized shooting of Plaintiff Raymond Gray by Baltimore [City] Police Officer William Scott Kern during a training exercise on February 12, 2013." *Id.* at *1. Plaintiffs were represented by two of the same attorneys as in this case: A. Dwight Pettit, Esquire and Allan B Rabineau, Esquire. As in the case *sub judice*, plaintiffs in *Gray* sued individual officers and raised *Monell* and supervisory liability claims against Batts and the BPD ("Police Defendants"). Judge William Nickerson granted the Police Defendants' motion to bifurcate and stay discovery. Thereafter, the Police Defendants filed a motion for summary judgment. As in this case, the plaintiffs argued that it was "unfair" to consider the motion for summary judgment at that time. *Id.* at *3: Rejecting that argument, Judge Nickerson said, *id.*:

> The Court notes that it granted Police Defendants' Motion to Bifurcate and to Stay Discovery based on the potential for prejudice to Police Defendants inherent in trying § 1983 claims against individuals and municipalities/ supervisors jointly. ECF No. 56. Because the constitutional claims against the individual officers

charged in this action have been dismissed by the Court, the Court will consider Police Defendants' Motion for Summary Judgment as to Count X-the remaining § 1983 claim alleging supervisory liability against Commissioner Batts and of liability under <u>Monell</u> against the Baltimore Police Department.

Judge Nickerson also said, *id.* at *4:

The law of this circuit . . . is well-settled, and the binding precedent requires dismissal of § 1983 <u>Monell</u> and supervisory liability claims against municipal defendants where no underlying constitutional violation exists. <u>See</u>, <u>e.g.</u>, <u>Evans v. Chalmers</u>, 703 F.3d 636, 654 (4th Cir. 2010), <u>cert. denied</u>, 134 S. Ct. 617 (2013)("Because we hold that all plaintiffs failed to state predicate § 1983 claims against the individual officers, we must also hold that all plaintiffs have failed to state supervisory liability, <u>Monell</u> liability, and 'stigma-plus' claims."); <u>cf.</u> <u>Int'l Ground Transp. v. Mayor and City Council of Ocean City</u>, 475 F.3d 214, 219 (4th Cir. 2007) (stating a finding of no liability on the part of the individual defendants can co-exist with a finding of liability on the part of the municipality when the individual defendants successfully assert a qualified immunity defense).

To be sure, "*Monell* ... and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on [a] local government." *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985). There are some narrow circumstances in which "a finding of no liability on the part of the individual municipal actors can co-exist with a finding of liability on the part of the municipality." *Int'l Ground Transp., Inc.*, 475 F.3d at 219; *see also, e.g.*, *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 305 (7th Cir. 2010). But, in such cases, municipal liability under *Monell* is limited to situations in which "such a finding would not create an *inconsistent* verdict" as to the individual defendants. *Thomas,* 604 F.3d at 305 (emphasis in *Thomas*).

For example, "the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights," even if the conduct of "no one employee may violate" those rights. *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 310 (10th Cir. 1985); *see Speer v. City of Wynne, Arkansas*, 276 F.3d 980, 986 (8th Cir. 2002) ("[S]ituations may arise where the combined actions of multiple officials or employees may give

rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation."). But, these situations most often arise in cases where a plaintiff alleges understaffing by the municipality.

Courts have also determined that municipal liability under *Monell* is appropriate in the absence of liability for individual officers where "the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange Cnty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999). Such a theory is appropriate, for example, where there are unknown defendants. Moreover, courts have determined that municipal liability is appropriate in the absence of a finding of individual officer liability under § 1983 where the individual officers are entitled to qualified immunity. *Int'l Ground Transp., Inc.*, 475 F.3d at 219; *accord Awalt v. Marketti*, No. 11 C 6142, 2012 WL 1161500, at *12 (N.D. Ill. Apr. 9, 2012). None of these circumstances is applicable here.

I have concluded that, as to the traffic stop and the arrest, and as to any claim regarding deliberate indifference to a serious medical need, none of the individual officers violated the constitutional rights of Mr. West. "As such, there [are] no underlying constitutional violation[s] that can serve as the basis for…derivative § 1983 <u>Monell</u> or supervisory liability claim[s]…." *Gray*, 2016 WL 429914, at *4. Accordingly, as to the Fourth Amendment claim regarding the traffic stop and Mr. West's arrest, and as to the Fourteenth Amendment deliberate indifference claim, the § 1983 *Monell* and supervisory liability claims against the BPD Defendants fail as a matter as law. But, because I have concluded that the BPD Officers are not entitled to summary judgment as to the use of force claim or the claim related to the search of the passenger compartment of Mr. West's vehicle, the BPD Defendants are not entitled to summary judgment as to these claims.

As indicated, the BPD Defendants claim that they are entitled to partial summary judgment as to the Fourth and Fourteenth Amendment claims, to the extent that plaintiffs complain that Mr. West died from positional asphyxia, because they have "policies and training" that are intended to prevent positional asphyxia. ECF 99-1 at 29-33. The BPD Defendants argue that they could not have been "deliberately indifferent" as to the risk from positional asphyxia because they "took affirmative steps to prevent the very harm that Plaintiffs complain about, *i.e.*, positional asphyxia." *Id.* at 29-30.

Plaintiffs have not had the opportunity to pursue discovery as to this claim, because of the bifurcation and stay. Therefore, I shall not consider it here.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. Appx. 632, 639-40 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2015). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002) (discussing affidavit requirement of former Rule 56(f)).

To be sure, plaintiffs did not file a Rule 56(d) affidavit, explaining their need for discovery. But, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted);

*see also Putney*, 656 Fed. App'x. at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Here, plaintiffs opposed bifurcation and it is reasonable to assume that they would have pursued discovery, but for the stay. Moreover, they reference the need for discovery in the BPD Opposition. *See* ECF 103-1 at 1-2. Discovery as to this claim would likely involve multiple topics, such as the BPD's policies and training regarding positional asphyxia, the effectiveness of any such policies, and other incidents involving positional asphyxia.

In *McCray*, 741 F.3d at 483, the Fourth Circuit stated: "Summary judgment before discovery forces the non-moving party into a fencing match without a sword or mask." Moreover, a party "needs an 'adequate opportunity' to present its case and 'demonstrate a genuine issue of material fact.'" *Adams Housing, LLC v. City of Salisbury*, 672 Fed. App'x. 220, 222 (4th Cir. 2016) (per curiam) (citation omitted).

Accordingly, the BPD Partial Motion for Summary Judgment is premature as to any claim regarding positional asphyxia, because plaintiffs have not had the opportunity to pursue discovery.

## IV. Conclusion

For the reasons stated above, I shall GRANT in part and DENY in part the Motion for Summary Judgment (ECF 97) filed by the BPD Officers and joined by MSU Officer David Lewis (ECF 100). And, I shall GRANT in part and DENY in part the Partial Motion for Summary Judgment (ECF 99) filed by the BPD Defendants.

An Order follows.


Date: June 7, 2017                                    _____/s/_____
                                                      Ellen Lipton Hollander
                                                      United States District Judge